Nos. 09-3243 and 09-3275

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

*Appellee*

v.

WAYNE BRYANT and
R. MICHAEL GALLAGHER,

*Appellants*

Appeal from Judgments of Conviction
Entered in the United States District Court
for the District of New Jersey
Under Criminal No. 07-267

_____

**JOINT BRIEF OF APPELLANTS
AND JOINT APPENDIX (VOLUME I, PAGES 0001-0086)**

_____

Carl D. Poplar
1010 Kings Highway South
Building Two
Cherry Hill, NJ  08034
(856) 216-9979

Jeremy D. Frey
PEPPER HAMILTON LLP
3000 Two Logan Square
Philadelphia, PA  19103-2799
(215) 981-4445

Lisa A. Mathewson
Law Offices of Lisa A. Mathewson, LLC
123 South Broad Street, Suite 810
Philadelphia, PA  19109
(215) 399-9592

Ralph A. Jacobs
Jacobs & Singer LLC
34 Tanner Street
Haddonfield, NJ  08033
(856) 427-0330

Attorneys for Appellant
Wayne Bryant

Attorneys for Appellant
R. Michael Gallagher

# TABLE OF CONTENTS

**Page**

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ........................................................................... 1

STATEMENT OF RELATED CASES .......................................... 2

STATEMENT OF THE ISSUES PRESENTED............................................ 2

    A.    Whether <u>Skilling v. United States</u>, ___U.S. ___, 130 S.Ct. 2896 (2010), requires reversal of the honest services fraud conviction because the jury was erroneously instructed as to the contours of *quid pro quo* bribery and because the charged conduct falls outside the scope of the statute? ................................................................. 2

    B.    Whether the jury instruction on the bribery counts charged under 18 U.S.C. §666 improperly omitted the requirement that the prosecution prove that a thing of value was offered by or received by the Defendant with the intention that it be "in exchange for" official action and, instead, allowed the jury to convict merely upon the showing that there was intent to influence official action that temporally overlapped the payment of value without any showing of an intended exchange?...................................... 2

    C.    Whether there was sufficient evidence to support the convictions?................................................................................ 3

    D.    Whether the lower court's order of restitution requiring the defendants jointly to repay Defendant Bryant's salary from the medical school was erroneous? ................................... 4

    E.    Whether the prosecution improperly interfered with Defendants' due process rights and violated F.R.Cr.P 6(e) by interfering with the defense's access to witnesses?.............. 4

    F.    Whether Mr. Bryant is entitled to a new trial as the pension fraud counts or to judgment of acquittal, because the trial court permitted a lay witness to testify about the law, the conviction violates the doctrine of mail fraud convergence, and the evidence did not show material falsity or intent to defraud? ......................................................... 4

STATEMENT OF THE CASE ...................................................... 5

**Page**

STATEMENT OF THE FACTS .................................................................. 9

    A.    UMDNJ's School of Osteopathic Medicine. ............................ 9

    B.    The Defendants. ........................................................................ 9

    C.    The Medical School Hires Wayne Bryant. ............................. 10

    D.    Mr. Bryant's Role In Funding For SOM. ............................... 14

    E.    Dr. Gallagher's Dealings With Mr. Bryant. ........................... 15

SUMMARY OF THE ARGUMENT .......................................................... 18

ARGUMENT ............................................................................................ 22

I.    <u>SKILLING</u> REQUIRES THAT THE HONEST SERVICES
    FRAUD CONVICTIONS OF DEFENDANTS BE REVERSED ..... 22

    A.    The Core Concept of Quid Pro Quo Bribery Requires
        The Intent to Alter an Official Action. ..................................... 28

    B.    The "Stream Of Benefits" Instruction Given In This Case
        Does Not Comport With A Post-<u>Skilling</u> Definition Of
        Bribery. ...................................................................................... 36

    C.    The "Dual Purpose" Test Imported From The Healthcare
        Fraud Context Does Not Survive <u>Skilling</u>. ............................... 37

    D.    The Reallocation of Public Funds Among Public
        Agencies Is Not Subject to Prosecution as an Honest
        Services Fraud Bribery. ............................................................. 41

II.    THE JURY CHARGE ON THE §666 COUNTS WAS
    DEFECTIVE FOR FAILURE TO INCLUDE AS AN
    ELEMENT OF THE OFFENSE THE REQUIREMENT THAT
    DEFENDANT INTENDED THAT THE THING OF VALUE
    BE GIVEN "IN EXCHANGE FOR" AN OFFICIAL ACT. ............. 44

III.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE
    GUILTY VERDICTS AGAINST MR. BRYANT AND DR.
    GALLAGHER ON *QUID PRO QUO* BRIBERY. ............................ 55

    A.    The Evidence Was Insufficient As To Mr. Bryant ................. 56

    B.    The Government Failed To Prove That Mr. Bryant Took
        Any Official Action In Exchange For His Salary, Rather
        Than To Serve His Constituents. ............................................. 59

        1.    The $2.325 Million Dollar Carve-Out From
            UMDNJ's Budget for SOM. ........................................ 59

2. The $400,000 Dollars In State Funds For SOM Through The Cancer Institute Of New Jersey ............... 61

3. The $200,000 For SOM's Institute for Successful Aging ......................................................... 64

4. The $800,000 For New Jersey CARES ...................... 67

5. The $1.5 Million In Contracts For Services, For New Jersey CARES ...................................... 68

C. The Government Offered No Evidence About the Value of the Legitimate Work that Mr. Bryant Performed, Leaving Its Key Inference Unsupported. .......... 71

D. The Evidence Was Insufficient As To Dr. Gallagher. ............. 75

IV. THE GOVERNMENT'S INTERFERENCE WITH THE DEFENSE'S ACCESS TO WITNESSES VIOLATED DUE PROCESS. ........................................................................ 79

A. The Government's Conduct .................................................... 80

B. The Government's Actions Violated Due Process .................. 81

C. The Defense Adequately Demonstrated Prejudice, Or Should Have Been Given A Hearing At Which To Do So. ............................................................................ 89

D. Reversal is Required Without Regard to Prejudice. ................ 96

V. THE RESTITUTION ORDER REQUIRING DEFENDANTS TO REPAY THE FULL AMOUNT OF BRYANT'S MEDICAL SCHOOL SALARY MUST BE REVERSED BECAUSE THE MEDICAL SCHOOL WAS AWARE OF BRYANT'S EMPLOYMENT, APPROVED OF IT, AND IS ALLEGED TO HAVE BENEFITED FINANCIALLY FROM IT, NOT SUFFERED ANY PECUNIARY LOSS ............................ 97

A. The Medical School Was Not a Victim, So Repayment of Bryant's Salary Cannot be Ordered as Restitution. ................... 98

B. The Government Did Not Meet Its Burden of Proving the Amount of Any Pecuniary Loss ............................................ 102

VI. JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE A NEW TRIAL, IS REQUIRED ON THE PENSION FRAUD COUNTS. ......................................................................... 104

A.  The District Court Erred In Admitting The Testimony Of The Government's Pension Witness On The Meaning Of A Key, Disputed, Provision Of State Law. ........................... 106

    1.  Mr. Frederick Beaver Improperly Testified About Legal Issues. ............................................................... 106

    2.  The Limiting Instruction Was Insufficient to Cure the Prejudice. ............................................................... 110

B.  The Convictions Violate the Doctrine of Mail Fraud Convergence, because Mr. Bryant Made No False Statements to the Alleged Victim. ......................................... 114

C.  The Evidence was Insufficient to Support the Guilty Verdicts on the Pension Fraud Counts. .................................. 116

    1.  The Government Failed to Prove that Mr. Bryant's Claim of Benefits Was False and Fraudulent. ............. 116

    2.  The Government Failed to Prove That Mr. Bryant Acted With Intent to Defraud. .................................... 117

CONCLUSION ........................................................................... 119

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alexander v. Ohio State University College of Social Work*, 697 F. Supp.2d 831 (S.D.Ohio 2010) ............................................................ 51

*Bailey v. United States*, 516 U.S. 137 116 S.Ct. 501 (1995) .................................... 49

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ...................... 108

*Black v. United States*, 130 S. Ct. 2963 (2010) ......................................................... 25

*Boyd v. United Transp. Union Ins. Ass'n*, 2006 WL 2350175 (W.D.Wash. 2006) ................................................................................ 50

*Callahan v. United States*, 371 F.2d 658 (9th Cir. 1967) ........................................ 81

*Clark County School Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ................................................................ 50

*Government of Virgin Islands v. Brown*, 685 F.2d 834 (3d Cir. 1982) ................... 52

*Government of Virgin Islands v. Carmona*, 422 F.2d 95 (3d Cir. 1970) ............... 52

*In re Grand Jury Proceedings (Appeal of Diamante)*, 814 F.2d 61 (1st Cir. 1987) ................................................................................ 82, 85, 86, 88, 94

*In re Grand Jury Subpoena Duces Tecum*, 797 F.2d 676 (8th Cir. 1986) ................................................................................................ 82

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) ........................................ 84

*Kines v. Butterworth*, 669 F.2d 6 (1st Cir. 1981) ....................... 79, 80, 83, 89, 90, 91

*Mazur v. Merck & Co.*, 964 F.2d 1348 (3d Cir. 1992) ............................................ 91

*McNally v. United States*, 483 U.S. 350 (1987) .................................. 23, 24, 26, 114

*Newmark v. United States*, No. 10-123 (U.S. petition filed July 19, 2010) ................................................................................................ 115

*Reyes v. Wyeth Labs*, 498 F.2d 1264 (5th Cir. 1974) ................................................ 91

**PAGE(S)**

*Skilling v. United States*
___ U.S. ___, 130 S. Ct. 2896 (2010) ................................22, 23, 24, 25, 26, 28, 29, 30, 35, 36, 37, 40, 43, 56, 57, 59

*Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)............................................................................................49

*State v. Williams*, 485 S.E.2d 99 (S.C. 1997) ....................................92, 93

*United States v. Akande*, 200 F.3d 136 (3d Cir. 1999) ...........................99

*United States v. Bailey*, 123 F.3d 1381 (11th Cir. 1997)......................114

*United States v. Baumann*, 684 F. Supp. 2d 1140 (D.S.D. 2009) ..........48

*United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990) ............................41

*United States v. Bittner*, 728 F.2d 1038 (8th Cir. 1984).........................85

*United States v. Boffa*, 688 F.2d 919 (3d Cir. 1982) ..............................27

*United States v. Bradford*, 129 F.2d 274 (5th Cir. 1942) .......................27

*United States v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974) .......................31

*United States v. Brown*, 359 U.S. 41 (1959).........................................83

*United States v. Brown*, 459 F.3d 509 (5th Cir. 2006) ....................78, 101

*United States v. Brown*, 540 F.2d 364 (8th Cir. 1976) ...........................27

*United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997) .........................26

*United States v. Bruno*, 809 F.2d 1097 (5th Cir. 1987)..........................26

*United States v. Bryant*
2009 U.S. Dist. LEXIS 44648 (D.N.J. 2009) ....................8, 10, 11, 13

*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008)..............8, 35

*United States v. Camiel*, 689 F.2d 31 (3d Cir. 1982) ...........................116

*United States v. Campbell*, 684 F.2d 141 (D.C. Cir. 1982)....................31

**PAGE(S)**

*United States v. Carbo*, 572 F.3d 112 (3d Cir. 2009)...............................................37

*United States v. Carrigan*, 804 F.2d 599 (10th Cir. 1986)...............................84, 95

*United States v. Chalupnik*, 514 F.3d 748 (8th Cir. 2008) ...............................98, 99

*United States v. Cicco*, 938 F.2d 441 (3d Cir. 1991)...............................................47

*United States v. Coyne*, 4 F.3d 100 (2d Cir. 1993)...................................................41

*United States v. Dent*, 149 F.3d 180 (3d Cir. 1998) ................................................55

*United States v. Duvall*, 846 F.2d 966 (5th Cir. 1988) ...........................................31

*United States v. Evans*, 844 F.2d 36 (2d Cir. 1988) .............................................114

*United States v. Fineman*, 434 F. Supp. 189 (1977)................................................27

*United States v. Flemming*, 2007 WL 1451126 (3d Cir. May 17, 2007) ..........29, 34

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006)................................................52

*United States v. Frankel*, 721 F.2d 917 (3d Cir. 1983) .........................................115

*United States v. Galloway*, 509 F.3d 1246 (10th Cir. 2007) ...........................99, 104

*United States v. Guthrie*, 64 F.3d 1510 (10th Cir. 1995) .....................................103

*United States v. Harvey*, 532 F.3d 326 (4th Cir. 2008) ...................................99, 103

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998)...................................3, 52

*United States v. Johnson*, 621 F.2d 1073 (10th Cir. 1980) ....................................32

*United States v. Keane*, 678 F. Supp. 708 (N.D. Ill. 1987), aff'd, 852
    F.2d 199 (7th Cir. 1988) ....................................................................................116

*United States v. Kemp*
    500 F.3d 257 (3d Cir. 2007) ...............................30, 32, 33, 34, 35, 36, 37, 48, 51

*United States v. Leahy*, 445 F.3d 634 (3d Cir. 2006) .......................................57, 75

*United States v. Lee*, 573 F.3d 155 (3d Cir. 2009) ........................................110, 113

*United States v. Leo*, 941 F.2d 181 (3d Cir. 1991) ...............................................108

**PAGE(S)**

*United States v. Lew*, 875 F.2d 219 (9th Cir. 1989) ...............................114

*United States v. Long*, 449 F.2d 288 (8th Cir. 1971)..............................81

*United States v. Lovett*, 811 F.2d 979 (7th Cir. 1987)............................27

*United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1979).........................27

*United States v. Mariano*, 983 F.2d 1150 (1st Cir. 1993) .......................51

*United States v. Martin*, 507 F.2d 428 (7th Cir. 1974)...........................52

*United States v. Matlock*, 491 F.2d 504 (6th Cir. 1974)..........................81

*United States v. McNieve*, 536 F.2d 1245 (8th Cir. 1976)........................27

*United States v. Miller*, 527 F.3d 54 (3d Cir. 2008)................................55

*United States v. Monostra*, 125 F.3d 183 (3d Cir. 1997) .......................105

*United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976)..........................96

*United States v. Newmark*, 2010 WL 850200 (3d Cir. 2010).................114, 115

*United States v. Olatunji*, 872 F.2d 1161 (3d Cir. 1989)................114, 115

*United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002) (Becker, J.) .............24, 29

*United States v. Pawlinski*, 374 F.3d 536 (7th Cir. 2004) .....................102

*United States v. Pecora*, 693 F. 2d 421 (5th Cir. 1982) ..........................27

*United States v. Previte*, 648 F.2d 73 (1st Cir. 1981)..............................32

*United States v. Price*, 788 F.2d 234 (4th Cir. 1986) .............................27

*United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978)..........................27

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .............................103

*United States v. Rowe*, 988 F.2d 125 (9th Cir. 1993)..............................104

*United States v. Rudolph*, 137 F.3d 173 (3d Cir. 1998) .........................101

*United States v. Runnels*, 833 F.2d 1183 (6th Cir. 1987).........................26

<b>PAGE(S)</b>

*United States v. Russell*, 134 F.3d 171 (3d Cir. 1998) ............................................52

*United States v. Ruuska*, 883 F.2d 262 (3d Cir. 1989) ...........................................55

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc).........................24

*United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998) ..................................103

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) .......................................37, 40

*United States v. Schmitz,* (N.D. Ala., Cr. No. 08-014) ........................................100

*United States v. Shelton*, 848 F.2d 1485 (10th Cir. 1988) (*en banc*) ...................114

*United States v. Shushan*, 117 F.2d 110 (5th Cir. 1941) ........................................28

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ..............................................94

*United States v. Strand*, 574 F.2d 993 (9th Cir. 1978) ..........................................31

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999).........................32, 48

*United States v. Terzado-Madruga*, 897 F.2d 1099 (7th Cir. 1987) ......................96

*United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008).........................................42

*United States v. Urciuoli*, ___ F.3d ___, 2010 WL 2814311 (1st Cir.
   July 20, 2010) ("Urciuoli II")...................................................................28, 29

*United States v. Wexler*, 838 F.2d 88 (3d Cir. 1988).............................................55

*United States v. Williams*, 458 U.S. 279 (1982) ...........................................115, 117

*United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998)..................................40, 41

*Weyhrauch v. United States*, 130 S. Ct. 2971 (2010) .............................................25

**STATUTES**

*12 U.S.C. §§ 3409, 3412(I)*.....................................................................................81

*18 U.S.C. Section 201* ...................................................................30, 32, 34, 35, 48

*18 U.S.C. Section 201(a)* .........................................................................................40

**PAGE(S)**

*18 U.S.C. §666* ............................................................................passim

*18 U.S.C. Section 666(a)(1)(A)* ...................................................... 6

*18 U.S.C. §924(c)* .......................................................................... 49

*18 U.S.C. Section 1341* ........................................................... 6, 7, 23

*18 U.S.C. Section 1341, 1343 and 1346* ........................................ 6

*18 U.S.C. Section 1343* ................................................................. 23

*18 U.S.C. § 1346* ........................................................................passim

*18 U.S.C. § 1503 (1982)* ............................................................... 86

*18 U.S.C. Section 1510* ................................................................. 82

*18 U.S.C. § 3231* ............................................................................. 1

*18 U.S.C. § 3663A* ........................................................................ 98

*18 U.S.C. §3663A(a)(2)* ................................................................ 98

*18 U.S.C. §3663A(c)(1)(B)* ............................................................ 99

*28 U.S.C. § 1291* ............................................................................. 1

*42 U.S.C. § 1395nn(b)(2)(1977 amendments)* ............................ 39

*Mass. Gen. Laws ch. 268A, § 3* ..................................................... 40

*N.J.S.A. 43:1-3* ........................................................................ 105, 117

*N.J.S.A. § 17:2-2.2* .................................................................. 115, 119

*N.J.S.A. § 19:3-5* ........................................................................... 57

*N.J. Stat. Ann. §§ 43:1-1 et seq.* ................................................. 105

**OTHER AUTHORITIES**

American Heritage College Dictionary ............................................ 34

F.R.Cr.P 6(e) ......................................................................... 4, 6, 94

**PAGE(S)**

F.R.Crim.P. 29 ....................................................................................... 3

Federal Rule of Criminal Procedure 6(e)(2) .......................................... 81, 85, 86, 94

Federal Rule of Criminal Procedure 6(e)(2)(A) ..................................... 79

Federal Rules of Criminal Procedure 29 and 33 .................................... 8

<u>Legislator Drawn Into Scandal at UMDNJ – U.S. Attorney Looks at
<u>Bryant's Job</u>, Newark Star Ledger, April 7, 2006 ............................. 87

New Jersey Rules of Professional Conduct Rule 3.4(f) ......................... 83

Webster's Third New International Dictionary (1966) ........................... 39

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is a consolidated appeal by two defendants from their criminal convictions.  This Court has jurisdiction under 28 U.S.C. § 1291, as an appeal from a final decision of a district court.  The Appellants, Wayne Bryant and R. Michael Gallagher, were charged in an Indictment in the District of New Jersey, Cr. No. 07-267 (FLW) [JA II 0120].[1]  The District Court had original jurisdiction pursuant to 18 U.S.C. § 3231.

Defendants were convicted after a trial before Hon. Freda L. Wolfson and a jury.  Defendants were sentenced on July 24, 2009. [JA II 0113]  Timely notices of appeal were filed by Appellant Bryant on July 31, 2009 [JA I 0001] and by Appellant Gallagher on August 3, 2009 [JA I 0002].

---

[1] All references to "JA" are to the Appellants' Joint Appendices. Roman numerals following cites to JA refer to the Appendix Volume.

## STATEMENT OF RELATED CASES

This case has not previously been before this Court and, to counsel's knowledge, there are no related proceedings pending or about to be presented to this Court or any other court or agency.

## STATEMENT OF THE ISSUES PRESENTED

A.    Whether Skilling v. United States, ___U.S. ___, 130 S.Ct. 2896 (2010), requires reversal of the honest services fraud conviction because the jury was erroneously instructed as to the contours of *quid pro quo* bribery and because the charged conduct falls outside the scope of the statute?

### Preservation of the Issue for Review

In its pretrial motions, the defense challenged the overbroad application of the honest services fraud statute to the charges in this case. [JA II 0093, et seq.]    In its ruling on the pretrial motions, the lower court narrowed the scope of the prosecution's honest services theory but did not dismiss the charges. [JA I 0016, et seq.]  The defendants further challenged the application of the honest services fraud statute to the circumstances of this case in their motions for judgment of acquittal  [JA II 0110, DDE #165-66], which were denied [JA II 0112, DDE #179] and in certain requests for jury instructions, [JA XXIII 5366 et seq.] which were denied.  [JA XXIII 5393 et seq.].

B.    Whether the jury instruction on the bribery counts charged under 18 U.S.C. §666 improperly omitted the requirement that the prosecution prove that a thing of value was offered by or

received by the Defendant with the intention that it be "in exchange for" official action and, instead, allowed the jury to convict merely upon the showing that there was intent to influence official action that temporally overlapped the payment of value without any showing of an intended exchange?

<u>Preservation of the Issue for Review</u>

The proposed jury charge submitted by the defense included the "exchange" requirement. [JA XXIII 5372, 5376] The defense objected to the trial court's failure to give its requested jury charge on §666. [JA XVIII 4318] Even if the issue had not been preserved, a jury charge on §666 which fails to convey the basics of the quid pro quo concept constitutes plain error. <u>United States v. Jennings</u>, 160 F.3d 1006, 1021-22 (4th Cir. 1998).

C.     Whether there was sufficient evidence to support the convictions?

<u>Preservation of the Issue for Review</u>

The defendants moved for judgments of acquittal pursuant to F.R.Crim.P. 29 at the end of the prosecution's case [JA XVI 3522 et seq] and renewed the motion at the close of all of the evidence. [JA XVIII 4292-93] The trial court denied the motions for judgment of acquittal. [JA XXIII 5471 et seq.]

D.    Whether the lower court's order of restitution requiring the defendants jointly to repay Defendant Bryant's salary from the medical school was erroneous?

<u>Preservation of the Issue for Review</u>

In responding to the draft Presentence Reports, the defendants both objected to payment of restitution to the medical school,  [Gallagher PSR at 43] and repeated the objections at the sentencing hearing.  [JA XXII 5204-05]  The trial court rejected the defense arguments at the sentencing hearing and ordered full restitution of the amount of Mr. Bryant's salary.  [JA I 0004-0010]

E.    Whether the prosecution improperly interfered with Defendants' due process rights and violated F.R.Cr.P 6(e) by interfering with the defense's access to witnesses?

<u>Preservation of the Issue for Review</u>

The defense moved to dismiss the indictment pre-trial because of the due process violation. [JA II 0093].  The lower court declined to grant the relief that the defendants requested.  [JA III 0357, et seq.]

F.    Whether Mr. Bryant is entitled to a new trial as the pension fraud counts or to judgment of acquittal, because the trial court permitted a lay witness to testify about the law, the conviction violates the doctrine of mail fraud convergence, and the evidence did not show material falsity or intent to defraud?

<u>Preservation of the Issue for Review</u>

The defense objected to the lay witness' testimony repeatedly, before, during, and after the testimony.  [E.g., JA XV 3209-47 (oral argument on

admissibility of proposed testimony, 2:13-40-24); see also JA XV 3372-73, 3374-75 (contemporaneous objections and sidebars during testimony, 62:20-63:14, 64:17-65:9)]  Defense counsel preserved their objections to the court's limiting instruction as well.  [JA VXIII 4292 (comments of counsel and court, 8:9-20)]

Mr. Bryant raised the mail fraud convergence issue in his pretrial motions [JA 0275-0276, oral argument of counsel, 121:19-122:14].  Mr. Bryant also moved at the close of the government's case, and post-trial, for judgment of acquittal on the theory that, inter alia, the government had failed to prove the elements of mail fraud in connection with the pension counts. The trial court denied that motion.  [JA XVI 3614 (oral motion at close of government's case, 95:20-96:21); JA XXIII 5471 (Order denying Rule 29 and 33 motions)]

## STATEMENT OF THE CASE

Introduction.  This case arises out of the part-time employment of Wayne R. Bryant, then a New Jersey State Senator, by the University of Medicine and Dentistry of New Jersey (UMDNJ), School of Osteopathic Medicine (SOM), a New Jersey state-chartered and state-funded university. The indictment [JA II 0120] charged that the otherwise lawful hiring of the state legislator for a part time position at the state medical school violated

the federal honest services mail fraud statute (Counts 1 to 6) and constituted

bribery (Counts 7 and 8) because the dean of the medical school, Dr. R.

Michael Gallagher, expected that hiring Mr. Bryant would assist the medical

school in obtaining state funding. Mr. Bryant alone was also charged with

defrauding the New Jersey Division of Pensions and Benefits by applying

for pension benefits based on his income from two sources: his SOM

income, and income he received as counsel for the Gloucester County Board

of Social Services (GCBSS).[2] (Counts 9 to 13). [Id.]

**The Indictment**. On March 29, 2007, Bryant and Gallagher were

indicted by a federal grand jury in Trenton, New Jersey. [Id.] In the form of

the indictment ultimately submitted to the jury, Counts 1-6 alleged that

Bryant, a New Jersey State Senator, and Gallagher, the Dean of the medical

school, engaged in a scheme to defraud the citizens of New Jersey of

Bryant's honest services as a state senator, in violation of 18 U.S.C. §§1341,

1343 and 1346. Count 7 charged Bryant, and Count 8 charged Gallagher,

with bribery in violation of 18 U.S.C. §666(a)(1)(A). Counts 9-13 charged

Bryant alone with mail fraud in violation of 18 U.S.C. §1341 in connection

---

[2]    The indictment also charged that Mr. Bryant committed pension fraud by claiming income that he earned from Rutgers University Law School, but the district court dismissed those allegations pretrial.

with an alleged scheme to defraud the New Jersey Division of Pensions and

Benefits of money and property in connection with his employment at

GCBSS and UMDNJ.[3]

**Pretrial Motions**.  The defense filed extensive pretrial motions, on

which the district court heard argument on March 11, 2008.  [JA II 0093, et

seq.]  Among other issues, the defense raised challenges to the application of

the honest services fraud statute to the conduct at issue, arguing among other

things that state law did not prohibit the widespread practice of New Jersey

state legislators holding other public sector jobs, and that federalism

concerns precluded federal prosecutors from criminalizing this practice. [Id.]

The defense also challenged the prosecution's efforts to preclude defense

access to witnesses by means of improper warnings and implicit threats in

the course of obtaining grand jury testimony from the witnesses.  [Id. at

0093]  The trial court granted the motions in part, effectively narrowing to a

*quid pro quo* bribery theory the scope of the indictment as it related to SOM,

---

[3]    Based on pretrial and trial rulings of the Court, certain portions
and counts of the original indictment were severed or redacted.  The version
of the indictment included in the Appendix [JA II 0120] is the one provided
to the jury at trial, and not the one originally returned by the grand jury.
Some counts against Gallagher charged in the original indictment were
ultimately dismissed by government with prejudice after Gallagher's trial
and sentence.

and narrowing the pension fraud counts to GCBSS and SOM.  <u>United States</u> <u>v. Bryant</u>, 556 F. Supp. 2d 378 (D.N.J. 2008) [JA I 0016, et seq.]  The court also criticized the government's tactics to limit defense access to witnesses and ordered the government to send a remedial letter to witnesses subpoenaed before the grand jury, but refused to grant other relief.  [JA III 0357, et seq.; JA XXIII 5473]

**Trial**.  The trial of this case commenced with jury selection on September 8, 2008, and concluded on November 18, 2008 with jury verdicts of guilty on all counts as to Bryant.  Gallagher was convicted on all counts against him, except Count 4 of the indictment, on which he was acquitted. [JA II 0102, 0109]

**Sentencing**.  After the trial court's denial of the defense's post-trial motions under Federal Rules of Criminal Procedure 29 and 33, <u>United States</u> <u>v. Bryant</u>, 2009 U.S. Dist. LEXIS 44648 (D.N.J. 2009), the defendants were sentenced on July 24, 2009.  Bryant was sentenced to 48 months imprisonment and fined $25,000.  [JA I 0113]  Gallagher was sentenced to 18 months imprisonment and fined $15,000. [JA I 0113]  As restitution, the defendants were ordered jointly to reimburse the medical school $113,167, representing the entire amount of Bryant's salary. [JA I 0113]  The

defendants filed timely Notices of Appeal on July 30, 2009 and August 3, 2009.  [JA I 0001-0002]

## STATEMENT OF THE FACTS

A.     UMDNJ's School of Osteopathic Medicine.

The University of Medicine and Dentistry of New Jersey (UMDNJ) is New Jersey's public medical educational institution.  It is comprised of eight schools scattered throughout the state including the School of Osteopathic Medicine (SOM), located in Stratford, Camden County, New Jersey.  [JA IV 0558-60; 0659]  UMDNJ receives funding from state legislative appropriations each year, some of which is designated by the legislature for particular UMDNJ schools or programs.  [JA IV 0581-82]  Central to the mission of SOM is the training of primary care physicians for underserved communities of southern New Jersey and the recruiting of minority medical students who had historically been underrepresented in medical education in New Jersey and nationwide.  [JA IV 0683]

B.     The Defendants.

Defendant Wayne Bryant was a New Jersey State Senator representing a South Jersey district that included SOM.  Mr. Bryant was the chair of the Senate Budget and Appropriations Committee.  [JA IV 0573] Like many New Jersey state legislators, Mr. Bryant had other outside employment with public entities, including his position at SOM and a

position as counsel for the Gloucester County Board of Social Services (GCBSS).

Defendant R. Michael Gallagher was the Dean of SOM during the time period at issue. Dr. Gallagher was a highly regarded medical educator who had been a medical educator and clinical practitioner at SOM for many years, in positions of increasing responsibility. [JA IV 0713, et seq.] As dean, he worked effectively to increase minority enrollment at SOM and to further SOM's public mission of producing physicians for under-served area of the state. [JA IV 0683; 0724, et seq.] Dr. Gallagher was also a specialist in the treatment of headaches who continued to spend at least one day a week at his clinical practice while serving as Dean. [JA VII 1476]

C.    The Medical School Hires Wayne Bryant.

The government's evidence showed that in 2002, Mr. Bryant asked Dr. Stuart Cook, President of UMDNJ, about the possibility of a part-time job at UMDNJ. [JA IV 0669-76] Cook did not have a position available for Bryant and, instead, referred the question of Bryant's possible employment with UMDNJ to George Hampton, UMNDJ's Vice President of Urban and Community Development. [Id. at 0679; 0725-27] Dr. Cook was willing to authorize the hiring of Bryant for a job with UMDNJ so long as the job was

legal and legitimate and Bryant was the most qualified person for it.  [Id. at 0679-80]

The matter of Mr. Bryant's hiring was discussed with "all top level management" at UMNDJ, including the UMDNJ legal department.  [JA XVII 4001-06; JA IX 2045-50]  It was also evidently discussed by the University Trustees.  [JA IV 0727]  As part of his effort to find a position for Bryant within UMDNJ, Hampton scheduled a meeting between Mr. Bryant and Dr. Gallagher at SOM for November 21, 2002.  During this time, Dr. Cook or Dr. Lawrence Feldman, UMDNJ's second-in-command to the President, contacted general counsel for the University, Vivian Sanks-King, to inquire about the legality of hiring a state senator at UMDNJ.  [JA IV 0728l JA XVI 3739-40; JA IX 2033-35; 2050]  UMDNJ's legal counsel was aware that another sitting legislator worked at UMDNJ.  [JA IX 2049-50]  After considering the matter, Sanks-King advised Dr. Feldman that there was no legal impediment to hiring a state senator in New Jersey, and simply directed that it was "ok."  Id.  UMDNJ's legal position was relayed to Dr. Gallagher by Dr. Feldman without legal qualification or limitation.  [JA XVI 3741]

Dr. Gallagher met with Hampton and Mr. Bryant and agreed to find a position for him.  [JA XVI 3997]  Dr. Gallagher believed that hiring Mr.

Bryant was a good idea that would help SOM, and shared those views with SOM's top management. There was general agreement that hiring Mr. Bryant was a good idea, and no objection from anyone consulted. [JA XVII 3999 - 4005] When one of SOM's key managers, Robert Prodoehl, Director of Operations, asked Dr. Gallagher whether hiring Bryant was a conflict of interest, Dr. Gallagher responded that it had been approved by the legal department. [JA V 1028; JA VII 1414] John Crosbie, SOM's Director of Strategic Program Development also spoke to Dr. Gallagher about hiring Wayne Bryant, and Dr. Gallagher advised the job was cleared with legal. [JA IX 1876]. Other UMDNJ employees were aware that other state legislators had public sector jobs, including one who was a UMDNJ employee. [JA IX 2035] No one at UMDNJ communicated to Dr. Gallagher any concern that the employment of Mr. Bryant could be considered a bribe, not Prodoehl [JA VII 1414], Crosbie [JA X 1876], Hampton [JA XVII 3997-4005], Maryanne Master (UMDNJ's Vice President of Human Resources) [JA XVI 3889], Dr. Robert Saporito, UMDNJ Senior Vice President [JA XVII 3838, 3878], Dr. Feldman [JA XVI 3889], Dr. Cook [JA IV 0728], those attending the UMDNJ monthly senior management meetings [JA XVII 4004-06], those attending the SOM

management committee meetings [JA IX 1813], the UMDNJ Board of

Trustees  [JA IV 1727], or UMDNJ's legal counsel [JA IX 2033-35].

The hiring of Bryant was also not a secret at UMDNJ or in New

Jersey, as his hiring at SOM was widely reported in the newspapers and

publicized throughout UMDNJ.  [JA VI 1250-51; JA XVI 3812; JA XVII

4016-17]  Although some of the newspaper publicity was critical of the

hiring of a legislator by a public entity, no one within UMDNJ or any other

branch of state government took any step to challenge Mr.  Bryant's hiring

or to limit his actions with respect to SOM.  [Id.]

Bryant's one day a week position at SOM was a loosely described

"community relations" job.  [JA XX 4769, et seq.]  While SOM did go

through a formal interview and hiring process before awarding the position

to Bryant, there was general consensus that the job was Bryant's from the

start.  The SOM managers who worked most closely with Bryant understood

the job to be one day per week with the work to be done one-half day per

week on campus and "other as needed." [JA V 1048; VIII 1632, 1880]

Bryant was notified of his hiring by letter from UMDNJ dated March 11,

2003.  [JA VIII 1528]  His first meeting with Gallagher and Crosbie for the

new job was held on March 25, 2003.  [JA VIII 1876, et seq.]

D.    Mr. Bryant's Role In Funding For SOM.

During the years that he was employed at SOM (and the years prior),

Mr. Bryant in his position as a legislator had a role in the formulation of the

state budget, including appropriations to UMDNJ, with carve-outs for

various schools and programs within the UMDNJ system.  The government

alleged that Mr. Bryant's involvement in the following funding issues

affecting SOM were official actions taken in exchange for his salary:

- a $2.325 million carve-out from UMDNJ's budget, aimed at achieving per-student funding parity for SOM with other UMDNJ schools;

- the restoration of $800,000 in funding for New Jersey CARES, SOM's "Center of Excellence" for the diagnosis and treatment of child abuse;

- the award of $1.5 million in contracts for services to New Jersey CARES;

- SOM's efforts to share in the funding allocated for a cancer treatment facility in South Jersey; and

- A grant of $200,000 to the Institute for Successful Aging, another SOM "Center of Excellence."

Additional facts related to each of these alleged official actions are

developed below, section III.A (challenging the sufficiency of the evidence).

The evidence also showed, however, and is also detailed below, that Mr.

Bryant performed work for SOM that the government did not allege was

wrongful; for example, assisting SOM with marketing and community outreach.

E.    Dr. Gallagher's Dealings With Mr. Bryant.

During the time that Mr. Bryant was an employee of SOM, Dr. Gallagher viewed him has a knowledgeable and well-connected resource. Bryant's work for SOM was directly supervised by John Crosbie, SOM's Director of Strategic Program Development [JA IX 1822-23].  Bryant also met periodically with Dr. Gallagher, although Dr. Gallagher was not generally present in the SOM administrative office complex on Tuesdays, Bryant's regular work day, because that was the day a week that Gallagher worked in his headache clinic.  [Id; JA VII 1476]  But Dr. Gallagher spoke with Mr. Bryant from time to time about SOM's overall financial situation within UMDNJ and about various excellent SOM programs and their financial needs.  Also from time to time, Mr. Bryant informed Dr. Gallagher of financial measures taken or contemplated by the legislature which might impact SOM and UMDNJ.

Dr. Gallagher appreciated any assistance that Mr. Bryant was able to provide to SOM, and was pleased that SOM eventually received a fairer share of UMDNJ's appropriation, something that even the UMDNJ president, Cook, acknowledged was the right thing to do.  [JA IV 710-11]

Mr. Bryant's support for SOM consisted of aid for the school generally and support for specific programs run by other physicians. Dr. Gallagher's headache clinic did not receive any particular support from Mr. Bryant, and Dr. Gallagher did not receive any direct benefit from any of Mr. Bryant's efforts. Dr. Gallagher's performance evaluation was not based on the amount of state funding that was obtained for SOM, and Gallagher's yearly merit increases and bonuses (as a percentage of base salary) were essentially the same as those given the Deans of the other seven schools that comprise UMDNJ. [JA XVII 3868 et seq.].

Mr. Bryant's Pension. As a public employee, Mr. Bryant participated in the New Jersey Public Employee Retirement System ("PERS"); that is, he earned a pension for his public employment. Among his public sector jobs were, of course, his job with SOM, with which he was employed from March 2003 to February 2006; and a job as part-time counsel to the Gloucester County Board of Social Services ("GCBSS"), which he began in 1996 and continued through 2006.

The government alleged that Mr. Bryant's claim of pension benefits for the SOM job was a federal mail fraud, because the SOM job was actually a bribe. As to GCBSS, the allegations were different. The government contended that Mr. Bryant committed fraud by applying for pension benefits

-16-

based on work that he did not personally perform.  Associates from Mr.

Bryant's law firm covered court appearances and interacted with GCBSS on

his behalf.  GCBSS staff were aware that Mr. Bryant and other GCBSS

lawyers engaged in this practice, yet nonetheless certified Mr. Bryant's

employment to the Division of Pensions and Benefits.  There was evidence

that Mr. Bryant signed time sheets to GCBSS identifying "the hours I have

worked . . . and the other compensable hours I have used."  The testimony

showed that the time sheets did not affect the employer's decision to certify

Mr. Bryant's pension eligibility.

# SUMMARY OF THE ARGUMENT

A.    The Supreme Court's recent decision in Skilling v. United States, ___ U.S. ___, 130 S. Ct. 2896 (2010), strictly limited the boundaries of honest services fraud and requires the reversal of the honest services fraud convictions in this case.  Skilling confined §1346 to its "solid core" of bribes or kickbacks. As pre-McNally case law demonstrates, the core of bribery is limited to a specific *quid pro quo* exchange of a thing of value for an official act.  That requirement rendered the trial court's instructions erroneous in three respects:  one, the instructions permitted conviction absent the intent to alter official action; two, the "stream of benefits" instruction does not comport with Skilling; and three, the "dual purpose test" for corrupt intent is also improper after Skilling.  Moreover, the prosecution's novel theory labeled as bribery the defendants' actions which merely reallocated governmental funds among public entities for proper purposes, without diverting any public monies to private or improper uses.  This attempt to criminalize an intra-governmental *quid pro quo* is far outside the core of bribery contemplated by Skilling.  These erroneous jury instructions and the denial of the Rule 29 motion allowed the defendants to be convicted for conduct well beyond the core bribery conduct to which Skilling limited the statute.

B.    The jury instruction on the bribery counts charged under 18 U.S.C. §666 improperly omitted the requirement that the prosecution prove that a thing of value was offered by or received by the Defendant with the intention that it be "in exchange for" official action.   Instead, the instruction required the jury to find only that defendant Bryant was on the medical school payroll at the same time there was an intention to influence his official actions, even if the influence was intended to come from perfectly legal conduct, not from his salary.   Thus, the instructions erroneously allowed the jury to convict merely upon the showing that there was intent to influence official action that temporally overlapped the payment of value without any showing of an intended exchange.

C.    The evidence was insufficient to support the conviction of Mr. Bryant on the charges of *quid pro quo* bribery.  The government failed to present evidence from which a jury could infer that Mr. Bryant's intent was to exchange official action for his salary, rather than to serve his constituents.  Considering the proper purposes for which the money was to be spent, his official acts do not permit that inference.  Nor did the government offer any evidence of the value of the work Mr. Bryant did for SOM apart from his official acts, thereby providing no basis for inferring that his salary was payment for official acts.

D.     The evidence was insufficient to support the conviction of Dr. Gallagher on the charges of *quid pro quo* bribery.  The evidence was sufficient only to allow a jury to conclude that Dr. Gallagher intended to influence Mr. Bryant to take official action to benefit the medical school, not that he intended Bryant's salary to be exchanged for official action.  The evidence, which showed that Dr. Gallagher's intention was only to aid his employer, the state medical school, and not to divert any state funds to his own use or any other improper purpose, was insufficient to allow a jury to conclude that Dr. Gallagher had the required *mens rea*.

E.     The prosecution's improper attempts to inhibit grand jury witnesses from speaking with the defense deprived defendants of important due process rights and requires reversal.  The prosecutors added a legend to the court's grand jury subpoena, without court permission, asking that witnesses not discuss the case and intimating that to do so might constitute a criminal offense.  The prosecutors told witnesses on the witness stand, outside the presence of their counsel, in the sealed grand jury room that they were requested not to disclose their testimony to anyone.  The understandable effect of the prosecutors' conduct was to inhibit witnesses from speaking with the defense and substantially impairing the ability of the defense to prepare for trial.

-20-

F.    The trial court erred in treating the medical school as a victim of the crime and ordering the defendants jointly to repay the full amount of Mr. Bryant's salary as restitution under the Mandatory Victims Restitution Act.  The medical school suffered no financial loss and because the prosecution's theory of the case and evidence at trial showed that the school was an intended beneficiary of Mr. Bryant's official actions.  Accordingly, the school cannot be considered a victim for MVRA purposes, and an order that it be repaid Mr. Bryant's salary is improper.  Even assuming, arguendo, that the medical school could be considered an MVRA victim, the trial court erred in calculating the amount of restitution without regard to the value of non-criminal services provided by Mr. Bryant which would have to be deducted from his total salary to arrive at a proper restitution award.

G.    The trial court abused its discretion in permitting a lay witness, Mr. Frederick Beaver of the New Jersey Division of Pensions and Benefits, to testify about the law.  Although proffered as a witness on materiality, Mr. Beaver in fact testified about the legal standards that govern pension eligibility in New Jersey.  The limiting instruction that the district court gave did not cure the error, both because it was given a full twenty-six days after the witness testified, and because the instruction itself contained legal terminology that would not be explained to the jury until another two days

later. This error warrants a new trial, if the court does not otherwise grant judgment of acquittal.

The evidence on the pension fraud counts was insufficient to sustain the convictions for several reasons. First, the evidence failed to show a material false statement by Mr. Bryant to the alleged victim, violating the doctrine of mail fraud convergence. Second, the evidence failed to show that Mr. Bryant made a materially false statement in support of his claim for pension benefits, because the government failed to prove that he was in fact ineligible for pension benefits. Third, the evidence failed to establish an intent to defraud, because it did not show that Mr. Bryant was on notice that he was ineligible for pension benefits (if indeed he was) at the time that he submitted his claim. The failure of proof warrants judgment of acquittal.

## **ARGUMENT**

### I.    SKILLING REQUIRES THAT THE HONEST SERVICES FRAUD CONVICTIONS OF DEFENDANTS BE REVERSED

### STANDARD OF REVIEW

The standard of review of the trial court's jury instructions on *quid pro quo* bribery is whether they were legally correct. The trial court's ruling that the charged conduct fell within the scope of the honest services fraud is a question of law as to which this Court's review is plenary.

<u>DISCUSSION</u>

The Supreme Court's recent decision in <u>Skilling v. United States</u>, ___ U.S. ___, 130 S. Ct. 2896 (2010), has pared back the sweeping boundaries of "honest services fraud." This case surely falls outside the narrowed boundaries.[4] Because Appellants were convicted under jury instructions that, <u>Skilling</u> shows, incorrectly stated the law, reversal is required.

In 1987, the Supreme Court ruled that the federal mail fraud statute, 18 U.S.C. §1341, criminalized only schemes to defraud a victim of money or property. <u>McNally v. United States</u>, 483 U.S. 350, 360 (1987). That ruling swept away several decades of jurisprudence that had construed §1341, and its companion wire fraud statute, 18 U.S.C. §1343, to reach schemes to defraud a victim of the "intangible right to honest services." <u>See</u> <u>Skilling</u>, 130 S. Ct. at 2926-27. After <u>McNally</u> declared the honest services fraud theory outside the reach of the statutes, Congress acted quickly to recriminalize it. <u>Id.</u> at 2927. Specifically, Congress enacted a definitional section stating that "for purposes of [the mail and wire fraud statutes], the term 'scheme or artifice to defraud' includes a scheme or artifice to defraud another of the intangible right of honest services." 18 U.S.C. § 1346. As the

---

[4]    Appellants have always maintained, and maintain today, that this case fell outside even the sweeping boundaries that previously governed.

second circuit later observed, "the definite article 'the' suggests that 'intangible right of honest services' referred specifically to the intangible right that had been protected prior to <u>McNally</u>."  <u>Skilling</u>, 130 S. Ct. at 2929 (citing <u>United States v. Rybicki</u>, 354 F.3d 124, 137-38 (2d Cir. 2003) (en banc)).  Thus, Congress clearly intended §1346 to recriminalize the conduct that the pre-<u>McNally</u> case law had criminalized.  <u>Id.</u>

But Congress's pronouncement by no means ended the labors of counsel and courts to define the scope of honest services fraud.  Instead, it launched a new round of litigation in which courts struggled mightily to confine the potentially-limitless reach of the concept of "honest services." This Court, like many others, settled upon an interpretation that confined honest services fraud to two theories:  "(1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain."  <u>United States v. Panarella</u>, 277 F.3d 678, 690 (3d Cir. 2002) (Becker, J.).

Notwithstanding the efforts of the circuit courts to circumscribe the law, however, the government continued to press ever-more-creative applications of it, and defendants continued to contest the contours of its application.  Thus, the Supreme Court eventually granted *certiorari* in three cases, including <u>Skilling</u>, to resolve several issues related to honest services

fraud, including the statute's very constitutionality.[5]  The <u>Skilling</u> decision

emerged from those to become the Supreme Court's controlling opinion.

Implementing its mandate to "construe, not condemn" a statute if

possible, the <u>Skilling</u> Court declined to strike down §1346 as

unconstitutionally vague.  <u>Skilling</u>, 130 S. Ct. at 2928.  Yet recognizing the

due process problems threatened by novel applications of the sweeping

phrase "honest services fraud," <u>Skilling</u> confined §1346 to its "solid core" of

bribes or kickbacks.[6]  <u>Id.</u> at 2930.  In that process, the Court observed that

"there is no doubt that that Congress intended § 1346 to refer to and

incorporate the honest services doctrine recognized in [pre-McNally] Court

of Appeals decisions."  <u>Id.</u>  Thus, to identify the "core" of §1346, the Court

> pare[d] that body of precedent down to its core:  In
> the main, the pre-<u>McNally</u> cases involved
> fraudulent schemes to deprive another of honest
> services through bribes or kickbacks supplied by a
> third party who had not been deceived.  Confined
> to these paramount applications, § 1346 presents
> no vagueness problems.

<u>Id.</u> at 2928.  Defining the "core" of honest services with reference to the

paradigmatic pre-<u>McNally</u> cases makes sense in terms of Congressional

---

[5]    The other cases were <u>Black v. United States</u>, 130 S. Ct. 2963
(2010) and <u>Weyhrauch v. United States</u>, 130 S. Ct. 2971 (2010).

[6]    <u>Thus</u>, §1346 does not criminalize undisclosed conflicts of
interest.  <u>Id.</u>

intent:  Congress intended to adopt the jurisprudence as it stood at the moment before <u>McNally</u>.  <u>Id.</u>  Naturally, legal sources that post-date the October 1988 adoption of §1346 provide no clue to Congress's intent when it enacted that statute.  Thus, <u>Skilling</u> eliminated from the §1346 jurisprudence all of the engraftments and embellishments in the intervening case law.

To be sure, the pre-<u>McNally</u> cases charging honest services fraud were uneven, and many of them have "opinions far broader than their holdings."  <u>United States v. Brumley</u>, 116 F.3d 728, 733 (5th Cir. 1997).  That makes it all the most essential to pare the cases down to their "core," as <u>Skilling</u> mandates.  In this case, the "core" concept for definition is bribery, because kickbacks were not charged.

One aspect of the bribery "core" is immediately apparent:  overwhelmingly, the pre-<u>McNally</u> honest services fraud bribery cases defined the *actus reus* of the offense as a specific *quid pro quo*.  Indeed, the very definition of bribery that emerges from the case law is a *quid pro quo* exchange of a thing of value for an official act.  <u>See, e.g.</u>, <u>United States v. Runnels</u>, 833 F.2d 1183 (6th Cir. 1987)(secret payments to union official for worker's compensation case referrals that depend on revenue generated by scheme); <u>United States v. Bruno</u>, 809 F.2d 1097 (5th Cir. 1987)(scheme to

fix specific criminal case in return for secret cash payments); United States v. Lovett, 811 F.2d 979 (7th Cir. 1987)(provision of secret business interest in return for cable television contract); United States v. Price, 788 F.2d 234 (4th Cir. 1986)(union officials get excess application fees from member applicants to join union); United States v. Boffa, 688 F.2d 919 (3d Cir. 1982)(union official received benefits of free and reduced-price cars in return for acquiescence in labor switch arrangement); United States v. Pecora, 693 F. 2d 421 (5th Cir. 1982)(secret cash payments attempting to fix a specific criminal case); United States v. Mandel, 591 F.2d 1347 (4th Cir. 1979)( mail fraud conviction overturned for failure to instruct that bribery "imports the notion of some more or less specific *quid pro quo* for which the gift or contribution is offered or accepted"); United States v. Rabbitt, 583 F.2d 1014 (8th Cir. 1978)(overturning conviction for a public official taking secret percentage commission regarding a contract he could not award); United States v. Fineman, 434 F. Supp. 189 (1977)(public official receives cash from parents seeking his recommendation to get students admitted to schools); United States v. McNieve, 536 F.2d 1245 (8th Cir. 1976)(overturning conviction for gratuities accepted by plumbing inspector); United States v. Brown, 540 F.2d 364 (8th Cir. 1976)(building commissioner extorts secret payments for rent from businessmen); United

States v. Bradford, 129 F.2d 274 (5th Cir. 1942)(public officials get secret cash in selling buses to city); United States v. Shushan, 117 F.2d 110 (5th Cir. 1941)(secret payments in connection with bond refunding scheme).

This focus on specific *quid pro quo* reveals three defects in the jury instructions in this case: one, the failure to require the intent to alter an official action; two, the use of "stream of benefits"; and three, the endorsement of a "dual purpose" test.

A.    The Core Concept of Quid Pro Quo Bribery Requires The Intent to Alter an Official Action.

The district court erred in permitting the jury to convict the defendants absent an intent to alter an official action. The very first court of appeals decision to apply Skilling illustrates the centrality of this concept. In United States v. Urciuoli, ___ F.3d ___, 2010 WL 2814311 (1st Cir. July 20, 2010) ("Urciuoli II"), the payor defendant argued, in essence, that he had been convicted merely for creating a conflict of interest for the public official. Rejecting that claim, the court of appeals stated that the "well-organized instructions" of the district court clearly set out a bribery theory. The feature distinguishing bribery from conflict of interest was the instruction that

> required the jury to find that the payor "intended
> the payment to cause [the public official] to alter
> his official acts, to change an official position
> which he otherwise would have taken, or to take

> official actions that he would not have taken but
> for the payments."

Urciuoli II, 2010 WL 2814311 at *6; see also *3.  That focus on altering the

official action defined "the core bribery offense preserved by Skilling."  Id.

at *6.

This Court has not previously addressed, in the bribery context, the

requirement of an intent to alter an official action.  As the government may

point out, the Court has refused to require an actual impact on official action

under a conflict of interest theory of honest services fraud.  United States v.

Panarella, 277 F.3d 678, 680 (3d Cir. 2002).  But the fact that the Court

accepted that principle in the conflict of interest context actually strengthens

Appellants' argument here.  The Supreme Court's repudiation of the conflict

of interest theory requires this Court to strictly delineate bribery from a

conflict of interest.  And as Urciuoli makes clear, the requirement of an

actual impact is the very feature that distinguishes the two.  Cf. United States

v. Flemming, 2007 WL 1451126, *4 (3d Cir. May 17, 2007) (unpublished

opinion) (bribe must be intended to "influence" official's actions) with

Urciuoli II, 2010 WL 2814311 at *7 ("the government must establish that

the payments to [the public official] were made with the specific purpose of

**influencing** his actions on official matters")(emphasis added).

This analysis makes sense for at least three reasons:

**First**, both a "*quid*" and a "*quo*" must be things of value. In an honest services fraud bribery case, the thing of value offered by the public official must be an official act. Promising to do something that one would do anyway is worth nothing; that is, such a promise cannot be a "*quid*" or a "*quo*." See United States v. Kemp, 500 F.3d 257, 285-86 (3d Cir. 2007) (a loan is not a thing of value unless it was otherwise unavailable). Promising to do an act that one would not otherwise do *is* a thing of value, but the jury instructions permitted conviction absent such a finding. That was error. See id. (evaluating whether payor received "benefit" from public official).

**Second**, the entire concept of "exchange" presupposes a mental state of intentional reciprocity; "exchanging" one thing for another requires a causal link between the action on both sides. In the parlance of the cases, there must be a "*pro*"; that is, the "*quo*" must come back only when the "*quid*" is given. The central importance of reciprocity to an "exchange" is confirmed in the case law distinguishing a bribe from a gratuity. Skilling specifically identified the federal bribe and gratuity statute, 18 U.S.C. §201, as a source from which courts may "draw content" for the definition of bribery.[7] Even prior to the enactment of §1346 (and thus, for this Court's

---

[7]    Skilling also identified 18 U.S.C. section 666, but the section 666 case law that predates the enactment of §1346 is extremely limited, and

(continued...)

consideration in determining what Congress intended §1346 to mean; see

footnote 7 above), courts treated the intent to cause or alter an official action

as the distinguishing feature of bribery:

> The bribery section makes necessary an explicit
> *quid pro quo* which need not exist if an illegal
> gratuity is involved.  . . . We have laid emphasis
> under the bribery section on "corruptly . . . in
> return for being influenced" as defining the
> requisite intent, incorporating a concept of the
> bribe being **the prime mover or producer** of the
> official act.

United States v. Brewster, 506 F.2d 62, 82 (D.C. Cir. 1974) (emphasis

added).  Similarly, the D.C. circuit later stated that "payments to a public

official for acts that would have been performed in any event – whether

before or after those acts have occurred – are probably illegal gratuities

rather than bribes."  United States v. Campbell, 684 F.2d 141, 148 (D.C. Cir.

1982).  Accord United States v. Strand, 574 F.2d 993, 995 (9th Cir. 1978)

(quoting Brewster's "prime mover" language; "It is this element of *quid pro*

*quo* which distinguishes the heightened criminal intent requisite under the

_____

(continued...)

much of it applies a prior version of section 666, which used a lower
standard for criminality:  delivering something of value "for or because of"
an official action, as opposed to the current "intent to influence" formulation
of bribery.  See, e.g., United States v. Duvall, 846 F.2d 966, 976 (5th Cir.
1988).  Appellants have not identified section 666 cases from the relevant
time frame that shed particular light on the issues raised here.

bribery sections…."); United States v. Johnson, 621 F.2d 1073, 1075 (10th Cir. 1980)(same); United States v. Previte, 648 F.2d 73 (1st Cir. 1981).  The Supreme Court later endorsed this analysis in United States v. Sun-Diamond Growers, 526 U.S. 398, 404-05 (1999).

Indeed this Court has recognized this very distinction, anticipating Skilling's statement that §201(b) illuminates §1346 bribery.  In Kemp this Court quoted the Supreme Court's interpretation of §201 when firmly contrasting a §1346 bribe with a gratuity; a gratuity, the Court said,

> may constitute merely a reward for some future act that the public official will take (and **may already have determined to take**),

or for a past act that he has already taken.  Kemp, 500 F.3d 257, 281 (3d Cir. 2007) (emphasis added)(quoting Sun-Diamond Growers, 526 U.S. at 404-05).  In contrast, bribery requires a *quid pro quo* – which is *not* merely a payment for something that the public official will do, has done, or "may already have determined" to do.  Contrasting "influence" with "reward" (that is, bribe with gratuity) underscores the need for an intended impact upon the official's actions.  If the public official intends to continue in the course that he had already set – taking an action he "may already have determined to take" – then he has received "merely a reward," which is a gratuity.  Without

proving an intent that the payment influence the public official's actions, the government fails to prove a bribe.

This Court's analysis of the facts in the <u>Kemp</u> case illustrates this point: proving that both sides to the transaction contributed something of value is essential to an "exchange." If benefits flowing in one direction were sufficient, this Court would not have needed to ask whether the bankers provided value to Kemp; it had already determined that the evidence supported a finding that Kemp had provided a thing of value to the bankers. <u>Kemp</u>, 500 F.3d. at 281, 285-86.

But reciprocity is essential, so the court did ask whether the bankers sent value back. And it answered that "a reasonable jury could find" that the bankers had conferred value by making a loan that ***they would not otherwise have made*** absent the improper benefits conferred on them. <u>Id.</u> That is, the bankers contributed something of value to the exchange by deviating from their usual practice as a result of the value that Kemp delivered to them. Had they not deviated from their usual practice, they would have delivered nothing of value, and there would have been no exchange. The <u>Kemp</u> Court undertook this particular analysis with respect to benefits flowing to the public official rather than from him, but that is not relevant; the central point is the need for an "exchange." The same requirement that the public official

intend to take an action that he "would not otherwise have" taken applies -- and was elided -- in this case.

**Third**, the intent requirement central to the pre-<u>McNally</u> case law, which carried through to <u>Kemp</u>, further illustrates this point.  There is no bribe unless *both* parties had specific intent:  for the payor, intent to influence; for the payee, intent to be influenced.  <u>Kemp</u>, 500 F.3d. at 282.  Again, as a matter of pure logic, a person who intends to do exactly what he would have done all along, payment or no, does not "intend to be influenced" by the payment.  He may be pleased to be rewarded for his action, but by definition he never intends that the payment exert influence upon him.  That is the very distinction that the §201 case law, and later the <u>Kemp</u> Court, emphasized, between a mere gratuity and a bribe.  Analyzing the issue from the perspective of specific intent yields the same result as the "value" and "reciprocity" analyses explained above.  <u>See also</u> <u>Flemming</u>, 2007 WL 1451126 at *4 (unpublished Third Circuit opinion requiring intent to "influence" official's actions, in both honest services fraud bribery and §666 bribery); American Heritage College Dictionary, defining the verb "influence" as "1. to produce an effect on . . . ; sway. 2. to affect the nature, development, or condition of; modify."  A person who knows that a payment

will not change his views cannot subjectively "intend to be influenced" – swayed – by the payment.

Without a requirement that the official intends his actions to be influenced by a payment, a "*quid pro quo* bribe" would consist solely of this: a benefit to a public official, and the public official taking an action in favor of the payor. That "mere simultaneity" is a *lower* standard than the now-repudiated theory of nondisclosure of a conflict of interest – and thus outside the scope of §1346. Indeed, in this case the district court's opinion denying the motions to dismiss fell into this very error, which carried through to the jury instructions. The defendants contended pretrial that the Indictment failed to allege bribery because it alleged no change in official position. Rejecting that argument, the district court stated that the indictment adequately charged bribery because the salary that UMDNJ paid to Mr. Bryant might place a "thumb on the scale" of his decision-making process, even if it never affected an actual decision. United States v. Bryant, 556 F. Supp. 2d 378, 392 (D.N.J. 2008). But as Kemp and its predecessor cases under §201 make clear, when in response to a payment a public official merely continues in a course that he "has already determined to take," he has received a gratuity and not a bribe. After Skilling this Court must be even more attentive, not less, to these critical distinctions. Because

the jury instructions in this case permitted conviction absent an intent to alter

an official action, they strayed from the core bribery offense permitted by

<u>Skilling</u>.

> B.    The "Stream Of Benefits" Instruction Given In This Case Does
> Not Comport With A Post-<u>Skilling</u> Definition Of Bribery.

As noted, <u>Skilling</u> requires a return to the "core" of bribery, which

means eliminating the post-<u>McNally</u> developments that stray from the core.

One such development is this circuit's endorsement of a "stream of benefits"

concept, to the extent that the concept permits conviction when a public

official accepts payments in exchange for being available "as needed" to

assist the payor, rather than in exchange for a specific official action.  <u>Kemp</u>,

500 F.3d at 282.

Appellants do not challenge the narrower sense of "stream of

benefits"; <u>i.e.</u>, the notion that multiple *quids* may be exchanged over time for

multiple *quos*; or the notion that a *quid* may be paid in "installments" over

time, for an identifiable *quo*.  The facts in <u>Kemp</u> actually presented only this

scenario:  specific official acts (the award of municipal banking business)

exchanged for several things of value delivered over time.  Indeed, the

<u>Kemp</u> opinion defined "stream of benefits" within the scope of its facts

when it stated that "the form and number of gifts may vary."  <u>Id.</u>  Where the

language of <u>Kemp</u> went beyond its holding, however, was in the concept of

paying a public official to have him "on the shelf" -- available "as needed," in the language of the government's brief, quoted in that case – without the need to prove that the public official ever intended to exchange a specific official action for the *quid*. That novel engraftment appeared in the honest services fraud jurisprudence for the first time in <u>Kemp</u>. Its non-bribery lineage shows in <u>Kemp</u>'s citation to <u>United States v. Sawyer</u>, 85 F.3d 713, 730 (1st Cir. 1996), which on the page that <u>Kemp</u> cited explicitly ruled that §1346 encompasses gratuities "akin to a conflict of interest," paid without a *quid pro quo*. The "stream of benefits" theory as defined beyond the facts of <u>Kemp</u> cannot survive <u>Skilling</u>'s mandate to return to the core of *quid pro quo* bribery.[8]

>    C.    The "Dual Purpose" Test Imported From The Healthcare Fraud Context Does Not Survive <u>Skilling</u>.

The "dual purpose" instruction that the trial court gave in this case founders on <u>Skilling</u> for similar reasons. The trial court instructed the jury

---

[8]    The fact that <u>Skilling</u> cited <u>Kemp</u> does not indicate the Supreme Court's approval of this aspect of the decision, or any particular aspect of the decision. The <u>Skilling</u> Court cited numerous cases as examples of the application of §1346, without endorsing their reasoning. For example, <u>Skilling</u> cited this Court's decision in <u>United States v. Carbo</u>, 572 F.3d 112, 115 (3d Cir. 2009) for the proposition that bribery is "the most obvious form of honest services fraud," even though <u>Carbo</u> was a conflict of interest case only, which <u>Skilling</u> overruled. The Supreme Court's citation to <u>Kemp</u> was no more an endorsement of every aspect of its content than was its citation to <u>Carbo</u>.

that any degree of corrupt purpose sufficed to convert the *quid* into a bribe, even if legitimate purposes predominated.  Specifically, in this case there was evidence that defendant Bryant did legitimate work for his employer UMDNJ, but the court told the jury that it could convict if one purpose of the salary was to induce official action, even if UMDNJ would have paid the same salary for the legitimate work actually done.  [JA XXIII 5349 ("You may find that any salary and other financial benefits accepted by Wayne Bryant was a bribe even if you also find it was paid in part for legitimate work, if it was also paid in part in return for Wayne Bryant's official action.")]  The district court expressly declined the defendants' fallback request that it instruct the jury that a *de minimus* degree of corrupt purpose is insufficient to convict.  [JA XVIII 4317].

This "dual purpose" instruction is another recent engraftment onto the core concept of *quid pro quo* bribery -- and it is likewise inconsistent with *quid pro quo*.  Review of the pre-McNally case law provides no support for such an instruction.  Indeed, the "dual purpose" instruction first arose in a context far removed from public employee honest services:  the Anti-Kickback Act governing Medicare-reimbursable health care services.  In United States v. Greber, 760 F. 2d 68 (3d Cir. 1985), this Court endorsed this "dual purpose" test in the specific context of a statutory amendment that

explicitly required it.  In 1977, Congress amended the Anti-Kickback Act to apply to "any remuneration" intended to induce a referral of health care work, thereby broadening the statute beyond the "bribes," "kickbacks," or "rebates" to which it had previously applied.  See 42 U.S.C. § 1395nn(b)(2)(1977 amendments).  The defendant in <u>Greber</u> contended that the amended statute did not apply to compensation for services actually rendered.  <u>Greber</u>, 760 F.2d at 71.  Rejecting that argument, the Court noted that the definition of "remunerate" is "to pay an equivalent for service."  <u>Id.</u> (citing Webster's Third New International Dictionary (1966)).  By amending the statute beyond "bribes" and their ilk to "any remuneration," Congress had expressly manifested its intention to criminalize "dual purpose" payments intended both as compensation for legitimate service and as an inducement to refer work.  <u>Id.</u> at 72.

The Anti-Kickback Act amendments illustrate that when Congress intends to enact a "dual purpose" provision, it knows how to do so. Moreover, those amendments and the <u>Greber</u> decision show that Congress must broaden a statute **beyond bribery** if it wants to achieve that effect. The key to <u>Greber</u> was the distinction between "remuneration" and bribery: the former encompasses a payment made in part for legitimate purposes, and the latter does not.  <u>Greber</u> is thus consistent with the concept that a payment

is not a bribe – not a *quid* – if it would have happened anyway, for legitimate reasons; just as an official action is not a *quo* if it would have happened anyway, for legitimate reasons.  See discussion supra.

Greber's "dual purpose" test made its way into the honest services fraud case law in only one case, which does not threaten this principle:  the first circuit applied it in a case alleging gratuities, not a *quid pro quo* bribe. In United States v. Woodward, 149 F.3d 46 (1st Cir. 1998) and its companion case United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996), the first circuit explicitly broadened the concept of honest services fraud to encompass "a more generalized pattern of gratuities to coax ongoing favorable action," predicated upon a Massachusetts statute that prohibits public employees from receiving anything of substantial value "for or because of" an official act (the same gratuities language that is in 18 U.S.C. §201(a)).  Woodward, 149 F.3d at 55, 69 (citing Mass. Gen. Laws ch. 268A, § 3).  Both Woodward and Sawyer  described these gratuity offenses as "akin to a conflict of interest" that does not require a *quid pro quo*.  Id. at 55 (quoting Sawyer, 85 F.3d at 730).  This broader theory of honest services fraud – which does not survive Skilling – permitted the first circuit to import the concept of "dual purpose," because absent a *quid pro quo* there need be no a causal link between a payment and an official action.  See id.  For all of

the reasons described above, the link between the payment and the official

action that a *quid pro quo* requires – the parties' intention that one will not

happen without the other –  precludes importing "dual purpose" into a §1346

bribery case.[9]  Nothing in <u>Woodward</u> is to the contrary.

> D.    The Reallocation of Public Funds Among Public Agencies Is
>        Not Subject to Prosecution as an Honest Services Fraud
>        Bribery.

The government did not even accuse Mr. Bryant of taking an official

action – delivering a "*quo*" -- that removed money from the public fisc,

either to enrich himself or a third party.  Every alleged official action in this

case concerned the delivery of **state** funds to a **state** agency or program.  In

some cases, Mr. Bryant's alleged actions did not even increase a given

agency's funding, but merely shifted money from one program to another

within that very agency.  <u>See, e.g.,</u> discussion of carve-out for SOM from

---

[9]    Likewise, the second circuit cases that <u>Woodward</u> cited, which
had also permitted jury instructions embracing the concept of dual purpose,
involved Hobbs Act charges, section 666 bribery charges, and section 666
gratuity charges.  <u>United States v. Biaggi</u>, 909 F.2d 662 (2d Cir. 1990);
<u>United States v. Coyne</u>, 4 F.3d 100 (2d Cir. 1993) (relying upon <u>Biaggi</u>).
They also post-date the enactment of §1346 and thus do not inform
Congress's intent in enacting that statute.  If this Court chooses to consider
them, it should also note the <u>Biaggi</u> court's expressed concern that a jury
should not be permitted to convict based on a *de minimus* corrupt intent.
<u>Biaggi</u>, 909 F.2d at 683-84.  As noted above, the district court in this case
denied such an instruction, which the defense requested after the court ruled
that it would instruct consistently with "dual purpose."

UMDNJ funds, infra, section III.B.1.  In no case did the funding allocations increase the total cost to the state.  To find a criminal bribery case when a legislator allocates state money among state agencies is outside the core concept of honest services fraud -- to say the least.  In no pre-McNally honest services fraud bribery case was a public official prosecuted for allocating public funds within the public fisc.  Even post-McNally this case is novel.  In every bribery case of which appellants are aware, the challenged official action benefited a private third party at the public's expense.[10]  No case has criminalized an "intra-governmental *quid pro quo*."

This distinction between official actions for the benefit of a private entity and actions that serve the public also implicates a key reason for caution in the honest services fraud arena:  principles of federalism. Recognizing that core bribery is limited to cases in which a private entity benefits avoids the thorny federalism problems inherent in criminalizing the manner in which a state allocates the funding in its annual budget.  The manner in which New Jersey's public sector "shuffles the deck" of public monies is not for the federal government to punish using novel theories of

---

[10]     The "expense" to the public may not be a literal expense, because in several honest services fraud cases the private party is rewarded with access, or influence, rather than money.  See, e.g., United States v. Urciuoli, 513 F.3d 290 (1st Cir. 2008).

honest services fraud – particularly after <u>Skilling</u> has reeled in "honest services" from its most expansive applications.  A state may approach its funding allocations through classic legislative "log rolling," or some other form of "horse trading," but the intramural power struggles among public agencies are not core bribery. [11]  Whether, and when, such conduct may be permissible is certainty subject to regulation – but it is not subject to regulation-by-prosecution as a novel theory of honest services fraud.  Whether or not a public entity hiring a legislator with the intention of gaining a larger share of the public pie is "corrupt" in some sense (and the Court may find much to criticize about the conduct), it is certainly far afield from the core bribery cases that now define the boundaries of §1346.

A new trial on an indictment thus defective would be inappropriate.  The fact that the core bribery theory defined by §1346 does not reach the conduct at issue requires that the indictment be dismissed.

---

[11]    If one legislator promises to vote for another's pet project, in exchange for the latter's vote for the former's pet project, have they engaged in a *quid pro quo*?  If an executive builds a bridge in a key legislator's district, with the intention (the expectation?  the hope?) that the legislator reciprocate by supporting the executive's policy priorities, has the executive offered a bribe?  A creative prosecutor may say so, but the creative prosecutor is the audience to whom <u>Skilling</u> speaks in a cautionary tone.

II.   THE JURY CHARGE ON THE §666 COUNTS WAS DEFECTIVE
      FOR FAILURE TO INCLUDE AS AN ELEMENT OF THE
      OFFENSE THE REQUIREMENT THAT DEFENDANT
      INTENDED THAT THE THING OF VALUE BE GIVEN "IN
      EXCHANGE FOR" AN OFFICIAL ACT.

STANDARD OF REVIEW

The trial court's failure to include the "exchange" element in the jury

charge on §666 bribery was a legal error as to which this Court's scope of

review is plenary.

DISCUSSION

The very essence of the offense of bribery captured in the Latin

legalism "*quid pro quo,*" is that a thing of value be given "in exchange for"

the official act.  The jury charge on the §666 counts in this case failed to

inform the jury that "exchange" was an essential element of the offense.

Instead, the instruction confusingly allowed the jury to convict if it

concluded that Dr. Gallagher hoped that Mr. Bryant would take action to

benefit the medical school payroll during the same period of time that Mr.

Bryant was on the medical school, even if it were not proved that the intent

was for the one to be given "in exchange for" the other.  In other words, the

jury was told that it was sufficient that receipt of money and intent to

influence – perhaps by other means than the payment of money -- existed

simultaneously.  By failing to include the "exchange" element that is the

very essence of the offense, and thus by allowing the jury to convict based on temporal simultaneity rather than causal nexus, the charge is defective.

The jury was instructed that to convict on the §666 counts, all it need find other than undisputed jurisdictional elements was that:

> with respect to Wayne Bryant, that Wayne Bryant corruptly accepted, agreed to accept, solicited, or demanded salary payments and other financial benefits from UMDNJ/SOM, the quid; while intending to be influenced in taking favorable actions toward SOM in his capacity as a state legislator, the quo. With respect to R. Michael Gallagher, that R. Michael Gallagher corruptly gave, agreed to give, or offered salary payments and other financial benefits from UMDNJ/SOM, the quid; while intending to influence Wayne Bryant in taking favorable actions toward SOM in his capacity as a state legislator, the quo.

Jury Charge No. 33. [JA XXII 5448-49].[12]  This language fails to include the critical concept of an exchange of payment for official act.  The use of the word "while" as the critical link merely required the jury to find, for example, that Dr. Gallagher agreed to pay Mr. Bryant a salary during the same time period ("while") that he possessed an intention to influence Mr. Bryant to take official actions favorable to the medical school.  The

---

[12]    To act "corruptly" was defined as:  "to act knowingly and willfully with the purpose either of accomplishing an unlawful result, or of accomplishing some otherwise lawful result by unlawful means." Jury Charge No. 34 [JA XXIII 5450].

instruction does not require the jury to find that Dr. Gallagher hired Mr. Bryant ("offered" the salary) for the purpose of influencing Bryant.

In the circumstances of this case, this was much more than a linguistic technicality. Based on the trial testimony, the jury may well have concluded that Dr. Gallagher hoped that Mr. Bryant would take action to assist the medical school and that he believed Mr. Bryant might be influenced by what he saw and heard as an employee, but that his intention was not to exchange payment of salary for Mr. Bryant's legislative help. The jury certainly heard that Mr. Bryant was exposed to details of the medical school's many worthwhile programs "while" he was receiving a medical school salary. Thus, a rational jury may well have concluded that Dr. Gallagher possessed the intent to influence Mr. Bryant's actions as a legislator at the same time ("while") Mr. Bryant was receiving a salary but not that the salary was intended to be given "in exchange for" official action. As charged, the jury could have convicted even in the absence of the requisite "exchange" element.

The vast temporal span and institutional complexity of the events at issue in this case makes the simultaneity instruction ("while") even more confusing. In contrast to a one-time payment of cash for a specific official action, such as an on-the-spot bribe of a plumbing inspector to sign off on

defective work, the jury in this case heard about the complexities of a large

medical institution with numerous programs and the intricacies of the state

budgetary process over several years.  The jury heard about the funding

history of numerous medical school programs involving cancer treatment,

abused children, and senior citizens and about information provided to Mr.

Bryant about these programs.  Evidence was presented about many formal

and informal meetings concerning those programs, and the ebb and flow of

their funding.  Days of testimony and thousands of pages of exhibits detailed

the state legislative budgetary cycles.  This vast and complex scope made the

mere simultaneity instruction particularly dangerous.  It allowed the jury to

convict on the §666 counts if it concluded merely that an intention to

influence Mr. Bryant arose at any point in this lengthy trail of events, even

long after the salary had been offered, and even if there was no causal nexus

between the payment of the salary and the hope to influence Bryant's official

action as long as the jury found that the two coexisted in time.  In other

words, the §666 instruction allowed the jury to convict even if it did not find

an intended exchange.

There is no doubt that exchange is the essence of the §666 bribery

offense.  United States v. Cicco, 938 F.2d 441, 442-43 (3d Cir. 1991) (§666

violation for "soliciting political services and loyalty *in exchange for*

municipal jobs")(emphasis added).  When courts have looked to other

statutes for guidance in interpreting §666, they have recognized the

centrality of the exchange requirement:

> In interpreting the intent element for bribery, the
> United States Supreme Court noted that "[b]ribery
> requires intent 'to influence' an official act or 'to
> be influenced' in an official act ... In other words,
> for bribery there must be a *quid pro quo*-a specific
> intent to give or receive something of value *in
> exchange* for an official act." United States v. Sun-
> Diamond Growers, 526 U.S. 398, 404-05, 119
> S.Ct. 1402, 143 L.Ed.2d 576 (1999) (interpreting
> 18 U.S.C. § 201 "Bribery of Public Officials and
> Witnesses" statute). As this interpretation reveals,
> an allegation of intent to give something of value
> with an intent to influence is synonymous with an
> allegation of a "quid pro quo." In fact, the statutory
> language of sec. 666(a)(2) contains the term
> "intent to influence" rather than "quid pro quo."

United States v. Baumann, 684 F. Supp. 2d 1140, 1144 (D.S.D. 2009)

(emphasis in the original); see United States v. Kemp, 500 F.3d 257, 281 (3d

Cir. 2007)("we thus conclude that bribery requires 'a specific intent to give

or receive something of value *in exchange* for an official act.' Id. at 404-05,

119 S.Ct. 1402.") (interpreting 18 U.S.C. §201) (emphasis added).

    The defect in the charge goes to the heart of the offense:  the nature of

the required nexus between act and intention.  The difference between a

payment made in exchange for an official act and payments made for a

multi-year period at some point during which a defendant intended to

influence an official's acts -- by whatever means -- is significant.  These

differences in language are not mere semantic niceties; they affect important

rights, as the Supreme Court has recognized in numerous cases carefully

construing statutory language and jury instructions.  For example, the

Supreme Court commented on the importance of a similar linguistic analysis

in determining the scope of 18 U.S.C. §924(c).   In tracing the history of that

statute, as amended over the years, the Court wrote:

> The phrase "uses a firearm to commit" indicates
> that Congress originally intended to reach the
> situation where the firearm was actively employed
> during commission of the crime. This original
> language would not have stretched so far as to
> cover a firearm that played no detectable role in
> the crime's commission. For example, a defendant
> who stored a gun in a nearby closet for retrieval in
> case the deal went sour would not have "use[d] a
> firearm to commit" a crime. This version also
> shows that "use" and "carry" were employed with
> distinctly different meanings.

Bailey v. United States, 516 U.S. 137, 147 116 S.Ct. 501, 508 (1995);

compare Smith v. United States, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d

138 (1993)(using a firearm "during" commission of a crime interpreted more

broadly).  In the present case, there is a very real world difference between

making a payment "with" intent to influence and making a payment "while"

having an intent to influence just as, for example, a charge of committing a

crime "with" a firearm might cover conduct different in scope than

committing a crime "while" possessing a firearm.  The different words connote a different nexus.

The distinction between one element of a claim or offense occurring "while" another existed (temporal overlap) and some more causal relationship (such as, in this case, the "exchange" element) crops up in other areas of the law.  For example, a common insurance policy provision excludes coverage for criminal conduct.  Sometimes the provision is interpreted to apply to any injury which occurs "while" engaged in criminal activity; other courts have applied it only when there is a causal nexus between the criminal activity and the injury.  The key point is the recognition that the word "while" sweeps in much more conduct than other forms of nexus.  E.g., Boyd v. United Transp. Union Ins. Ass'n, 2006 WL 2350175 at *6 (W.D.Wash. 2006) (denying summary judgment in insurance coverage case because the required causal nexus between injury and criminal conduct is much narrower than merely showing that injury occurred "while" engaged in criminal conduct).

In a similar vein, in employment discrimination cases, the courts distinguish between mere temporal overlap and actual causal nexus.  While one may be evidentiary of the other, they are very different concepts:

> Temporal proximity, to be relevant in establishing retaliation, must be very close. See Clark County

> School Dist. v. Breeden, 532 U.S. 268, 121 S.Ct.
> 1508, 149 L.Ed.2d 509 (2001)., The Sixth Circuit
> has held that mere temporal proximity between
> protected activity and the adverse action is
> insufficient to establish the causal connection
> element of a retaliation claim, without additional
> evidence of retaliatory animus.

Alexander v. Ohio State University College of Social Work, 697 F. Supp. 2d

831, 851 (S.D.Ohio 2010).  The wide range of cases that have grappled with

this issue confirms the importance of instructing the jury about the precise

nexus required ("in exchange for") rather than leaving them to convict based

on mere temporal overlap ("while").

       The defense requested a jury instruction on the §666 counts that

explicitly charged the exchange element: " ... the prosecution must prove

beyond a reasonable doubt that the payment was intended to be in exchange

for official action ... ."  Defense Request To Charge No. 9 [JA XXIII 5376].

In other submissions on the jury charge, the defense made it clear that it

viewed the essence of the offense as "the payment of money in exchange for

an official act" (Mathewson letter, November 6, 2008, p.6) [JA XXIII 5488]

(emphasis added) (citing United States v. Mariano, 983 F.2d 1150, 1159 (1st

Cir. 1993)); "bribery requires a quid pro quo. ... a specific intent to give or

receive something of value in exchange for an official act." Id., p. 5 (citing

United States v. Kemp, 500 F.3d 257, 281 (3d Cir. 2006)).

Following the instructions to the jury, the defense objected to the trial

court's refusal to give the defense request.   [JA XVIII 4318].  Thus, the

issue was properly preserved.[13]  The failure to instruct the jury accurately on

an essential element is certainly not harmless beyond a reasonable doubt.

United States v. Russell, 134 F.3d 171, 180-81 (3d Cir. 1998); see

Government of Virgin Islands v. Brown, 685 F.2d 834 (3d Cir. 1982) ("The

omission of an essential element of an offense in the charge to the jury

ordinarily constitutes plain error").  A defective charge is more likely to be

found to constitute reversible error when it misstates an important mental

element.  See, e.g.,  Government of Virgin Islands v. Carmona, 422 F.2d 95,

99 (3d Cir. 1970) (reversing for error in charging mental element of offense

although tracking the statutory language).   A confusing instruction

regarding the defendant's state of mind as an element of the offense calls for

reversal even if there were a logical pathway in which the jury might have

considered the instruction without being confused.  United States v. Martin,

507 F.2d 428, 430-31 (7th Cir. 1974); see United States v. Ford, 435 F.3d

204, 213 (2d Cir. 2006) (reversing a §666 conviction based on instructions

---

[13]    Even had there been no objection, a jury charge on §666 which
fails to convey the basics of the *quid pro quo* concept constitutes plain error.
See *United States v. Jennings*, 160 F.3d 1006, 1021-22 (4th Cir. 1998).

that failed to convey accurately the intention-to-be-influenced element of statute).

If the jury consulted the indictment, which was available to them, this error would be reinforced. The honest services counts allege that defendants "... caused defendant Bryant to receive a stream of corrupt payments and other financial benefits from SOM, **in exchange for** defendant BRYANT using his position as a State Senator to take official action .... " Indictment, Counts 1-6, ¶18) [JA II 0126] (emphasis added). In contrast, the §666 counts of the indictment gloss over the nexus between the payments and the official action, using an oblique and passive grammatical construction:

> … did accept and agree to accept a thing of value,
> namely, a salaried and pensionable position at
> SOM permitting him to receive a stream of
> payments and pensionable income, from another
> person, intending to be influenced and rewarded ...

(Indictment, Count 7, ¶3) [JA II – 0135] (emphasis added). Thus, a confused jury referring back to the indictment on the §666 count would have faced an opaque, double-gerund construction. The first gerund, "permitting," suggests that what follows is not even something that necessarily occurred, merely something that was made possible to occur. Far from clarifying the defect in the jury charge, the indictment's language compounds it.

The different jury instructions on the honest services fraud counts do not save the defective §666 instructions.  First, the jury was told to consider each count individually [JA XXIII 5465], and plainly they did so, having acquitted Dr. Gallagher on one count.  Second, the existence of two different formulations for the two different offenses would lead a rational juror to conclude that different standards were to be applied to the different offenses.  Third, if the jurors referred to the indictment for clarification, they would again find different language on the key point, with the "exchange" language prominent in the honest services counts and missing from the §666 counts.  Fourth, the rhetorical focus of the honest services counts was the breach of a fiduciary duty, with the prosecution arguing in summation about depriving the citizens of New Jersey of the faithful services of elected officials [JA XIX 4447-48].  Thus, the jury deliberations on the honest services counts could have had a very different focus than the §666 counts where the exact causal and logical nexus between act and intention was key.  For all of these reasons, nothing in the instructions or verdict on the honest services counts can save the defective §666 charge.[14]

---

[14]    In addition to the failure to charge the "exchange" element of §666 bribery, the trial court did not charge other important limitations on the bribery offense which are discussed in greater length in Point I , supra.  The defense requested that §666 bribery be charged in the same terms as §1346

(continued...)

III.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE
GUILTY VERDICTS AGAINST MR. BRYANT AND DR.
GALLAGHER ON *QUID PRO QUO* BRIBERY.

STANDARD OF REVIEW

The standard of review of the sufficiency of the evidence is whether

the evidence in the light most favorable to the government was sufficient to

prove every element of the offense beyond a reasonable doubt.  Proof is

insufficient unless a reasonable jury, taking the evidence in the light most

favorable to the government, could have found each element of the offense,

properly construed, to be established beyond a reasonable doubt by

substantial evidence.  United States v. Ruuska, 883 F.2d 262 (3d Cir. 1989);

United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1988).  This Court's

review of that question is plenary.  United States v. Miller, 527 F.3d 54, 60

(3d Cir. 2008); see United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998).

_____

(continued...)

bribery [JA XXIII 5376] and that the charge require the jury to find a *quid
pro quo*.  The trial court's refusal to do so result in three defects in the jury
instructions which apply equally to the §666 counts (1)  the failure to require
the intent to alter an official action; (2) the use of "stream of benefits;" and
(3) the endorsement of a "dual purpose" test. These defects applied to the
bribery instructions for both the §1346 offense and the instructions for the
§666 offense.  Accordingly, for the reasons set forth in more detail in Point
I, supra, the convictions on the §666 counts must be reversed as well.

<u>DISCUSSION</u>

A.    The Evidence Was Insufficient As To Mr. Bryant

<u>Skilling</u> reaffirms that novel theories of prosecution are disfavored in the honest services context.  On appellate review of a pre-<u>Skilling</u> guilty verdict, this Court must apply the most searching scrutiny to the record, to avoid even the possibility that the defendant was convicted on proof of anything less than a "core" *quid pro quo* bribery offense.  As explained above, here reversal (at least) is required because errors in the jury instructions imported broader concepts of bribery than <u>Skilling</u> tolerates. But a careful review of the record also reveals that judgment of acquittal is required because the government's proof failed to establish the elements of bribery within the parameters that <u>Skilling</u> set, and within the existing parameters of §666.  That is, the government failed to prove a *quid pro quo*.[15]  The failure of *quid pro quo* dooms the convictions both on the honest services fraud counts (1-6) and §666 count (7).

The government certainly proved that Mr. Bryant took official action favoring SOM **at the same time** as he was employed there.  The parties

---

[15]    Appellant Bryant does not concede that the government's proof sufficed even under the jury instructions actually given.  That is, even if this Court rejects Appellants' contentions about the errors in the jury instructions, judgment of acquittal is still required because the government failed to prove the offense as the district court defined it.

never disputed that New Jersey law permitted dual public employment.  <u>See</u>

N.J.S.A. § 19:3-5 (listing specific positions that a state legislator may not

hold; permitting dual public employment generally).  The New Jersey

legislature later amended that law to prohibit dual elective office (continuing

to permit dual public employment generally), but the U.S. Attorney's Office

did not defer to the state's resolution of the issue.  Before New Jersey

amended the law, the government indicted Mr. Bryant and Dr. Gallagher.

The government charged both conflict of interest and bribery theories of

honest services fraud, but the district court dismissed the conflict of interest

theory pretrial.  Subsequently, of course, the Supreme Court ruled that the

honest services fraud statute does not – cannot, constitutionally – criminalize

conflicts of interest.  <u>Skilling</u>, 130 S. Ct. at 2932.  Thus, the conviction

stands only if the government proved that the dual public employment at

issue was actually a *quid pro quo* bribe.  It did not.

Key to the Court's review of the evidence are the limitations on co-

schemer liability.  Mr. Bryant and Dr. Gallagher were charged as co-

schemers, and the government took the position at trial that other SOM

personnel who testified as government witnesses (*e.g.*, John Crosbie and

Robert Prodoehl) were co-schemers as well.   Although the acts and

statements of one knowing co-schemer may be imputed to another; <u>United</u>

States v. Leahy, 445 F.3d 634, 656 (3d Cir. 2006); the knowledge and intent required to establish that two people are co-schemers to begin with may **not** be imputed. The government presented the testimony of SOM personnel about their intentions for Mr. Bryant's employment, but that testimony does not bear the weight that the government put on it: it sheds no light on Mr. Bryant's own intentions. The government's own witnesses did not dispute that Mr. Bryant had been a long-time supporter of SOM, of South Jersey, and of education and health care initiatives targeted to minority and underserved populations. [E.g., JA IV 0711-12 (testimony of S. Cook, former President of UMDNJ, regarding SOM's "medallion award" to Mr. Bryant in 2000; 55:15-56:4); JA XII 2545-46 (testimony of T. Cavalieri regarding Mr. Bryant's longstanding support for senior citizens, 31:3-32:3); JA IX 1777-78 (testimony of J. Crosbie, 6:25-7:5), JA XI 2415-16 (testimony of G. LeBlanc, 112:1-113:5); see JA XXIII 5529, 5532 (GEs 605 and 606 (2004 budget language proposals, identified by sponsor, including Bryant))] The government's evidence failed to establish that Mr. Bryant harbored any intention to do anything other than what was best for his constituents.

B.   The Government Failed To Prove That Mr. Bryant Took Any
Official Action In Exchange For His Salary, Rather Than To
Serve His Constituents.

Given the length of the trial (approximately ten weeks), the most

cogent way to review the evidence is with reference to each alleged official

act.  This approach also comports with <u>Skilling</u>'s mandate to apply the core

concept of bribery, which requires a specific *quid pro quo*.  The generalized

concept of "availability as needed," on which the government tried this case

and the judge instructed the jury, does not survive <u>Skilling</u>.  <u>See</u> discussion

<u>supra</u>, section I.B.

1.   The $2.325 Million Dollar Carve-Out From UMDNJ's
Budget for SOM

The government alleged that Wayne Bryant used his influence to

obtain for SOM an earmark of $2.325 million for operating expenses, out

of the total amount that the 2004 state budget allocated to the UMDNJ

system.  The evidence did not bear that out.  The state budget initially

allocated $10 million dollars of the UMDNJ budget for the Robert Wood

Johnson Clinical Program at the Cooper Hospital in Camden.[16]  David

Matos, a government affairs employee for UMDNJ, brought that

allocation to the attention of his supervisors, and with their input drafted the

---

[16]   The jury did not learn the actual dollar amount.

revised carve-out that ultimately was enacted.  [JA XVII 4161-4165

(testimony of D. Matos, 89:4-93:4)]  The language first appeared in the

Assembly budget; Mr. Bryant served in the Senate.  [JA IX 1796

(testimony of J. Crosbie, 25:2-25)]  Mr. Matos testified that he

communicated with a member of the Assembly, and not with Mr. Bryant,

about the requested change.  [JA XVII 4161-65 (testimony of D. Matos,

89:5-93:9)]

There was no dispute that the money was intended to remedy a

funding imbalance within UMDNJ, which historically disadvantaged

South Jersey-based SOM.  [JA IV 0709-11 (testimony of S. Cook, 53:2-

55:8); JA IX 1796 (testimony of J. Crosbie, 25:2-25); JA XI 2406

(testimony of G. LeBlanc, 10:15-19)]  And there was no dispute that the

carve-out had no effect on the total amount budgeted to UMDNJ.  The

former President of UMDNJ, Stuart Cook, testified that he had intended

to rectify that funding imbalance even prior to the legislative intervention

requiring him to do so. [E.g., JA IV 711 (testimony of S. Cook, 55:5);

Ultimately, both houses of the legislature approved budget

language that carved out of the UMDNJ budget $2.225 Million Dollars

for the Robert Wood Johnson Clinical Program at Cooper Hospital, and

$2.325 Million Dollars for SOM.  [JA 5526-28 (GE14f at p. 153 (P.L.

2003, Ch. 122, approved July 1, 2003))]  The budget language explicitly referenced the 105 students at the Robert Wood Johnson Camden campus versus the 329 at SOM – clearly establishing the intention to achieve per-student funding parity.  [Id.]

Naturally Mr. Bryant, as chair of the state Senate Budget and Appropriations Committee, knew of and acted upon the carve-out – as did every voting member of both houses of the legislature.  Yet the government never alleged, much less proved, that the carve-out had any effect other than the salutary one it was intended to have:  shifting money within UMDNJ to move toward funding parity for SOM.  No inference arises under these circumstances that Mr. Bryant voted for the carve-out in exchange for his salary.  And no official act that Mr. Bryant took deprived the citizens of his honest services.

2.    The $400,000 Dollars In State Funds For SOM
Through The Cancer Institute Of New Jersey

The 2004 budget allocated $5 million dollars for the Cancer Institute of New Jersey ("CINJ"), a National Cancer Institute "Center of Excellence," to establish a South Jersey facility.  The absence of a cancer treatment facility in South Jersey was a long-standing problem, which forced extremely ill South Jersey residents to commute to Philadelphia for treatment.  [JA XIII 2788-89 (testimony of C. Kirchner, former

assistant to the Commissioner of Health and Senior Services, 53:15-54:20)]  The state's intention was to establish a high-quality, culturally-sensitive cancer treatment facility serving patients who lacked the ability to pay.  [JA XIII 2792 (testimony of C. Kirchner, 57:11-22)]  Without even a hint of involvement by Wayne Bryant, the state budget that provided funding for a South Jersey cancer center also prescribed that SOM's oncology center would participate in that funding.  [JA XIII 2790 (testimony of C. Kirchner, 55:24)]

After SOM's participation was already decreed in the budget, SOM wanted to address how much of the funding would come to it.  Again, the issue was not increasing a line item in a budget, but dividing the money that was already allocated.  The Department of Health and Senior Services was already working on a Memorandum of Understanding among the participating institutions about that very issue.  [JA XIII 2778, 2789 (testimony of C. Kirchner, 43:19-23, 54:21-24)]  The government alleged only one official act by Wayne Bryant in connection with it:  setting up a meeting with Clifton Lacy, then Commissioner of the Department of Health and Senior Services. [JA II 0130 (Indictment at ¶ 21a)].  The evidence showed even less than that:  Mr. Bryant "helped"

arrange that meeting. "He provided supporting phone calls."[17]  [JA VIII 1662 (testimony of J. Crosbie, 127:3-23)]

Yet any causal link between that allegation and the later allocation of funds is illusory.  First, the parties were already in discussions about the allocation.  Second, Commissioner Lacy had no power to influence SOM's share of the budgeted funds.  [JA XIII 2793 (testimony of C. Kirchner, 58:2-5)]  Mr. Bryant attended the meeting with Commissioner Lacy, but merely facilitated the meeting, did the introductions, and identified the purpose of the meeting.  [JA XIII 2779, 2791 (testimony of C. Kirchner, 44:17-20, 56:3-12)]  Naturally, the meeting with Commissioner Lacey had no impact at all on SOM's budget, because Commissioner Lacey had no power to change the funding allocation.  Thus, to accomplish their aims -- again without a hint of involvement by Mr. Bryant -- the administrators of SOM negotiated with the administrators of Cooper Hospital for SOM to

---

[17]    Although the government introduced a memorandum that showed Mr. Bryant's office confirming the meeting, there was no proof that he actually set up the meeting.  Nor was there proof that setting up the meeting was an "official act" subject to a bribery theory.  Given that the state budget already prescribed SOM's participation in the funding, there is no basis for concluding that SOM utilized Mr. Bryant's official influence to obtain the meeting.  As Ms. Kirchner testified, she had already been working on a Memorandum of Understanding among the participating entities.  [JA XIII 2778, 2789 (testimony of C. Kirchner, 43:19-23, 54:21-24)]

$400,000 of the money that was allocated to CINJ. [JA VIII 1666 (testimony of J. Crosbie, 131:7-11)]  Again, no official act that Mr. Bryant took deprived the citizens of his honest services.

### 3. The $200,000 For SOM's Institute for Successful Aging

New Jersey's Treasurer administered the Property Tax Assessment and Community Development Grant ("PTACDG") program, also known as the "Mac account."  At the relevant time, the PTACDG program permitted legislators, the Governor, and the Treasurer to recommend grants out of an existing fund to certain community service organizations and educational institutions.  [JA XII 2661 (testimony of D. Rousseau, Deputy State Treasurer at the relevant time; 147:10-19)]  The proposed grantees would not automatically receive the money, but were required to submit an application, subject to the Treasury Department's review, and required to submit to audits of their compliance with the terms of the grant.  [E.g., JA XII 2651-54, 2659-63 (testimony of D. Rousseau, 137:18-140:4, 145:3-149:6)]  For fiscal year 2006, Mr. Bryant was allocated $4 million in PTACDG grants that he could recommend.  The lists of legislators' recommendations were compiled on a rolling basis.  In that year, the process began around August 2005.  [JA XII 2662 (testimony of D. Rousseau, 148:8-13)]

Ultimately, the Institute for Successful Aging received $200,000 through the PTACDG program, for fiscal year 2006. The government presented evidence that Mr. Bryant notified SOM of the availability of the grant money (again, already allocated to the PTACDG program in the state budget); SOM personnel decided which SOM department would apply. [JA VIII 1676-78 (testimony of J. Crosbie, 141:20-143:16)]

The evidence reflected that notifying SOM was something of an afterthought for Mr. Bryant. As noted, the grant process started around August 2005. As of December 1, 2005, Mr. Bryant's list of proposed grant recipients did not include any SOM department. [JA XXIII 5534 (GE 907a)] When he finally notified SOM that the money was available, it was at the last minute, and a scramble to produce a proposal ensued (without Mr. Bryant's involvement). [JA VIII 1676-78 (testimony of J. Crosbie, 141:20-143:16); JA XII 2522-23 (testimony of Dr. T. Cavalieri, Director, Institute for Successful Aging; 8:5-9:6)] On December 2, 2005, Dr. Gallagher sent a letter to the state treasurer applying for a grant for the Institute for Successful Aging. [JA XXIII 5536 (GE 908)] The next version of Mr. Bryant's list of grant applicants included that Institute. [JA XXIII 5537 (GE 909)]

Indisputably, the program for which the Institute for Successful Aging received the grant, providing health care services to seniors in public housing in Camden, aligned perfectly with Mr. Bryant's legislative priorities.  [See JA XII 2547-49 (testimony of T. Cavalieri, 33:14-35:4)]  As were all recipients of PTACDG money, the Institute for Aging became subject to the Treasury Department's review of its grant application, a grant agreement that required it to fulfill the goals set forth in the grant, and to an audit process.  [JA XII 2651-54, 2659-63 (testimony of D. Rousseau, Deputy State Treasurer at the relevant time; 137:18-140:4, 145:3-149:6)]

The prosecution's proof focused almost entirely on its own view that the grant program itself was improper.  Yet the merits or demerits of the PTACDG program versus its predecessors are no basis for imposing criminal liability on any legislator who acted in accordance with the program, which was statutorily-prescribed.  Nor does the process by which the program came to be, long before the Institute for Successful Aging grant, shed any light on the motivation for Mr. Bryant's last minute decision to give SOM an opportunity to apply for it.  Again, the government's proof failed to establish that Mr. Bryant harbored a corrupt intent.

4.    The $800,000 For New Jersey CARES

The $800,000 in funding that the state allocated for New Jersey

CARES, a nationally-respected center for the diagnosis and treatment of

child abuse, was in the budget before, during and after Mr. Bryant's

employment with SOM.  [E.g., JA VIII 1719-20 (testimony of J. Crosbie,

184:23-185:12)]  The indictment alleged and the proof showed that for the

2004 budget, Mr. Bryant took the perfectly ordinary step of passing along to

legislative staff some language that the constituent suggested, restoring the

$800,000 in funding that a prior governor had vetoed (and which

members of both houses, including Mr. Bryant, had previously approved).

[JA II 129 (Indictment ¶ 20(b)(ii)); JA X 2140-46 (testimony of D. Rosen,

Office of Legislative Services, 72:7-78:10)]  As the staffperson from the

Office of Legislative Services (the non-partisan legislative support staff)

made clear, no legislator has the power to simply insert language into the

budget; the legislator can merely "request" its inclusion.  [E.g., JA X 2081-

82, testimony of D. Rosen, 13:20-14:4)]  Although the indictment further

alleged that Mr. Bryant "ensured" that the state budget included the

$800,000 allocation in 2004 (and that the allocation continued in 2005 and

2006), the proof showed no action other than passing along the language that the constituent proposed.[18]  [See JA II 129 (Indictment ¶ 20(b)(ii)]

Indeed, the proof at trial showed that Mr. Bryant actually rejected the constituent's suggestion that it receive new money rather than a carve-out from existing funds.  [JA X 2100 (testimony of D. Rosen, 32:4-33:3)]  Of the language that the constituent had proposed, only the language describing the program made it into the budget; the proposed language that "operates the money" did not.  [JA X 2100 (testimony of D. Rosen, 32:10-12)]  The difference to the state is significant:  "one costs us money and the other one doesn't."  [JA X 2101  (testimony of D. Rosen, 33:12-13)]  Mr. Bryant supported the option that did not cost the state money – contrary to SOM's wishes.

5.    The $1.5 Million In Contracts For Services, For New Jersey CARES

The indictment also alleged that Mr. Bryant steered an additional $1.5 million dollars to New Jersey CARES.  [JA II 130 (Indictment ¶ 21(b))]  At trial, however, the facts developed that the $1.5 million was actually compensation for contracted services that New Jersey CARES

---

[18]    The funding continued for the years after that, but the government did not allege that Mr. Bryant played a role in the continuation. The funding actually appeared in the Governor's own proposed budget – prior to legislative action – for the years after.

provided on behalf of the state Division of Youth and Family Services

("DYFS"), part of the Department of Human Services.  [See JA XIII

2821-22 (testimony of K. Way, 86:17-87:5); JA XIII 2889-90 (testimony

of J. Davy, former Commissioner of Human Services, 154:20-155:7)]

Contracting was the province of the executive branch.  [Id.]  New Jersey

CARES and its predecessor had been contracted service providers for

DYFS since before Mr. Bryant's employment with SOM.  [JA XVII

3923-24 (testimony of M. Schalick 96:12-97:7); JA XIII 2883-84

(testimony of J. Davy to historic relationship between DYFS and New

Jersey CARES, Tr. 148:14-149:1)]

At trial and in post-trial briefing, the government attempted to link

Mr. Bryant to the contracting process by emphasizing his forceful

advocacy for New Jersey CARES with the executive branch.  According

to the former Commissioner for the Department of Human Services,

James Davy, Mr. Bryant linked the Department of Health's support for

New Jersey CARES to his own efforts in support of comprehensive child

welfare reform.[19]  [JA XIII 2883 (testimony of J. Davy, 148:2-13)]

---

[19]    The state was operating under a consent decree requiring
reform of the Department of Youth and Family Services, as the result of
litigation specifically directed at its failures in serving children who were
victims of abuse and neglect.  [JA XIII 2917 (testimony of J. Davy, 182:13-

(continued...)

Strikingly, the witness told the jury that Mr. Bryant warned him "you will have a problem with me" on child welfare reform if the Department did not use New Jersey CARES as its service provider.  [JA XIII 2883 (testimony of J. Davy, 148:2-13)]  But notably, the witness also acknowledged that Mr. Bryant had previously expressed his opposition to Commissioner Davy's particular approach to child welfare reform. [JA XIII 2878-79 (testimony of J. Davy, 143:6-144:4)]  And New Jersey CARES (then known as the Center for Children's Support), was *already* integral to the Child Welfare Reform Plan (see footnote 19), which contained the explicit goal of replicating and increasing the New Jersey CARES model statewide.[20]  [JA XVII 3927-30 (testimony of M. Schalick, 100:24-103:3)]  In fact, the New Jersey CARES model was identified as a "best practice" in the Child Welfare Reform Plan.  [JA XIII 2962-63 (testimony of J. Davy, 19:14-20:6)]  That is, expanding

_____

(continued...)

180)]  The settlement agreement and consent decree required DYFS to develop a Child Welfare Reform Plan, to implement the goals outlined in the settlement agreement.  [JA XVII 3916-19 (testimony of M. Schalick, 89:10-92:19)]

[20]     New Jersey CARES was the only program in New Jersey (and one of the few in the country) providing the services that it did, at the level of excellence that it did.  [See generally JA VIII 1715-18 (testimony of J. Crosbie, 180:15-183:5)]

New Jersey CARES' role as a DYFS provider was an explicit part of the executive branch's plan for complying with a consent decree – not the brainchild of Mr. Bryant on a self-serving lark to please SOM.

In any event, the fact that the senator from South Jersey was a forceful advocate for a South Jersey-based, nationally-renowned program that provided a critical service to his constituents, and which fulfilled a essential piece of his policy goals, is so unsurprising as to be perfectly un-illuminating on the critical issue in this case:  whether Mr. Bryant supported New Jersey CARES **because of** his SOM salary.  Yes, Mr. Bryant supported New Jersey CARES.  Yes, he advocated for the state to use New Jersey CARES rather than an inferior provider.  If one credits the government's witness, he did so with the full force of his legislative influence.  But nothing in the record suggests that he did so in exchange for employment with SOM.  And nothing suggests that by advocating for New Jersey CARES Mr. Bryant deprived his constituents of his honest services.

> C.    The Government Offered No Evidence About the Value of the Legitimate Work that Mr. Bryant Performed, Leaving Its Key Inference Unsupported.

Even the government's witnesses agreed that Mr. Bryant did do legitimate work for SOM.  The government invited the jury to infer,

however, that the work that he did was insufficient to justify his salary –

and thus that the excess compensation must have been payment for

official acts.  The government produced no evidence to support that

theory, however, because it produced no evidence at all about the value

of Mr. Bryant's work.  The problem is particularly acute in this case

because the type of work that Mr. Bryant did is inherently difficult to

value.  For example:

- Robert Prodoehl, the Director of Operations for SOM, admitted that, Mr. Bryant's position did not require him to be physically present on campus for work each day, and often required him to work beyond regular working hours.  [JA V 1071 (testimony of R. Prodoehl, 181:15-21)]  He testified that Mr. Bryant was, nonetheless, on campus approximately three out of four Tuesdays, and when he was not present it was because of Senate budget hearings or an illness.  [JA VI 1176 (testimony of R. Prodoehl, 67:4-13)]

- Mr. Prodoehl also testified that Mr. Bryant taught classes for a Dr. McAbee, Dr. Mason, Dr. Erde, and Dr. Gallagher.  Coursework included medical jurisprudence, history of medicine, and the government's role in health care.  [JA VI 1264-65 (testimony of R. Prodoehl, 155:6-156:14); JA VII 1346-49 (testimony of R. Prodoehl, 34:21-37:3)]

- Mr. Prodoehl and Mr. Crosbie acknowledged that Mr. Bryant's job duties included planning a joint degree program between Rutgers Law School and SOM.  [JA VII 1349 (testimony of R. Prodoehl, 37:18-22); JA IX 1788-91 (testimony of J. Crosbie, 17:9-20:17)]

- Dr. Cavalieri of SOM's Institute for Successful Aging testified that Mr. Bryant advised him, and other leaders of the institute, on the expansion of the program and the availability of community resources.  [JA XII 2540-45 (testimony of T.

Cavalieri, 26:16-31:22)]  He memorialized these discussions in
a memorandum that came into evidence.  [JA XII 2539-45
(testimony of T. Cavalieri, 25:22-31:22); JA XXIII 5513 (GE
926, November 4, 2005 memorandum)] The memorandum
reflects Mr. Bryant's "important insights" and specific
suggestions for expanding the institute statewide, while
developing community ties and a model that would attract
federal funding and industry support.  [Id.]

- Mr. Crosbie testified that Mr. Bryant secured then-Justice
  Wallace's participation as a commencement speaker.  [JA IX 1780
  (testimony of J. Crosbie, 9:18-25)]

- Mr. Crosbie testified that Mr. Bryant brought Assemblywoman
  Bonnie Watson Coleman to campus as a commencement speaker.
  [JA IX 1781 (testimony of J. Crosbie, 10:1-5)]

- Mr. Crosbie testified that Mr. Bryant helped arrange a meeting for
  SOM with the Economic Development Authority (an independent
  agency) to discuss funding for construction on campus.  [JA IX
  1834-35 (testimony of J. Crosbie, 63:20-65:8)]

- Mr. Crosbie also acknowledged that Mr. Bryant had an
  "encyclopedic knowledge" of the South Jersey community, and
  also had a great knowledge of health care and health care legal
  issues.  [JA IX 1814-15 (testimony of J. Crosbie, 43:9-44:21)]  He
  discussed these matters, as they related to SOM, with Mr. Bryant
  on campus.  [JA IX 1823-24 (testimony of J. Crosbie, 52:21-53:1)]

- Mr. Crosbie testified that he was to work with Mr. Bryant on a
  business incubator program that was designed to link small
  businesses in the science and technology fields to SOM, and that
  Mr. Bryant helped with that effort (although in the end, Rutgers
  personnel did most of the work).  [JA IX 1852-54, 1891 (testimony
  of J. Crosbie, 81:19-83:2, 120:14-23)]

- Mr. Crosbie also testified that Mr. Bryant reached out to, and
  encouraged, members of the New Jersey Black Caucus to meet at
  SOM.  At the meeting, SOM administration briefed the lawmakers
  on SOM's commitment to diversity, cultural competency, and

service to underserved populations, among other topics. [JA IX 1820-22 (testimony of J. Crosbie, 49:24-51:11)]

- Mr. Crosbie testified that Mr. Bryant brought then-Acting Governor Codey to campus for a bill signing ceremony, on an issue key to SOM's historical mission: cultural competency for medical providers. Mr. Crosbie acknowledged that the publicity surrounding the visit was a positive for SOM in terms of marketing and outreach. [JA IX 1842-43 (testimony of J. Crosbie, 71:3-72:10)]

- Ms. Schalick testified that she attended approximately five meetings with Mr. Bryant while she worked for New Jersey CARES. At the meetings, the CARES team would share with him information about the institute's growth, and its services; he would "give advice about marketing ideas and ways to increase public awareness . . . and ideas about collaboration with different agencies and community groups." [JA XVII 3932-34 (testimony of M. Schalick, 105:18-107:5)]

- Ms. Schalick also testified that Mr. Bryant facilitated a meeting for New Jersey CARES with New Jersey's Office of the Attorney General, to discuss how the program could help with prosecutions of child abuse cases. [JA XVII 3935-36 (testimony of M. Schalick, 108:4-109:13)]

- Ms. Schalick further testified that Mr. Bryant spoke at a statewide training event that New Jersey CARES presented, in the Spring of 2005. [JA XVII 3936-37 (testimony of M. Schalick, 109:19-110:7)]

In sum, the record showed that Mr. Bryant did quite a bit for SOM.

Some of what he did was official action, and some was not. What the record

entirely lacked is a basis from which to infer that when Mr. Bryant did take

official action on SOM's behalf, he did so in exchange for his salary.

Considering Mr. Bryant's knowledge and intent on its own, as this Court

must; see Leahy, 445 F.3d at 656; his teaching, consulting, marketing, and outreach work for SOM explained his salary.  The merits of SOM's programs aimed at strengthening South Jersey institutions, and serving poor and minority communities, explained his votes.

> D.    The Evidence Was Insufficient As To Dr. Gallagher.

Just as the prosecution failed to prove *quid pro quo* with respect to Mr. Bryant, the proof also failed with respect to Dr. Gallagher.  While the government had evidence of official action taken by Mr. Bryant with respect to the medical school *while* he was on its payroll, that failed to establish he performed such action in exchange for his salary.  See Point VIII infra.   For the same reason, the government's proof failed to establish that Dr. Gallagher participated in hiring Mr. Bryant as part of an exchange for official action.  Thus, the proof on Counts 1-6, and Count 8, failed.

The government's argument at trial, and in summation, had only two basic elements:  (i) that after Bryant was hired and at the prompting of Dr. Gallagher and others at the medical school, various legislative benefits accrued to the school that Mr. Bryant had a role in promoting, and (ii) there was evidence of deceptive practices by Dr. Gallagher and others at UMDNJ employed in various aspects of the employment of Mr. Bryant.  Evidence of

the simultaneity of Mr. Bryant's employment and his efforts to help the medical school did not suffice to prove the requisite *quid pro quo*.

What is completely missing is any evidence that the funding received by the medical school was undeserved.  This is not a case of paying a regulator to overlook safety problems or paying a public employee to assist in siphoning public funds into a private pocket.  The evidence in this case showed only a state medical school obtaining state funding for good purposes.  Accordingly, the evidence supports no inference of a *quid pro quo*.  The government did not prove that Bryant's job was offered and provided contingent upon Bryant's provision of requested official action.  The medical school was, after all, a constituent of Mr. Bryant.  Approaching Bryant to promote the interests of the medical school, a public agency of New Jersey, was not improper.  There was nothing offered by the government in evidence that proved the arrangement with Bryant, or the public purposes with respect to which official action was allegedly sought by UMDNJ and Gallagher, was the result of Dr. Gallagher conditioning the payment of Mr. Bryant's salary upon any official action for UMDNJ.  The fact that Dr. Gallagher may have been pleased with some of Mr. Bryant's efforts does not convert the hiring into a criminal *quid pro quo*.

Secondly, the government argued at trial and in summation that various items of evidence revealed deception on the part of Dr. Gallagher and others. These items of alleged deception (which were in fact nothing of the kind) primarily related to matters such as the alleged falsity of the job description, the hiring process, and the SPTF form. The government also offered various snippets of proof regarding statements attributed to Dr. Gallagher about (i) his reaction to a statement by Prodoehl that Mr. Bryant's hiring was a "good investment" for UMDNJ, (ii) out of Bryant's PTACDG funds grant to SOM's geriatric institute was "pay-back time" and (iii) upbraiding an employee for discussing the aging grant in the hallways at SOM. Evidence of such deception, even if it was deceptive (which the defense exhaustively countered at trial), cannot provide the missing element of offered exchange—that is evidence that UMDNJ conditioned either its payment, or its offer of payment, upon Mr. Bryant's provision of official action.

The government likewise failed to prove that Dr. Gallagher had the requisite *mens rea* to commit the offenses for which he was convicted . Trying to help one's employer, a state medical school, obtain state dollars is not improper. The government produced no evidence of cash in a bag or secret, undisclosed relationships or financial dealings. Mr. Bryant's hiring at

UMDNJ was open and public and published in newspapers of New Jersey. The alleged bribe in this case was a regularly-paid salary, and Mr. Bryant appeared in the office regularly. There is no contention that Bryant completely failed to report to work. Bryant's hiring was approved by the entire senior administration of UMDNJ, including its general counsel. Dr. Gallagher had no personal financial interest in the hiring of Bryant outside of those necessarily attendant to an employee acting in a wholly institutional role on behalf of his employer. The official action at issue was solely for public purposes.

The only intent proven by the government was the intent to promote the interests of UMDNJ/SOM, and that does not prove the *mens rea* necessary to support a conviction. United States v. Brown, 459 F.3d 509 (5th Cir. 2006). In short, the fact that Dr. Gallagher may have hoped that hiring Mr. Bryant would benefit the medical school does not convert this otherwise legal and permissible employment relationship by a part-time legislator into a federal crime.

IV.    THE GOVERNMENT'S INTERFERENCE WITH THE
       DEFENSE'S ACCESS TO WITNESSES VIOLATED DUE
       PROCESS.

## STANDARD OF REVIEW

The trial court's refusal to dismiss the indictment based on the

prosecution's interference with the defense access to witnesses is a legal

ruling as to which this Court's review is plenary.

## DISCUSSION

The defense moved pretrial to dismiss the indictment because the

government violated due process, and Federal Rule of Criminal Procedure

6(e)(2)(A), by interfering with the defense's access to witnesses.  See Kines

v. Butterworth, 669 F.2d 6, 9 (1st Cir. 1981) ("when the free choice of a

potential witness to talk to defense counsel is constrained by the prosecution

without justification, this constitutes improper interference with a

defendant's right of access to the witness").  In support of that motion, the

defense submitted both an affidavit of counsel and several exhibits that

showed the nature of the government interference, and made a *prima facie*

showing, at least, of prejudice from it.  As explained below, at a minimum

the district court should have ordered a hearing at which the defendants

could have developed further proof of prejudice.  The remedy that the

district court ordered instead of a hearing was insufficient to redress the due

process violation.

A.    The Government's Conduct

The government limited the defense's access to witnesses in two ways:  first, it influenced witnesses not to speak with the defense by placing on grand jury subpoenas, without court authorization, the following warning:

> DISCLOSURE OF THE NATURE AND
> EXISTENCE OF THIS SUBPOENA COULD
> OBSTRUCT AND IMPEDE A CRIMINAL
> INVESTIGATION INTO ALLEGED
> VIOLATIONS OF FEDERAL LAW.
> THEREFORE, THE UNITED STATES
> ATTORNEY REQUESTS THAT YOU DO NOT
> DISCLOSE THE EXISTENCE OF THIS
> SUBPOENA.

[JA XXIV 5640 (capitalization in original)].  In one instance of which the defense learned, the government's warning stated that disclosure "would" (rather than "could") obstruct and impede a criminal investigation.  [Id. at 5638]  The warning was emblazoned on an official court document as though it were endorsed by the court, and was unlimited in time and scope.

Second, witnesses under oath before the grand jury, outside the presence of counsel, were "requested" not to disclose matters occurring before the grand jury.  As quoted by the trial court from one transcript, the prosecutor said :  "This [secrecy] rule does not apply to witnesses such as yourself.  I wish to request that you voluntarily not disclose any matters which occurred before this grand jury today."  [JA III 361]  In at least once

instance, prosecutors elicited the witness's commitment – under oath – not to disclose outside the proceedings the matters occurring before the grand jury.  [JA XXIV 5570-71]  One grand jury witness submitted an affidavit saying that the agent who served the subpoena verbally warned him not to talk to the defense, under threat of prosecution.  [JA XXIII 5517-18]  In another instance, a government agent asked a witness in a subsequent interview whether the non-disclosure warning was heeded.  [JA XXIV 5645-46]

### B.    The Government's Actions Violated Due Process

Witnesses belong to neither the government nor the defense.  United States v. Matlock, 491 F.2d 504, 506 (6th Cir. 1974).  Both sides have the right to interview witnesses before trial.  Callahan v. United States, 371 F.2d 658 (9th Cir. 1967); United States v. Long, 449 F.2d 288 (8th Cir. 1971).  The Federal Rules of Criminal Procedure specifically prohibit restricting a grand jury witness's freedom to disclose grand jury matters.  Federal Rule of Criminal Procedure 6(e)(2)("No obligation of secrecy may be imposed on any person except in accordance with this rule.").  Congress and the courts have the power to craft exceptions to that rule, but neither did so here.  Congress has authorized the government to take that action only in Bank Secrecy Act cases, and even then only upon court order.  12 U.S.C. §§ 3409,

3412(I); cf. 18 U.S.C. §1510 (limited to financial institutions); United States Attorney's Manual Title 9, Criminal Resource Manual Section 462, Form Q-1 (form motion for court order permitting instruction to witness not to disclose under Bank Secrecy Act). Those statutes, obviously, do not apply here.

Courts in other jurisdictions have concluded that a court may authorize the government to restrict a witness' disclosure of certain other (non-Bank Secrecy Act) grand jury matters upon a "stringent" showing of "compelling necessity . . . shown with particularity." See, e.g., In re Grand Jury Proceedings (Appeal of Diamante), 814 F.2d 61, 69 (1st Cir. 1987) (quoting In re Grand Jury Subpoena Duces Tecum, 797 F.2d 676, 681 (8th Cir. 1986)).

But this circuit has not so held, and the government did not bother to seek court authorization in any event. The government simply, and improperly, arrogated the authority to determine when a witness should be discouraged from speaking. Worse, the government inaccurately implied to the witnesses that a court – and not the prosecutors themselves – had issued the secrecy warning, when it emblazoned the warning on the face of the grand jury subpoenas. That action alone illustrates the government's misapprehension of the nature of the grand jury:  the grand jury subpoena is

not the government's to alter, the grand jury witness is not the government's to control, and the terms of the witness's testimony are not the government's to dictate. The grand jury is an appendage of the court, and not an arm of the prosecution. United States v. Brown, 359 U.S. 41 (1959).

Although "no right of a defendant is violated when a potential witness freely chooses not to talk, . . . when the free choice of a potential witness to talk to defense counsel is constrained by the prosecution without justification, this constitutes improper interference with a defendant's right of access to the witness." Kines v. Butterworth, 669 F.2d 6, 9 (1st Cir. 1981); see ABA Standards for Criminal Justice §3-3.1(d) ("a prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel. A prosecutor should not advise any person or cause any person to be advised to decline to give to the defense information which such person has the right to give."); New Jersey Rules of Professional Conduct Rule 3.4(f) (providing under certain circumstances that a lawyer shall not request that a person refrain from voluntarily giving relevant information to another party).[21] Interference with a witness's "free choice" violates due process. Kines, 669 F.2d at 9 (and cases cited therein).

---

[21]    The rules of ethics also prohibit contact with represented parties without their counsel's consent. Although a prosecutor certainly may

(continued...)

The government contended pretrial that its warnings to the witnesses were mere "requests" [JA III 351-352]; but both common sense and case law show the fallacy of that argument. Government interference with defense access to witnesses need not be overt to violate due process. For example, in United States v. Carrigan, 804 F.2d 599 (10th Cir. 1986), the government "by words, implications or non-verbal conduct of the prosecutor, either intentionally or unintentionally" informed the witnesses that the government did not want them to talk to the defense, and "substantially chilled" their prior willingness to do so. Id. at 604. In other words, the defendant's due process rights were violated by the mere suggestion – indeed, the mere implication, through "non-verbal conduct" -- that negative consequences would flow from the witness's perceived cooperation with the defense investigation. Accord Gregory v. United States, 369 F.2d 185, 187-88 (D.C. Cir. 1966) (prosecutor violated defendant's right to a fair trial when he told witnesses that they had the right to speak with defense counsel, but gave the

_____

(continued...)

question a represented witness in the grand jury, delivering these "requests" to represented parties who were present by force of court process, and separated from their counsel by force of court rules, served no legitimate testimonial purpose. The stratagem appears to be an attempt to circumvent the involvement of counsel when "advising" the witness about the government's view of his best future course of action.

"advice" that the better practice would be to speak only with the prosecutor present).

The government warnings in this case go far beyond the advice to a witness that the Eighth Circuit found permissible in United States v. Bittner, 728 F.2d 1038 (8th Cir. 1984). In that case, the government's investigating agent merely advised a witness that she had the right to decline an interview with the defendant's attorney. At the opposite extreme, the government conduct in this case is even more problematic than that condemned in In re Grand Jury Proceedings (Appeal of Diamante), 814 F.2d 61(1st Cir. 1987). In Diamante, the government issued subpoenas with an accompanying letter instructing the recipient not to disclose the existence of, or compliance with, the subpoena for 90 days; and stating that "any such disclosure could seriously impede the investigation being conducted and, thereby, interfere with the enforcement of the federal criminal law." Id. at 63. The court found that the letters improperly purported to impose on the recipients an obligation to keep the subpoena secret, in violation of Fed. Rule Crim. P. 6(e)(2). In response to the government's argument that the warning language "merely inform[ed] the recipient" of the government's view, the Diamante court stated:

> Absent a clear showing to the contrary, we fail to
> see how a reasonable, law-abiding person who

> received such a letter would think anything other
> than that he was being told that he was legally
> obligated not to engage in that course of action.
> We note, in addition, that the letter, in stating that
> disclosure could "impede" an investigation and
> "interfere" with the enforcement of the law,
> closely resembles the language of 18 U.S.C. §
> 1503 (1982), which makes it a crime to "influence,
> obstruct, or impede the due administration of
> justice." . . . There was no actual threat of
> prosecution here.  Yet we cannot accept that a
> letter from an Assistant United States Attorney,
> Special Prosecutions Unit, is to be viewed as
> merely appealing to an individual's "discretion"
> when it portrays an action in terms substantially
> identical to those used to describe a very serious
> federal crime.

Id. at 70.

As in this case, in Diamante no court had authorized the imposition of such a secrecy requirement.  Unlike in this case, the government in Diamante at least disclosed to the witness that the prosecution alone, and not the court, endorsed the warning, by including the warning in a cover letter rather than on the face of the subpoena.  Also unlike this case, the government in Diamante temporally limited its instruction to the witness, permitting the witness to speak after 90 days.  The warnings in this case sought nondisclosure in perpetuity.

Moreover, the fact that the government in this case also refreshed their "request" to witnesses under oath in the grand jury, and required at least one

witness to commit during his testimony, under oath and on the record, to honoring the demand for secrecy [JA XXIV 5570], imported the additional implied threat of a perjury prosecution.  A witness would quite reasonably hesitate to act inconsistently with his sworn commitment to the prosecutor, for fear that the government would contend that the witness had falsely stated his intention to comply.

Still worse, the government's warnings -- that a witness's exercise of the first amendment right to disclose the "nature and existence" of the subpoena could *ipso facto* obstruct and impede a federal criminal investigation – lacked foundation and bordered on misrepresentation.  As a factual matter, the United States Attorney's own appointed "Monitor" had publicized the investigation through-and-through, beginning in 2005 and early 2006 before the grand jury started hearing from witnesses.  As early as April 7, 2006, statewide newspapers (e.g., the Newark Star Ledger) were reporting that a grand jury was also investigating the matter – a fairly obvious point, given that the Monitor was monitoring UMDNJ as a result of a deferred prosecution agreement, which contemplates the possibility of criminal charges.  The newspaper reports clearly linked the investigation to Mr. Bryant and his previously-publicized employment with SOM.  See, e.g., Legislator Drawn Into Scandal at UMDNJ – U.S. Attorney Looks at

Bryant's Job, Newark Star Ledger, April 7, 2006.  Before the district court,

the defense submitted an article from the New York Times from March 16,

2006 substantially to the same effect.  [JA XXIII 5525]  Had a witness

disclosed the "nature and existence" of a grand jury subpoena in this matter,

the disclosure would have done nothing to alert the targets of the

investigation to the scrutiny; the entire State of New Jersey was well-aware

of the scrutiny.  The grand jury witness subpoenas came after publicity had

already assured the targets' knowledge of the investigation; all of the

subpoenas dated from later in 2006, and 2007.  [JA XXIV 5613-40].

    Under these circumstances, the government neither could nor did

claim that secrecy was required to protect the judicial process based on a

showing of compelling necessity and particularized need.  See Diamante,

814 F.2d at 69.  The government's only justification was pure prosecutorial

prerogative:  it is United States Attorney's Office policy to put these

warnings on **every** grand jury subpoena.  [JA III-372-73]  There is no better

evidence of the prosecutors' lack of concern for the federal rule against

imposing secrecy on witnesses, their attitude of ownership toward the grand

jury process, and the violation of due process:  the prosecutors reflexively,

without respect to need, tell every witness in every case not to talk to the

defense.  The only purpose for doing so is tactical advantage.  Even though

the government could not literally *compel* witness secrecy in this case, its

actions certainly "constrained" the witnesses' "free choice" in a manner that

violates due process.  See Kines, 669 F.2d at 9.

C.    The Defense Adequately Demonstrated Prejudice, Or Should
Have Been Given A Hearing At Which To Do So.

As the above discussion makes clear, this Court certainly could find a

due process violation simply from the record of government's actions.  In

the district court, however, the defense also developed a record of prejudice;

specifically, its stymied attempts to interview witnesses.  The defense

supplied copies of subpoenas containing the warning language, and portions

of the offending grand jury transcripts.  [JA XXIV 5525-5640]  The defense

also provided an affidavit detailing its attempts to speak with several

witnesses who initially agreed to defense interview requests but then

subsequently declined.  [JA XXIII 5519]  The witnesses were employees of

UMDNJ and Rutgers, and they stated that their employers' counsel

instructed them not to speak with the defense.  Id.  Counsel for UMDNJ

confirmed that he had given that instruction, and explained that his decision

was informed by fear that allowing UMDNJ employees to speak to the

defense would jeopardize its Deferred Prosecution Agreement with the

United States Attorney's Office.  Id.  Counsel for Rutgers, while declining to

explain her reasoning, confirmed that she had spoken with the Assistant U.S.

Attorney assigned to the matter.  Id.  The defense also submitted an affidavit from its investigator, who reported that a witness who had previously agreed to speak with her later declined, citing advice from in-house counsel.  [JA XXV 5757]

In addition, the defense submitted an affidavit from a witness who received one of the problematic subpoenas and reported that the investigating agent "instructed me words to the effect that I was not allowed to disclose the existence of the subpoena to anyone and that if I did so, I could be charged with obstructing a criminal investigation."  [JA XXIII 5517-18]  The defense also submitted under seal an FBI 302 report indicating that one grand jury witness was re-interviewed after testifying.  During the witness' re-interview by the FBI, the witness was asked whether she had discussed her grand jury testimony with anyone.  After she said that she had, the government confronted her with its prior request that she not disclose anything occurring before the grand jury.  [JA XXIV 5645-46]  Thus it appears that even when the warning on the subpoena was not explicitly mandatory, the agents serving them reinforced the implied threat.

Given that showing of systematized pressure on witnesses, and prejudice to the defense investigation, the defense requested that the district court hold a hearing at which it could further develop proof that the

government's actions had prejudiced the defense investigation. [See JA III-325 et seq.]   The court criticized the government for a bad policy [JA 0358 (comments of court, 204:3-14)], but was unpersuaded that the defense had made an adequate showing of prejudice. [JA III-363] Specifically, the court relied upon the involvement of counsel giving advice to their clients, and denied the defense's request for a hearing. [JA III 0356-0357 (comments of court, 202:21-203:24)] That ruling was error.

The district court gave undue weight to the involvement of counsel for the entities that employed many of the witnesses, when ruling that the defense had not shown that the government's actions had influenced the witnesses' decisions not to talk. [Id. at 356-57] The unfair impact of the government's improper actions is not dissipated by filtering it through the mind of counsel.[22] The legal standard for a due process violation is whether a witness's "free choice" was "constrained" by the government's actions. As the Supreme Court of South Carolina correctly observed on this issue, the fact that counsel advised the witness that it was not in his "best interest" to

---

[22]    One might analogize to the "learned intermediary" doctrine in pharmaceutical product liability cases, in which the intervening advice of a medical professional to the plaintiff shields a device manufacturer from liability only if the manufacturer provided truthful information to the professional. See, e.g., Mazur v. Merck & Co., 964 F.2d 1348, 1361 (3d Cir. 1992); Reyes v. Wyeth Labs, 498 F.2d 1264, 1276 (5th Cir. 1974).

derogate the government's wishes, and the witness made his decision based on counsel's advice, "is not dispositive of the issue raised by Appellant: whether that decision was influenced by improper government interference?" State v. Williams, 485 S.E.2d 99, 102 (S.C. 1997). Here, the record is clear that the government's actions could not but have influenced the witnesses' choices, through counsel or not.

If anything, the involvement of counsel for the entities made it only more likely, not less, that the witnesses would defer to the government's instructions. These witnesses were not advised by separate counsel protecting their personal interests. They were advised by counsel for their employers that their employers did not want them to talk.[23] Yet counsel's advice was surely constrained by the government's clear indications that it did not want witnesses to talk to the defense, and would view a witness's

---

[23]    Thus the threat of adverse employment action compounded the implied threat of a prosecution for obstruction. To be clear, the record reflects that in March 2008, counsel for UMDNJ (one of the two entities at issue) informed defense counsel that it would send a letter to its employees telling them that they would not suffer adverse employment action if they chose to speak with defense counsel. [JA XXV 5625-28 (Supplemental Affidavit of C. Poplar)]. The record does not reflect whether the letter was actually sent, nor whether it contained a statement of the employer's preference that employees not cooperate with the defense. In any event, for the reasons explained below, just as a remedial letter from the government would not cure the prejudice to the defense investigation, much less would a letter from one of the universities.

decision to do so as impairing the government's interests (or as an actual

obstruction of justice). As counsel for UMDNJ candidly admitted to defense

counsel, the threat of prosecution inherent in his client's Deferred

Prosecution Agreement, and the ongoing scrutiny of the federal Monitor,

required him to instruct its employees not to permit any hint that they were

aiding the defense. In that context, the government's clear warnings that it

would view contact with the defense as obstructive had to influence

counsel's thinking about what to tell his client's employees. His goal was to

avoid angering the government. Surely counsel for Rutgers, who was less

open about her decision-making but admitted to having contact with the

Assistant United States Attorney handling the investigation, was not

ignorant of the potential threat to her client as well. In these circumstances,

the entities' counsel were not the independent bulwark against government

overreaching that the district court seemed to credit them with being.[24]

Their involvement did not "break the chain of causation" between the

government's improper warnings and the witnesses' refusal to talk to the

defense. To the contrary, counsel's desire to protect the entities from the

---

[24] That is not to criticize counsel, who were presumably giving advice that they thought would best serve their clients, the entities. It is merely to point out that counsel's decision-making was equally constrained by the government's actions. See Williams, 485 S.E.2d at 102.

government's ill-will actually amplified the government's message.[25]  At a

minimum, the record was sufficient to require the district court to give the

defense a further opportunity to prove the impact of the government's Rule

6(e)(2) violation.

Having denied a hearing but remaining troubled by the government's

actions, the Court directed that the government write a letter to those who

had received grand jury subpoenas containing the warning.  The letter did

not specifically address the Rule 6(e) prohibition on imposing secrecy on

grand jury witnesses.  Instead, it merely informed the witnesses that they

were now free to talk to the defense if they chose, and free not to talk to the

defense if they chose not to.  [See JA III 357 et seq.; JA XXIII 5473 (form of

letter)]

Although that remedy has been approved by another court of appeals;

see Diamante, 814 F.2d at 69, it was not adequate here.  First, by the time

that the government sent the remedial letters in this case in April 2008, up to

---

[25]    It is well-known in the world of white collar criminal defense
that corporate counsel's legitimate desire to protect the entity against a
business-ending prosecution often provides the government with an angle
for pressuring employees – to talk, to not talk, to plead guilty (when the
corporation refuses to advance counsel fees), etc., -- that it would not
otherwise have available.  See generally United States v. Stein, 541 F.3d 130
(2d Cir. 2008).

two years (and at least one) had passed since the witnesses had been in the grand jury. Thus, even had every witness who previously refused to talk to the defense changed her mind, the defense's investigation was irretrievably impaired by the inevitable diminution in witnesses' memories. The government got access to witnesses whose recollections were fresh; the defense got access (if at all) to witnesses whose memories had faded. Second, witnesses who had gone through the intimidating experience of grand jury testimony and all that is attendant to it, and had the experience firmly in the past, were naturally unwilling to reopen the matter in response to a letter merely telling them that they were free to do so if they chose. As the tenth circuit observed in <u>Carrigan</u>, when approving the ordering of witness depositions as a remedy for government interference with a defense investigation, "an order merely to cease such interference, after the fact, might be insufficient because the witnesses' free choice might have been already perverted and the witnesses likely to refuse voluntary interviews." <u>Carrigan</u>, 804 F.2d at 604. The remedial letters in this case were the equivalent of putting an end date on the government's otherwise-perpetual instruction not to talk. They may have ceased the government's active interference, but they did not dissipate its effect.

Third, the involvement of the witnesses' employers in reinforcing the government's instructions ensured that no matter what communication came from the government, the witnesses would still have firmly in mind the reinforced message that their employer did not want them to submit to a defense interview.  For all of these reasons, the remedial letter was not a remedy at all.  The prejudice from the due process violation remains uncured.

D.    Reversal is Required Without Regard to Prejudice.

This circuit and others have recognized that reversal is required for this type of due process violation, without regard to prejudice.  <u>United States v. Morrison</u>, 535 F.2d 223 (3d Cir. 1976); <u>United States v. Terzado-Madruga</u>, 897 F.2d 1099, 1108 (7th Cir. 1987).  As detailed above (section IV.A), the record adequately establishes a due process violation requiring reversal.

Were this Court to decide, however, that a defendant-appellant must demonstrate prejudice in order to warrant relief for this type of violation, Appellants submit that the record of their showing in the district court (discussed in section IV.C, above) is adequate to establish prejudice.  Were the Court to disagree on that point as well, however, then at a minimum the Court should remand to the district court with instructions to hold a hearing,

at which Appellants would have the opportunity to further prove their claim

of prejudice.

V.   THE RESTITUTION ORDER REQUIRING DEFENDANTS TO
     REPAY THE FULL AMOUNT OF BRYANT'S MEDICAL
     SCHOOL SALARY MUST BE REVERSED BECAUSE THE
     MEDICAL SCHOOL WAS AWARE OF BRYANT'S
     EMPLOYMENT, APPROVED OF IT, AND IS ALLEGED TO
     HAVE BENEFITED FINANCIALLY FROM IT, NOT SUFFERED
     ANY PECUNIARY LOSS.

STANDARD OF REVIEW

The trial court's treatment of the medical school as a victim is a mixed

question of fact and law.  As to any subsidiary facts found by the trial court,

the standard of review is clearly erroneous.  As to the trial court's legal

conclusion to treat as a victim an institution which did not suffer a financial

loss from the criminal conduct and which was intended to benefit from the

conduct, this Court's review is plenary.  The trial court's calculation of the

amount of damages is a finding of fact which this Court will review under

the clearly erroneous standard, but the court's failure to deduct the value of

Bryant's services from the amount of his salary was a legal error as to which

this Court's review is plenary.

The District Court ordered the defendants jointly to repay the amount

of Bryant's medical school salary as restitution.  [JA I 0009; 0015].  This

restitution order, in the amount of $113,167.00, was erroneous for two

reasons.  First, the medical school was a knowing participant in Bryant's hiring and a beneficiary of his actions, not a "victim" within the meaning of 18 U.S.C. § 3663A (the Mandatory Victims Restitution Act or "MVRA"). Second, assuming *arguendo* that the medical school could be considered a victim, the lower court failed to determine the fair value of services provided by Bryant, which amount would have to be deducted from his salary to determine the amount of pecuniary loss, which is the only amount properly subject to a restitution order under the statute.

> A.    The Medical School Was Not a Victim, So Repayment of Bryant's Salary Cannot be Ordered as Restitution.

The touchstone of restitution under the MVRA is actual loss to an identifiable victim, which may be less than, and very different from, the amount which might be imposed as a fine or other criminal sanction or the amount which might be recoverable under some other theory in a civil action.   United States v. Chalupnik, 514 F.3d 748, 754 (8th Cir. 2008). Restitution is not a form of punishment, which is to be achieved by fines, forfeiture, and other criminal penalties. It is a specific remedy created and narrowly tailored by statute.  See id.

The MVRA defines a victim as "a person directly and proximately harmed as a result of the commission of an offense," 18 U.S.C. §3663A(a)(2), and the act applies only if an identifiable victim suffered a

"pecuniary loss."  18 U.S.C. §3663A(c)(1)(B).  This case was tried on the

theory that the conduct at issue benefited the medical school, not that the

school suffered any financial injury.  The loss or injury that the prosecution

argued to the jury was an intangible injury to the public at large -- being

deprived of a legislator's honest services --  and the trial evidence would not

support a finding that medical school's interests were financially harmed.  To

the contrary, the prosecution sought repeatedly to show that the medical

school befitted financially from Bryant's actions.

Because the medical school was not a victim, restitution to it cannot

be ordered under the MVRA.  United States v. Akande, 200 F.3d 136, 138

(3d Cir. 1999) (court may order restitution only when authorized by statute).

Only loss to a statutory victim is compensable under the MVRA, not gain of

a defendant or unjust enrichment.  United States v. Harvey, 532 F.3d 326

(4th Cir. 2008); United States v. Chalupnik, 514 F.3d 748 (8th Cir. 2008);

United States v. Galloway, 509 F.3d 1246 (10th Cir. 2007).  The narrow

provisions of the MVRA cannot be employed to order restitution in the

amount of Bryant's salary merely because it might be viewed as an unjust

enrichment, and in any event for Gallagher there is no amount to be

disgorged because he received none of Bryant's salary.

The indictment itself makes it clear that the medical school was not a victim. The indictment did not describe the medical school as a victim nor did it assert that the medical school was injured by the charged conduct. Instead, the offense was defined in terms of a scheme to defraud the public of Senator Bryant's honest services. Had the government viewed the medical school as a financial victim of the charged conduct, it would have crafted the indictment to reflect that view of the world rather than explaining in the indictment how the school benefited from Bryant's employment. Compare, e.g., United States v. Schmitz, (N.D. Ala., Cr. No. 08-014)(alleged "no-show job with junior college for state representative charged as a financial fraud against college, not honest services fraud). The indictment charged in this case that the purpose of the scheme was to have Bryant "advocate on behalf of SOM" [JA II 0126 (Indictment, Counts 1-6, ¶18)], to "protect the interests of SOM," id., and to "obtain additional funding and other benefits from the State of New Jersey for SOM and its programs." Id. The indictment described the benefit the medical school obtained from the charged conduct. [JA II 0123 (Indictment, ¶11)]. Thus, the medical school is clearly identified in the indictment as a beneficiary, not a victim.

The victims of a bribe of a public official are the citizenry, not the entity who was intended to benefit from the scheme. In the context of a

sentencing guideline issue, this Court concluded that a bribe of a public official causes intangible injury; that the victim is the integrity of the governmental process, United States v. Rudolph, 137 F.3d 173, 181 (3d Cir. 1998).

The anomaly of honest services fraud charges being brought in the context of employees actually acting consistently with their employer's immediate interest was addressed in United States v. Brown, 459 F.3d 509, 522-23 (5th Cir. 2006). The Fifth Circuit pointed out that even had the employees breached a fiduciary duty, they did so "in pursuit of what they understood to be a corporate goal," id. at 522, and reversed the convictions. Plainly, in the narrower context of whether restitution could be ordered, rather than a conviction sustained, the fact that Bryant's hiring was intended to advance the medical school's own interest means that the school cannot be considered a victim under the MVRA.

The fact that the medical school was not a victim under the MVRA is confirmed by the central role played by senior administrators of the medical school in the hiring of Mr. Bryant. The UMDNJ President [JA IV 0728], Vice President for Urban and Community Development [JA XVII 3997-4005], the Senior Vice President for Administration [JA XVII 3838, 3878], and the Vice President of Legal Affairs [JA IX 2033-35] among others were

consulted and approved.  None of them contended that the medical school

suffered a financial loss.  Even if the medical school might have certain civil

remedies available to it regarding a portion of the salary paid to Senator

Bryant, that would not justify treating the medical school as a victim for

MVRA purposes.  A sentence awarding restitution to a non-victim is

unlawful and must be reversed.  United States v. Pawlinski, 374 F.3d 536,

540 (7th Cir. 2004).

> B.    The Government Did Not Meet Its Burden of Proving the
>        Amount of Any Pecuniary Loss

Even assuming *arguendo* that the medical school could be considered

a victim, the court below erred in adopting essentially a forfeiture of salary

approach which, while perhaps consonant with some views of rough justice,

is at odds with the narrow and carefully tailored limits of the MVRA.  The

government simply did not meet its burden of proving that the amount of

loss to the medical school was the entire amount of the salary paid to Bryant.

There was extensive evidence at trial that Bryant regularly appeared

for work, made himself available for assignment by his supervisor, Crosbie,

and provided a host of ordinary-course and unobjectionable services during

the course of his employment.  [See III.C. supra]  The trial court, however,

fashioned a restitution order as if this case were a "no-show" employee case,

when no part of the record supports such a finding.  In its restitution order,

the court erroneously ordered restitution in the amount of Bryant's alleged

gain, instead of requiring the government to meets its burden of proving the

amount actually lost.  [JA I 0004, 0010]

A fair quantification of the actual pecuniary impact of Bryant's

employment would require consideration of what benefits the medical

school reasonably expected to derive (whether or not they were ultimately

ruled to be aspects of a criminal scheme) as well as consideration of the

value of services Bryant actually delivered separate and apart from his role

as a legislator.  The government proved none of this, and untangling these

sorts of complexities is beyond the scope of the "streamlined" restitution

process envisioned by Congress in passing the MVRA.  United States v.

Reifler, 446 F.3d 65, 136-37 (2d Cir. 2006).

The value of services performed by an employee must be determined

and subtracted to establish the amount of loss for purposes of restitution.

United States v. Sapoznik, 161 F.3d 1117, 1121-22 (7th Cir. 1998); United

States v. Guthrie, 64 F.3d 1510 (10th Cir. 1995).  The mere fact that Senator

Bryant's benefited from the salary he received as part of the conduct found

to be criminal is not sufficient basis to order restitution of that amount.  A

defendant's gain in undertaking criminal activity is not an appropriate

estimate of loss for purposes of calculating the amount of restitution.  United

States. v. Harvey, 532 F.3d 326, 340-41 (4th Cir. 2008); United States v.

Galloway, 509 F.3d 1246 (10th Cir. 2007).  The government's failure to

quantify the actual loss suffered requires reversal.  United States v. Rowe,

988 F.2d 125 (9th Cir. 1993).

VI.    JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE A
       NEW TRIAL, IS REQUIRED ON THE PENSION FRAUD
       COUNTS.

## STANDARDS OF REVIEW

The trial court's ruling admitting Mr. Beaver's testimony as to legal

matters is to be reviewed for abuse of discretion.  The standard of review of

the sufficiency of the evidence is whether the evidence in the light most

favorable to the government was sufficient to support the conviction on the

pension fraud counts.

## DISCUSSION

The government alleged that Mr. Bryant committed federal mail fraud

by (1) applying for pension benefits for his job as attorney for the Gloucester

County Board of Social Services ("GCBSS"), because his law firm

associates performed much of the service on his behalf; and (2) applying for

pension benefits for his job at SOM, because the job was a bribe.  The

elements of this traditional "money or property" mail fraud are, of course,

one, a scheme or artifice to defraud by means of materially false or

fraudulent pretenses; two, participation by the defendant with specific intent to defraud; and three, use of the mail in furtherance of the scheme. E.g., United States v. Monostra, 125 F.3d 183, 187 (3d Cir. 1997).

For the reasons explained in detail below, the government did not plead or prove that Mr. Bryant made any false statements in his application for pension benefits. Indeed, the government failed to prove that Mr. Bryant was even ineligible for benefits – a necessary predicate to making his claim for benefits false and fraudulent. The New Jersey Public Employees Retirement System ("PERS") is governed by a robust set of statutes and regulations that prescribe detailed eligibility criteria for pension credit. See N.J. Stat. Ann. §§ 43:1-1 et seq. Contrary to the government's suggestions in this case, misconduct in office does not automatically disqualify a member from earning a pension. N.J.S.A. 43:1-3. Nor did any statute, rule, or decision in place at the relevant time preclude a professional member from claiming pension credit for hours worked by an associate on the member's behalf, as Wayne Bryant (and others) did for the Gloucester County Board of Social Services.

Having failed to prove anything other than a complex and disputed legal issue as to Mr. Bryant's eligibility, the government wholly failed to

prove an intent to defraud.  For all of these failures of proof, judgment of acquittal is required.

      A.    The District Court Erred In Admitting The Testimony Of The Government's Pension Witness On The Meaning Of A Key, Disputed, Provision Of State Law.

          1.    Mr. Frederick Beaver Improperly Testified About Legal Issues.

The key issue on the pension fraud counts was whether Mr. Bryant committed federal mail fraud by claiming pension benefits for which he was ineligible.  Because the eligibility question as to SOM was derivative of the government's bribery claims, the proof on the pension counts focused on GCBSS; specifically, on the question of whether Mr. Bryant was entitled to pension credit for the services that his law firm's associates provided to GCBSS on his behalf.

Given the comprehensive statutory and regulatory system that governs all aspects of New Jersey's PERS, this eligibility question was necessarily a legal question.   But to address the topic, the government proffered a lay "fact" witness:  the Director of the New Jersey Division of Pensions and Benefits ("the Division"), Mr. Frederick Beaver.  The defense objected to Mr. Beaver's proposed testimony on multiple grounds, boiling down to (1) the government did not identify him as an expert, and he would not qualify as an expert on the law; and (2) expert testimony on the law is not

permissible in any event.  [See JA XV 3209-47 (oral argument on admissibility of proposed testimony, 2:13-40:24); see also  JA XV 3372-73, 3374-75 (contemporaneous objections and sidebars during testimony, 62:20-63:14, 64:17-65:9)]  The government countered by representing to the court that Mr. Beaver would not testify about the law, but only about materiality. Accepting that representation, the district court ruled that the government could ask Mr. Beaver a materiality question:  "So the question is for the Division of Pensions, when they make a determination, is that something that's material to them?  . . . If you are going to ask about attorneys performing work or sending someone from their firm to do so and cover for them, whether that's material."  [JA XV 3244-45 (comments of the court, 37:18-38:4)] The court further noted that the witness would testify only from his "personal knowledge."  [JA XV 3246 (comments of the court, 39:4)]

Perhaps inevitably (but no less improperly, and prejudicially) the distinction between "materiality" testimony and "legal" testimony quickly broke down – as soon as the government asked the witness to define the term "creditable service."  Granted, the government prefaced its question with "in your experience"; i.e., "in your experience, what would be considered creditable service"?  [JA XV 3260 (question of counsel, 52:16-17); JA XV 3264 (counsel re-posing question after sidebar, 56:20-22)]  But

the witness himself showed the fallacy of the distinction:  "We look to –

there is actually a statutory cite – and I don't have the reference with me

today, but there is a cite that requires a service be rendered for payments

received.  So we would look to creditable service being any service that was

delivered on behalf of the employer."  [JA XV 3264-65, testimony of F.

Beaver, 56:23-57:3)] After defense objection, both the court and the

government invited the witness to explain the criteria in non-legal terms, but

the cat was out of the bag.  Mr. Beaver had clearly stated that the Division's

"practice" does not exist outside of the governing statute.  The boundary

honored in the case law, permitting testimony on "custom and practice" but

prohibiting testimony on the law, had been breached.  See Berckeley Inv.

Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006); United States v.

Leo, 941 F.2d 181, 195-96 (3d Cir. 1991).  Thus, when Mr. Beaver went on

to answer "no" to the question "does an attorney who repeatedly sends

someone else to perform work constitute creditable service?," [JA XV 3266

(testimony of F. Beaver, 58:1-4)], he was unavoidably testifying about the

law.

     Mr. Beaver merely reinforced the problem in his continuing testimony

the next day, when after another defense objection the court instructed the

government to lay a firmer foundation with additional testimony about how

the pension board makes its decisions. [JA XV 3375-76 (comments of the court, 65:13-66:2)] Instead of accepting the government's invitation to identify neutral "criteria" that the board uses to determine eligibility, Mr. Beaver stated that "the board follows the statutory requirements of the administrative code." [JA XV 3378 (testimony of F. Beaver, 68:11-16)] Nonetheless, the court permitted him to again opine on the significance of an employee personally performing the work. [JA XV 3378-80 (testimony of F. Beaver, 68:19-70:6)] When invited by the government, he opined that the practice was "abusive." [JA XV 3456-57 (testimony of F. Beaver, 146:23-147:3)] By the end of the witness's testimony, he had so far crossed the line into "legal expert" that the government orally block-quoted from statutes and case law and simply asked him "are you familiar with a statute [or decision] that says 'X'" – in effect laying before the jury the legal standards on which the witness was not qualified to testify, were such testimony even permissible.[26] [See, e.g., JA XV 3448-49, 3454 (testimony of F. Beaver, 138:4-139:9, 144:2-18)]

---

[26]    Worse, the government block-quoted to the jury the holding from a New Jersey Supreme Court case, knowledge of which the witness had just disclaimed – essentially substituting the prosecutor's own "testimony" about the law for the testimony that the witness was not qualified to give. [JA XV 3448-49, 3454 (testimony of F. Beaver, 138:24-139:2, 144:1-18)]

2.     The Limiting Instruction Was Insufficient to Cure the Prejudice.

The court later revisited this issue and agreed with the defense that the jury should not be permitted to rely upon Mr. Beaver's testimony about the law.  Accordingly, it gave a limiting instruction.  This Court does presume that juries follow limiting instructions.  <u>United States v. Lee</u>, 573 F.3d 155, 162 (3d Cir. 2009).  The rule "is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process. . . .  However, the rule is not absolute; [this Court] will not blindly assume that a jury is able to follow a district court's instruction to ignore the elephant in the deliberation room."  <u>Id.</u> at 162-63 (citations omitted).  This limiting instruction was plainly insufficient.

**Twenty-six days** after the witness testified, the district court told the jury:

> I instruct you that you may only consider Frederick Beaver's testimony as expressing his view and based on his experience as Director of the New Jersey Division of Pensions and Benefits.  While Mr. Beaver is both Director of the Division of Pensions and Benefits and a member of the Public Employees Retirement System Board of Trustees, only his testimony as director is relevant in this

case.  I instruct you to disregard Mr. Beaver's testimony regarding his views as a board member.

I also instruct you that Mr. Beaver is not an expert witness and may not opine on legal issues.  You must disregard any of his testimony that touched on his interpretation of any legal issue including the legal definition of creditable service.

Mr. Beaver's testimony regarding the importance of PERS members personally performing work was admitted for the limited purpose of showing materiality.  In weighing his testimony on this point, you may consider the presence or absence of prior action by the division with regard to the practice of attorneys sending associates to perform work for them in pensionable positions.

And I will instruct further about materiality in my final charge or instructions which you would have received today but will now receive on Wednesday[27] [two days later].

[JA XVIII 4342-43 (limiting instruction by the court, 58:18-59:18)][28]

This limiting instruction was insufficient to cure the prejudice for several reasons.  Most obviously, it was given nearly a month after the witness had testified.  The distinctions between Mr. Beaver's testimony as Direction of the Division and his testimony as a member of the PERS board

---

[27]    The court gave the instruction on a Monday.  That Tuesday, November 11, 2008, was a federal holiday.

[28]    Although defense counsel participated in crafting the limiting instruction, after the court's ruling, they made clear that they were not waiving their continuing objections. [JA XVIII 4292 (comments of counsel and court, 8:9-20)]

(distinctions that are difficult to identify even for counsel reviewing the transcript after the fact) were no doubt lost upon the jury.[29]  Second, the instruction concerned the distinction between materiality and law – a complex and subtle distinction for any layperson to apply, but impossible for a jury to apply when it did not yet know what "materiality" means, and would not be told until two days later.  Third, as explained above, there was **no** distinction between materiality and law in this case.  Although the government repeatedly invited the witness to identify decision-making "criteria" outside of the law, he repeatedly repaired to the law.  Perhaps the government will be able to articulate in its appellate briefing some distinction between materiality and law under these facts – but to conclude that a jury would have understood the difference, before it even knew what "materiality" meant, and nearly a month after the witness had testified,

---

[29]    Granted, the court did have occasion to remind the jury to disregard Mr. Beaver's testimony as a board member, when the government ignored the court's prior ruling and argued from that testimony in its closing. [JA XX 4649 (comments of the court, 4:6-24)]  At that point, however, twenty-eight days after Mr. Beaver testified, the jury likely had no idea at all which of Mr. Beaver's statements had been prefaced with "Director of the Division" (permissible to consider) and which with "member of the Board" (impermissible).  Even the transcript of the testimony shows that the distinction was not always discernable.

would be to "blindly assume" that the jury follows instructions.  See Lee,

573 F.3d at 162.  "Blindly assume" is what this Court does not do.

The other factors that this Court traditionally applies, when deciding

whether a jury could have followed a limiting instruction, also show the

inadequacy of the instruction in this case.  These include "the strength of the

proper evidence against the defendant, the nature of the information, and the

manner in which the information was conveyed."  Id. at 163.  Here, the

government had no evidence about the meaning of "creditable service" other

than Mr. Beaver's opinion.  Even he could point to no action by the Division

in accordance with his view prior to July 2006 (and could point to no *public*

action within the indictment period, which ended September 2006, at all).[30]

At the same time, the importance of the issue to the pension fraud

allegations cannot be overstated.  It was the critical, perhaps the only, issue

in dispute.  And Mr. Beaver testified with the full weight of his authority:  as

not only the Director of the Division that makes eligibility decisions, but as a

member of the board that reviews them, and as the only representative of the

alleged victim.

---

[30] Defense counsel later discovered that in fact the action to which Mr.
Beaver had pointed was decided on an entirely different legal issue, but the
court did not strike the testimony.  [JA XVI 3614-16 (representations of
counsel)]

In these circumstances, it is inconceivable that the jury properly understood and followed the district court's instruction to disregard Mr. Beaver's testimony about the law. The limiting instruction was plainly insufficient to cure the prejudice. Accordingly, reversal is required.

B. The Convictions Violate the Doctrine of Mail Fraud Convergence, because Mr. Bryant Made No False Statements to the Alleged Victim.

The convictions are also invalid because the government failed to prove (or even allege) that Mr. Bryant made misrepresentations to the alleged victim, the Division of Pensions and Benefits ("Division"). Absent a misrepresentation by the defendant to the victim, the conviction fails for lack of "convergence." United States v. Lew, 875 F.2d 219, 221 (9th Cir. 1989) (citing McNally v. United States, 483 U.S. 350 (1987)); United States v. Shelton, 848 F.2d 1485 (10th Cir. 1988) (en banc); United States v. Evans, 844 F.2d 36, 39 (2d Cir. 1988) (noting in dicta that the convergence requirement "seems logical"); see United States v. Bailey, 123 F.3d 1381 (11th Cir. 1997)(accepting Lew as correct). This circuit has recently disagreed with these cases in an unpublished opinion, United States v. Newmark, 2010 WL 850200, at *2 (3d Cir. 2010) (citing United States v. Olatunji, 872 F.2d 1161 (3d Cir. 1989)(finding sufficient to avoid a motion to dismiss the allegation, in a prosecution for defrauding the Department of

Education, that the defendant falsely represented his citizenship status in applications for student aid)).  Because the issue is still open in this circuit,[31] and a petition for *certiorari* is pending in <u>Newmark</u>, Appellant Bryant wishes to preserve this issue.  <u>See</u> <u>Newmark v. United States</u>, No. 10-123 (U.S. petition filed July 19, 2010).

The only "statement" that Mr. Bryant allegedly made to the Division was his application for pension benefits.  That application made no representation of fact that was capable of truth or falsity; it was merely a request that the Division review his eligibility under the governing, multi-factorial, state statutes and regulations.  <u>See</u> <u>United States v. Williams</u>, 458 U.S. 279 (1982) (writing a check, knowing that it is covered by insufficient funds, is not a statement of fact but a request for payment); <u>United States v. Frankel</u>, 721 F.2d 917 (3d Cir. 1983) (same).  Instead, the alleged pension fraud was derivative of the alleged frauds upon the employers; <u>see</u> N.J.S.A. § 17:2-2.2 (employer, not employee, must report to the Division the employee's compensation, duties, and other information).  That defect is

---

[31]    <u>Newmark</u> is an unpublished opinion; and <u>Olatunji</u> did not address the convergence issue directly because the Court deemed the indictment sufficient to track the statutory language, and to allege a false statement to the ultimate victim.  <u>Olatunji</u>, 872 F.2d at 1168.  Thus, the convergence issue is still open in this circuit.

fatal to a mail fraud prosecution. To state a violation of the mail fraud statute, the party deceived and the party deprived of property must converge.

The government's only allegations about the defendant's own conduct make the PERS charges wholly derivative of supposed frauds upon Mr. Bryant's employers. That derivative analysis is precisely what the convergence doctrine is intended to prevent. United States v. Keane, 678 F. Supp. 708, 711 (N.D. Ill. 1987), aff'd, 852 F.2d 199 (7th Cir. 1988). Accordingly, the convictions on the pension fraud counts are invalid. Because the indictment itself is likewise defective, judgment of acquittal is required. See United States v. Camiel, 689 F.2d 31, 37 (3d Cir. 1982).

> C.    The Evidence was Insufficient to Support the Guilty Verdicts on the Pension Fraud Counts.

>> 1.    The Government Failed to Prove that Mr. Bryant's Claim of Benefits Was False and Fraudulent.

As noted above, the testimony of Fred Beaver about the meaning of "creditable service" was improper. The government produced no other evidence even suggesting that Mr. Bryant made a materially false statement in support of his claim for benefits – i.e., that he claimed benefits for which he knew that he was statutorily ineligible.[32] As noted above, the pension

---

[32]    Because the government alleged that Mr. Bryant's SOM salary was not pensionable because his SOM salary was really a bribe, Mr. Bryant's eligibility for pension credit on his SOM salary rises or falls with

(continued...)

application itself was not capable of truth or falsity. <u>Williams</u>, 458 U.S. at 284-85. Absent proof of a material falsity, the mail fraud conviction cannot stand.

2. The Government Failed to Prove That Mr. Bryant Acted With Intent to Defraud.

Even if the government had proved that New Jersey law rendered Mr. Bryant ineligible for pension credits for his SOM and GCBSS income, it failed to prove that he was on notice of his ineligibility – and thus failed to prove that when he claimed benefits, he intended to defraud the pension system. As to SOM, as noted above (<u>see</u> footnote 32), the government's analysis was entirely *post hoc*: only if convicted of bribery would Mr. Bryant become ineligible, and even then the Pension Board would apply an eleven-factor balancing test before forfeiting his pension. <u>See</u> N.J.S.A. 43:1-3.

As to the GCBSS income, the ineligibility question centered on the testimony of Fred Beaver. For the reasons explained above, his statement of

_____

(continued...)

the government's success on the bribery prosecution. That *post hoc* analysis is inappropriate in a mail fraud context, because the salient question is whether Mr. Bryant's pension application was false when made. In any event, because the bribery prosecution fails for the reasons explained above, the pension fraud theory also fails to the extent that it is based on SOM.

the law was improperly admitted. But even had his testimony been proper, he would have remained unable to point to any *public* statement of the law, during the relevant time, that would have given Mr. Bryant notice that claiming benefits was a federal mail fraud. As Mr. Beaver conceded, neither the statutes nor the regulations governing PERS specifically prohibited an attorney from claiming credit for work for which he had engaged an associate to act on his behalf. [JA XV 3395-96]. And even though the Division of Pensions was well-aware that the practice was common among lawyers [JA XV 3436], it never attempted to revoke a pension on that basis until the very end of the time frame relevant to this action – and there was no public notice of basis for the Division's action until much later than that.[33] [JA XV 3467]. Later still, the legislature amended the pension eligibility rules to prevent this practice – a good indication that it had not previously been prohibited.[34] Thus, all the proof showed as to Mr. Bryant was that he participated in a common practice of using his law firm's associates to perform work on his behalf for a municipal client, which thereafter certified

---

[33]    The testimony showed that the website on which the Division's action was posted stated only that the named applicant's benefits had been denied. [JA XV 3467].

[34]    Again the State of New Jersey managed to police its own house, but again the federal government waded in to impose its own view of the law while the state deliberated.

his eligibility for a pension based on the work.  See N.J.S.A. § 17:2-2.2

(employer, not employee, must report to the Division the employee's

compensation, duties, and other information).  Nothing in this record

supported a finding that Mr. Bryant intended to defraud New Jersey's PERS.

### CONCLUSION

For all the foregoing reasons, on Counts 1-6 appellants are entitled to

dismissal, or to a remand with instructions to enter judgment of acquittal, or

at least to a new trial.  On Counts 7-8, appellants are entitled to a remand

with instructions to enter judgment of acquittal, or at least to a new trial.  On

Counts 9-13, Appellant Bryant is entitled to a remand with instructions to

enter judgment of acquittal, or at least to a new trial.

Respectfully submitted,

By: /s/ *Carl D. Poplar*　　　　　
　　Carl D. Poplar (NJ 4791)
　　1010 Kings Highway
　　South
　　Building Two
　　Cherry Hill, NJ 08034
　　(856) 216-9979

By: /s/ *Jeremy D. Frey*　　　　　
　　Jeremy D. Frey (PA 31096)
　　Pepper Hamilton LLP
　　3000 Two Logan Square
　　18th and Arch Streets
　　Philadelphia, PA  19103
　　(215) 981-4000


By: /s/ *Ralph A. Jacobs*　　　　
　　Ralph A. Jacobs (PA 21387)
　　Jacobs & Singer LLC
　　34 Tanner Street
　　Haddonfield, NJ 08033
　　(856) 427-0330

By: /s/ *Lisa A. Mathewson*　　　　
　　Lisa A. Mathewson (PA 77137)
　　Law Offices of Lisa A. Mathewson, LLC
　　123 South Broad Street
　　Suite 810
　　Philadelphia, PA 19109
　　(215) 399-9595

## **COMBINED CERTIFICATE**

1.      Pursuant to Fed.R.App.P. 32(a)(7)(B), undersigned counsel certifies that this brief complies with the type-volume limitations of Fed.R.App.P.32(a)(7)(B).

  a.      Exclusive of the portions exempted by Fed.R.App.P. 32(a)(7)(B)(iii), this brief contains approximately 24,965 words printed in a proportionally spaced typeface according to the word counting tool of Microsoft Word software.

  b.      This brief is printed in Times New Roman (a proportionally spaced typeface) in 14-point produced by Microsoft Word software.

2.      The undersigned further certifies that the text of the E-Brief and paper copies being filed are identical.

3.      The undersigned certifies that E-Brief has been scanned for viruses using Norton Antivirus.

4.      The undersigned further certifies that he is a member of the Bar of the U.S. Court of Appeals for the Third Circuit.


        */s/ Jeremy D. Frey*
        Jeremy D. Frey, Esquire
        Attorney for Appellant
Dated:  August 10, 2010  R. Michael Gallagher

## CERTIFICATE OF SERVICE

I, Jeremy D. Frey, hereby certify that on August 10, 2010, a true and correct copy of the foregoing Joint Brief of Appellants and Joint Appendices was served via ECF upon George Leone and Norman Gross, Assistant U.S. Attorneys, 970 Broad Street, Newark, NJ 07102.

I also certify that ten (10) paper copies of the Joint Brief, and four (4) paper copies of the Appendices (commencing with Volume II) are being delivered by hand to the Clerk's Office, U.S. Court of Appeals for the Third Circuit, 6th and Market Streets, Philadelphia, PA 19106 on August 10, 2010.


/s/ Jeremy D. Frey
JEREMY D. FREY