Nos. 09-3243 and 09-3275

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

────────────────────

UNITED STATES OF AMERICA

v.

WAYNE R. BRYANT and
R. MICHAEL GALLAGHER,
                    Appellants

Consolidated Appeals from the Final Judgments in a Criminal Case
of the United States District Court for the District of New
Jersey (Crim. No. 07-267).
Sat Below: Honorable Freda L. Wolfson, U.S.D.J.

────────────────────

BRIEF FOR APPELLEE

────────────────────

PAUL J. FISHMAN
United States Attorney
GEORGE S. LEONE
Chief, Appeals Division
Attorneys for Appellee
970 Broad Street
Newark, New Jersey  07102-2535
(973) 645-2750

On the Brief:
Norman Gross
Assistant U.S. Attorney
United States Courthouse and
 Federal Building
401 Market Street, Fourth Floor
Camden, NJ 08101
(856) 968-4930
norman.gross@usdoj.gov

## TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . vii

Table of Abbreviations . . . . . . . . . . . . . . . . . . . xx

Jurisdictional Statement . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . 1

Statement of Related Cases And Proceedings . . . . . . . . . 2

Statement of The Case . . . . . . . . . . . . . . . . . . . 2

Statement of the Facts . . . . . . . . . . . . . . . . . . . 5

Summary of Argument . . . . . . . . . . . . . . . . . . . . 6

**ARGUMENT**

**POINT I**

      **VIEWED IN THE PROPER LIGHT, RATHER THAN DEFENDANTS'
SELF-SERVING CHARACTERIZATION, THE TRIAL EVIDENCE FULLY
SUPPORTED THE GUILTY VERDICTS ON THE HONEST SERVICES
BRIBERY COUNTS (1-6) AND THE 18 U.S.C. § 666 BRIBERY
COUNTS (7 AND 8)**. . . . . . . . . . . . . . . . . . . 10

    **1.**    **Gallagher's Desperate Need in 2002 and 2003 For
Political "Muscle" For The SOM "Team."**. . . . . . . 13

    **2.**    **Bryant's 2002 Shakedown of UMDNJ President Cook For
A Salaried Job**. . . . . . . . . . . . . . . . . . . 15

    **3.**    **The *Quid Pro Quo*: Gallagher's Hiring Of Bryant For A
"Low-Show," Highly-Compensated Job At SOM In Return For
Bryant's Exploitation of His Official Power to Funnel
More State Money to SOM.**. . . . . . . . . . . . . . 18

    **4.**    **Bryant's Lies About Obtaining Approval For His
SOM Job**. . . . . . . . . . . . . . . . . . . . . . 22

    **5.**    **Gallagher's Fabrications About Bryant's Level Of Effort
In The Low-Show Job**. . . . . . . . . . . . . . . . 23

i

6.    Bryant's Official Acts That Funneled Increased State
      Funding To SOM... . . . . . . . . . . . . . . . . . 24

      A.    The Recurring $2.325 Million "Carve-Out" Of State
            Funds To SOM. . . . . . . . . . . . . . . . . 25

      B.    The $800,000 Allocation For The SOM Center For
            Child Support... . . . . . . . . . . . . . . 28

      C.    Bryant's Shakedown Of the DHS Commissioner On
            Behalf Of NJ CARES And The "Rollover" Of Unspent
            State Funding to NJ CARES... . . . . . . . . . 30

      D.    Bryant's Efforts To Secure Cancer Research Funding
            For SOM... . . . . . . . . . . . . . . . . . 33

      E.    The $200,000 "Christmas Tree" Grant To The SOM
            Institute For Successful Aging. . . . . . . . . 35

7.    Defendants' False Statements And Omissions Regarding
      The Illegal *Quid Pro Quo* Job At SOM. . . . . . . . 37

8.    Defendants' Sufficiency Challenges are Meritless... 41

POINT II

THE EVIDENCE WAS ALSO SUFFICIENT TO PROVE BRYANT'S
SCHEME TO DEFRAUD THE NEW JERSEY DIVISION OF PENSIONS AND
BENEFITS. . . . . . . . . . . . . . . . . . . . . . . . 49

A.    Bryant's Pension Fraud Scheme. . . . . . . . . . . 50

      1.    New Jersey's Pension Retirement System
            Administered By The Division Of Pensions And
            Benefits. . . . . . . . . . . . . . . . . . . 50

      2.    Bryant's Accumulation Of Multiple "Pensionable"
            Public-Sector Jobs. . . . . . . . . . . . . . 51

      3.    Bryant's No-Show Job As A Staff Attorney For The
            Gloucester County Board of Social Services. . . 52

      4.    Bryant's Systematic Lies That He Was Personally
            Performing Pensionable Work For GCBSS... . . . 54

      5.    Bryant's Application For Pension Benefits... . 56

B.    The Baseless Doctrine of "Mail Fraud Convergence"
      Provides no Basis to Disturb the Pension Fraud
      Convictions.. . . . . . . . . . . . . . . . . . . . 57

C.    Bryant's Legalistic Challenges to the Sufficiency of
      the Evidence to Prove His Intent to Defraud the NJDPB
      are Meritless.. . . . . . . . . . . . . . . . . . . 62

POINT III

      THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING
      TO DISMISS THE INDICTMENT, WHERE THE GOVERNMENT'S REQUEST
      THAT GRAND JURY WITNESSES NOT DISCLOSE THAT THEY HAD BEEN
      SUBPOENAED TO TESTIFY DID NOT IMPEDE DEFENSE COUNSELS'
      ACCESS TO THOSE PERSONS, AND THE DISTRICT COURT NEVERTHELESS
      ORDERED THE GOVERNMENT TO INFORM THOSE WITNESSES THAT THEY
      WERE FREE TO SPEAK TO DEFENSE COUNSEL ABOUT ANYTHING THEY
      CHOSE... . . . . . . . . . . . . . . . . . . . . . 67

      Background of the Claim... . . . . . . . . . . . . . 67

      Argument.. . . . . . . . . . . . . . . . . . . . . 70

A.    The Government Did Not Interfere with Defense Counsel's
      Access to Witnesses by Merely Asking Grand Jury
      Subpoena Recipients Not to Disclose That They Had
      Received a Subpoena.. . . . . . . . . . . . . . . . 70

B.    Defense Counsel's Affidavit Confirmed That The
      Government Did Not Deter Any Witness From Speaking To
      Counsel.. . . . . . . . . . . . . . . . . . . . . . 72

C.    The Curative Letter Remedied Any Possible Harm... . 75

D.    Defendants' Speculative Claims of Harm Do Not Merit
      Relief... . . . . . . . . . . . . . . . . . . . . . 78

POINT IV

      THE JURY INSTRUCTIONS COMPLIED WITH *SKILLING v. U.S.*, WHICH
      LIMITED HONEST SERVICES FRAUD PROSECUTIONS TO BRIBERY OR
      KICKBACK SCHEMES.. . . . . . . . . . . . . . . . . 81

A.    The Jury Instructions Required the Government to Prove
      a *Quid Pro Quo* Bribery... . . . . . . . . . . . . 81

B.  *Skilling* Upheld Honest Services Fraud So Long As The Jury Had To Find *Quid Pro Quo* Bribery or Kickbacks.. . . . . . . . . . . . . . . . . . . . 83

C.  Defendants' Arguments Misinterpret *Skilling* by Imposing Requirements That *Skilling* Rejected or Did Not Impose... . . . . . . . . . . . . . . . . . . . 86

    1.  *Skilling* Does Not Hold That QPQ Bribery Requires a Payment That Is Intended to "Alter," Rather than to "Influence," the Public Official's Conduct... . . . . . . . . . . . . . . . . . 86

    2.  The Supreme Court in *Skilling* Approved, Rather than Overruled, this Court's Holding in *Kemp* That a "Stream of Benefits" Given in Exchange for Official Conduct is Bribery... . . . . . . . . 93

    3.  *Skilling* Did Not *Sub Silentio* Legalize What Was until Then QPQ Bribery So Long as the Bribe Taker Had a Motive for His Official Actions in Addition to Getting the Bribe. . . . . . . . . . . . . . 96

POINT V

    THE DEFENSE-FAVORABLE INSTRUCTIONS REGARDING 18 U.S.C. § 666(a) PROVIDE NO BASIS FOR RELIEF.. . . . . . . . . . . 99

    Introduction.. . . . . . . . . . . . . . . . . . . . 99

    Argument... . . . . . . . . . . . . . . . . . . . 100

A.  By Including a *Quid Pro Quo* Requirement, The § 666(a) Instructions Were Erroneously Favorable To The Defense.. . . . . . . . . . . . . . . . . . . . 100

B.  Properly Read In Context, The Challenged Instructions Required Proof Of A *Quid Pro Quo* "Exchange.". . . . 105

C.  Given The Jury's Finding Of A *Quid Pro Quo* Exchange With Respect to Counts 1-6, Any Error In The Instructions Regarding Counts 7 and 8 Was Harmless... . . . . . . . . . . . . . . . . . . . 110

**POINT VI**

**THE DISTRICT COURT PERMISSIBLY EXERCISED ITS BROAD
DISCRETION BY DENYING BRYANT'S MISTRIAL MOTION AND INSTEAD
LIMITING TESTIMONY ABOUT WHAT CONSTITUTES "CREDITABLE
SERVICE" TOWARDS A PUBLIC PENSION TO THE ISSUE OF
MATERIALITY, WHERE THE COURT'S INSTRUCTIONS ON CREDITABLE
SERVICE WERE PROPER AND UNCHALLENGED.. . . . . . . . . . 113**

**Introduction.. . . . . . . . . . . . . . . . . . . . 113**

**Argument.. . . . . . . . . . . . . . . . . . . . . . 117**

**A.    Beaver's Testimony Was Properly Admitted to Prove the
Materiality to the NJDPB of Bryant's False Statements
to the GCBSS... . . . . . . . . . . . . . . . . . 117**

**B.    Bryant Cannot Show That The Jury Disregarded The
Limiting Instruction Regarding Beaver's
Testimony.. . . . . . . . . . . . . . . . . . . . 118**

**1.    Bryant's Claim That The Instruction Came Too Late
Fails To Establish Plain Error.. . . . . . . . 120**

**2.    Bryant's Claim That The Jury Could Not Possibly
Understand The Limiting Instruction Also Fails To
Demonstrate Plain Error. . . . . . . . . . . 124**

**POINT VII**

**THE DISTRICT COURT PERMISSIBLY ORDERED DEFENDANTS TO PAY
RESTITUTION IN THE AMOUNT OF THE STREAM OF BRIBE PAYMENTS
THAT BRYANT RECEIVED.. . . . . . . . . . . . . . . . . . 131**

**Background.. . . . . . . . . . . . . . . . . . . . . 131**

**A.    The District Court Did Not Clearly Err By Finding That
Defendants Concealed The Bribery Scheme From
Gallagher's Superiors At UMDNJ... . . . . . . . . 133**

**B.    The District Court Permissibly Ordered Payment of
Restitution To UMDNJ For The Losses From Bryant's
Honest Services Fraud Against New Jersey And Its
Citizens... . . . . . . . . . . . . . . . . . . . 135**

v

**C.    Defendants Did Not Meet Their Burden Of Proving Their Entitlement To An "Offset" Against The Restitution Amount** . . . . . . . . . . . . . . . . . . . . . . . . 137

Conclusion . . . . . . . . . . . . . . . . . . . . . . . 140

## TABLE OF AUTHORITIES

### Federal Cases

<u>Page</u>

*Badders v. U.S.,*
    240 U.S. 391 (1916) ....................................... 66

*Bilzerian v. U.S.,*
    127 F.3d 237 (2d Cir. 1997) .............................. 112

*Black v. U.S.,*
    130 S. Ct. 2963 (2010) .................................... 4

*Boyde v. California,*
    494 U.S. 370 (1990) ...................................... 110

*California v. Roy,*
    519 U.S. 2 (1996) ........................................ 111

*Conklin v. Schofield,*
    366 F.3d 1191 (11th Cir. 2004) ........................... 46

*Durland v. United States,*
    161 U.S. 306 (1896) ....................................... 67

*Government Virgin Islands v. Carmona,*
    422 F.2d 95 (3d Cir. 1970) .............................. 104

*Government Virgin Islands v. Lovell,*
    378 F.2d 799 (3d Cir. 1967) .............................. 41

*In re Grand Jury Proceedings (Appeal of Diamante),*
    814 F.2d 61 (1st Cir. 1987) ...................... 71, 76, 78

*Greer v. Miller,*
    483 U.S. 756 (1987) ...................................... 119

*Gregory v. United States,*
    369 F.2d 185 (D.C. Cir. 1966) ............................ 77

*Hi Technology Trans, LLC v. New Jersey,*
    382 F.3d 295 (3d Cir. 2004) ............................. 105

vii

*Hughey v. U.S.*,
  495 U.S. 411 (1990) ...................................... 132

*In re Insurance Brokerage Antitrust Litigation*,
  __ F.3d __, 2010 WL 3211147 (3d Cir., Aug. 16, 2010) ....... 42

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ........................................ 11

*In re Kaufhold*,
  256 F.2d 181 (3d Cir. 1958) ............................... 65

*Kines v. Butterworth*,
  669 F.2d 6 (1st Cir. 1981) ............................. 76, 78

*Marshall v. Hendricks*,
  307 F.3d 36 (3d Cir. 2002) ............................... 123

*McNally v. United States*,
  483 U.S. 350 (1987) ................ 61, 83-87, 91, 93-96, 100

*Neder v. U.S.*,
  527 U.S. 1 (1999) ................................. 109, 112

*Schmuck v. U.S.*,
      489 U.S. 705 (1989) ................................. 60

*In re Sealed Case Number 98-3077*,
      151 F.3d 1059 (D.C. Cir. 1998) ...................... 70

*Skilling v. U.S.*,
  130 S. Ct. 2896 (2010) ............................... passim

*South Camden Citizens in Action v. New Jersey Department of
      Environmental Protection*,
274 F.3d 771 (3d Cir. 2001) ............................... 61

*U.S. ex rel. Trantino v. Hatrack*,
      408 F. Supp. 476 (D.N.J. 1976),
      *aff'd*, 563 F. 2d 86 (3d Cir. 1977) ................... 73

*U.S. v. Abbey*,
  560 F.3d 513 (6th Cir. 2009) ............................ 102

*U.S. v. Agostino*,
  132 F.3d 1183 (7th Cir. 1997)........................... 71-72

*U.S. v. Alessio*,
  528 F.2d 1079 (9th Cir. 1976)............................. 94

*U.S. v. All Star Industries*,
  962 F.2d 465 (5th Cir. 1992)............................. 33

*U.S. v. Anderskow*,
  88 F.3d 245 (3d Cir. 1996)............................... 11

*U.S. v. Anderson*,
  798 F.2d 919 (7th Cir. 1986)............................ 118

*U.S. v. Arboleda*,
  929 F.2d 858 (1st Cir. 1991)............................. 75

*U.S. v. Armstrong*,
  517 U.S. 456 (1996)..................................... 80

*U.S. v. Bailey*,
  327 F.3d 1131 (10th Cir. 2003)........................... 65

*U.S. v. Bailin*,
  1990 WL 114741 (N.D.Ill. 1990)........................... 66

*U.S. v. Baptiste*,
  264 F.3d 578 (5th Cir. 2001)........................ 27, 46

*U.S. v. Bates*,
  614 F.3d 490 (8th Cir. 2010)............................. 46

*U.S. v. Baumann*,
  684 F. Supp. 2d 1140 (D.S.D. 2009)...................... 104

*U.S. v. Berryman*,
  322 Fed. Appx. 216, 220 (3d Cir. 2009)................... 41

*U.S. v. Biaggi*,
  909 F.2d 662 (2d Cir. 1990)............................. 97

*U.S. v. Blumberg*,
  1998 WL 136174 (D. Conn. 1998).......................... 71

*U.S. v. Blumeyer*,
  114 F.3d 758 (8th Cir. 1997)............................... 60

*U.S. v. Boccagna*,
  450 F.3d 107 (2d Cir. 2006).......................... 133, 139

*U.S. v. Bohonus*,
  628 F.2d 1167 (9th Cir. 1980)............................. 66

*U.S. v. Bornman*,
  559 F.3d 150 (3d Cir. 2009).............................. 10

*U.S. v. Bradshaw*,
  281 F.3d 278 (1st Cir. 2002)............................ 119

*U.S. v. Brewster*,
  408 U.S. 501 (1972)................................... 89, 92

*U.S. v. Brewster*,
  506 F.2d 62 (D.C. Cir. 1974)......................... 91, 92

*U.S. v. Brown*,
  459 F.3d 509 (5th Cir. 2006)........................... 135

*U.S. v. Bryant and Gallagher*,
  556 F. Supp. 2d 378 (D.N.J. 2008)........ 11, 85, 91, 95, 105

*U.S. v. Bryant and Gallagher*,
  2009 WL 1559796 (D.N.J. 2009)............................ 10

*U.S. v. Calbat*,
  266 F.3d 358 (5th Cir. 2001)........................... 138

*U.S. v. Calverley*,
  37 F.3d 160 (5th Cir. 1994)............................. 33

*U.S. v. Campbell*,
  684 F.2d 141 (D.C. Cir. 1982)........................ 91, 92

*U.S. v. Candie*,
  974 F.2d 61 (8th Cir. 1992)............................. 46

*U.S. v. Carbo*,
  572 F.3d 112 (3d Cir. 2009)............................ 115

*U.S. v. Carrigan*,
  804 F.2d 599 (10th Cir. 1986)............................. 80

*U.S. v. Carter*,
  217 U.S. 286 (1910)..................................... 131

*U.S. v. Celis*,
  608 F.3d 818 (D.C. Cir. 2010) ........................... 72

*U.S. v. Chalupnik*,
  514 F.3d 748 (8th Cir. 2008)............................ 133

*U.S. v. Christopher*,
  142 F.3d 46 (1st Cir. 1998).............................. 61

*U.S. v. Cicco*,
  938 F.2d 441 (3d Cir. 1991)............................. 103

*U.S. v. Conley*,
  186 F.3d 7 (1st Cir. 1999) ............................. 118

*U.S. v. Conner*,
  752 F.2d 566 (11th Cir. 1985)........................... 83

*U.S. v. Cosentino*,
  869 F.2d 301 (7th Cir. 1989)............................ 60

*U.S. v. Coyne*,
  4 F.3d 100 (2d Cir. 1993)........................... 97, 98

*U.S. v. Crawley*,
  533 F.3d 349 (5th Cir. 2008)........................... 132

*U.S. v. Davis*,
  154 F.3d 772 (8th Cir. 1998)............................ 78

*U.S. v. Diaz*,
  597 F.3d 56 (1st Cir. 2010)............................ 124

*U.S. v. Eisen*,
  974 F.2d 246 (2d Cir. 1992)............................. 58

*U.S. v. Ekanem*,
  383 F.3d 40 (2d Cir. 2004)............................. 134

*U.S. v. Elson*,
   577 F.3d 713 (6th Cir. 2009).............................. 138

*U.S. v. Evans*,
   844 F.2d 36 (2d Cir. 1988)............................... 61

*U.S. v. Feinberg*,
   535 F.2d 1004 (7th Cir. 1976)............................ 66

*U.S. v. Fenzl*,
   __ F. Supp. 2d __, 2010 WL 3236774
   (N.D. Ill., Aug. 16, 2010)............................... 66

*U.S. v. Ferguson*,
   2007 WL 4556625 (D.Conn. 2007).......................... 118

*U.S. v. Flores*,
   454 F.3d 149 (3d Cir. 2006)........................... 81, 88

*U.S. v. Forbes*,
   64 F.3d 928 (4th Cir. 1995)............................. 112

*U.S. v. Frankel*,
   721 F.2d 917 (3d Cir. 1983)............................. 58

*U.S. v. Fumo*,
   628 F. Supp. 2d 573 (E.D.Pa. 2007)...................... 60

*U.S. v. Galloway*,
   509 F.3d 1246 (10th Cir. 2007).......................... 133

*U.S. v. Gambino*,
   926 F.2d 1355 (3d Cir. 1991)............................ 113

*U.S. v. Ganim*,
   510 F.3d 134 (2d Cir. 2007)............... 85, 93, 103, 104

*U.S. v. Gartman*,
   145 F. Supp. 420 (E.D. Pa. 1956)........................ 66

*U.S. v. Gaytan*,
   342 F.3d 1010 (9th Cir. 2003)........................... 131

*U.S. v. Gee*,
   432 F.3d 713 (7th Cir. 2005)....................... 102, 136

*U.S. v. George*,
    477 F.2d 508 (7th Cir. 1973)............................... 83

*U.S. v. Goldblatt*,
    813 F.2d 619 (3d Cir. 1987)............................... 66

U.S. v. Gordon
    183 Fed. Appx. 202 (3d Cir.  2006) ....................... 89

*U.S. v. Gorny*,
    732 F.2d 597 (7th Cir. 1984) ............................. 94

*U.S. v. Green*,
    592 F.3d 1057 (9th Cir. 2010)............................. 13

*U.S. v. Guthrie*,
    64 F.3d 1510 (10th Cir. 1995)............................ 139

*U.S. v. Hairston*,
    46 F.3d 361 (4th Cir. 1995)......................... 111, 112

*U.S. v. Hakim*,
    344 F.3d 324 (3d Cir. 2003) ............................. 106

*U.S. v. Harkonen*,
    2010 WL 2985257 (N.D. Cal., July 27, 2010) ............... 66

*U.S. v. Harvey*,
    532 F.3d 326 (4th Cir. 2008)............................ 133

*U.S. v. Hernandez-Garcia*,
    284 F.3d 1135 (9th Cir. 2002)........................... 104

*U.S. v. Hoffecker*,
    530 F.3d 137 (3d Cir. 2008).............................. 13

*U.S. v. Holloway*,
    778 F.2d 653 (11th Cir. 1985)............................ 80

*U.S. v. Hood*,
    343 U.S. 148 (1952)...................................... 89

*U.S. v. Jennings*,
    160 F.3d 1006 (4th Cir. 1998)...................... 103, 104

xiii

*U.S. v. Johnson*,
   621 F.2d 1073 (10th Cir. 1980).............................. 89

*U.S. v. Kaplan*,
   490 F.3d 110 (2d Cir. 2007).............................. 109

*U.S. v. Karam*,
   201 F.3d 320 (4th Cir. 2000)........................ 138, 140

*U.S. v. Kemp*,
   500 F.3d 257 (3d Cir. 2007)........................... passim

*U.S. v. Kennedy*,
   64 F.3d 1465 (10th Cir. 1995)............................. 60

*U.S. v. Lee*,
   558 F.3d 638 (7th Cir. 2009)............................. 119

*U.S. v. Lee*,
   612 F.3d 170 (3d Cir. 2010).............................. 67

*U.S. v. Levy*,
   865 F.2d 551 (3d Cir. 1989).............................. 41

*U.S. v. Lincoln*,
   277 F.3d 1112 (9th Cir. 2002)........................... 134

*U.S. v. Louderman*,
   576 F.2d 1383 (9th Cir. 1978)............................ 66

*U.S. v. Lupton*,
   __ F.3d __, 2010 WL 3419889 (7th Cir., Sept 1, 2010)....... 35

*U.S. v. Malinowski*,
   472 F.2d 850 (3d Cir. 1973)............................. 33

*U.S. v. Mandel*,
   591 F.2d 1347 (4th Cir. 1979)............................ 83

*U.S. v. Marcus*,
   130 S. Ct. 2159 (2010)............................ 122, 128

*U.S. v. Mariano*,
   983 F.2d 1150 (1st Cir. 1993)........................... 103

*U.S. v. Martin*,
  507 F.2d 428 (7th Cir. 1974)............................. 104

*U.S. v. McGee*,
  612 F.3d 627 (7th Cir. 2010)............................. 136

*U.S. v. McGhee*,
  495 F. Supp. 2d 1024 (D.S.D. 2007)........................ 73

*U.S. v. McKee*,
  506 F.3d 225 (3d Cir. 2007).............................. 48

*U.S. v. McMillan*,
  600 F.3d 434 (5th Cir. 2010)............................. 60

*U.S. v. McNair*,
  605 F.3d 1152 (11th Cir. 2010)................. 101, 102, 131

*U.S. v. Mende*,
  43 F.3d 1298 (9th Cir. 1995)............................ 119

*U.S. v. Monostra*,
  125 F.3d 183 (3d Cir. 1997).............................. 66

*U.S. v. Morrison*,
  535 F.2d 223 (3d Cir. 1976)........................... 77-79

*U.S. v. Myers*,
  692 F.2d 823 (2d Cir. 1982).............................. 90

*U.S. v. Newby*,
  11 F.3d 1143 (3d Cir. 1993)............................. 123

*U.S. v. Newmark*,
  374 Fed. Appx. 279 (3d Cir. 2010)........................ 41

*U.S. v. Newmark*,
  __ S. Ct. __, 2010 WL 2888112 (U.S., Oct. 4, 2010)..... 60, 61

*U.S. v. Noel*,
  581 F.3d 490 (7th Cir. 2009)............................ 128

*U.S. v. Olatunji*,
  872 F.2d 1161 (3d Cir. 1989).......................... 59-62

*U.S. v. Ozcelik*,
   527 F.3d 88 (3d Cir. 2008)............................. 113, 122

*U.S. v. Panarella*,
   277 F.3d 678 (3d Cir. 2002)...................... 44, 84, 118

*U.S. v. Parsons*,
    141 F.3d 386 (1st Cir. 1998)........................... 138

*U.S. v. Paschall*,
   772 F.2d 68 (4th Cir. 1985)............................. 89

*U.S. v. Pawlinski*,
   374 F.3d 536 (7th Cir. 2004)........................... 137

*U.S. v. Payton*,
   159 F.3d 49 (2d Cir. 1998)............................. 27

*U.S. v. Pearlstein*,
   576 F.2d 531 (3d Cir. 1978)............................ 59

*U.S. v. Pena*,
   17 F. Supp. 2d 33 (D. Mass. 1998)...................... 73

*U.S. v. Perkins*,
   748 F.2d 1519 (11th Cir. 1984)......................... 59

*U.S. v. Pihakis*,
   224 F.2d 898 (3d Cir. 1955)............................ 58

*U.S. v. Quillen*,
   335 F.3d 219 (3d Cir. 2003)........................... 131

*U.S. v. Quinn*,
   359 F.3d 666 (4th Cir. 2004)........................... 89

*U.S. v. Rankin*,
    870 F.2d 109 (3d Cir. 1989)........................... 59

*U.S. v. Rawlins*,
   606 F.3d 73 (3d Cir. 2010)............................. 12

*U.S. v. Sain*,
   141 F.3d 463 (3d Cir. 1998)........................... 131

*U.S. v. Saladino*,
   2010 WL 3221427 (D.Or. Aug. 11, 2010) .................... 100

*U.S. v. Sapoznik*,
   161 F.3d 1117 (7th Cir. 1998) ............................ 132

*U.S. v. Sepulveda*,
   15 F.3d 1161 (1st Cir. 1993) ............................. 120

*U.S. v. Sheinbaum*,
   136 F.3d 443 (5th Cir. 1998) ............................. 139

*U.S. v. Simon*,
   995 F.2d 1236 (3d Cir. 1993) ............................. 125

*U.S. v. Smith*,
   223 F.3d 554 (7th Cir. 2000) ............................. 113

*U.S. v. Stadtmauer*,
   __ F.3d __, 2010 WL 3504321 (3d Cir. Sept. 9, 2010) ...... 129

*U.S. v. Strand*,
   574 F.2d 993 (9th Cir. 1978) .............................. 92

*U.S. v. Sun-Diamond Growers of California*,
   526 U.S. 398 (1999) ..................... 85, 88, 92-93, 105

*U.S. v. Terzado-Madruga*,
   897 F.2d 1099 (11th Cir. 1990) ................... 75, 76, 78

*U.S. v. Urciuoli*,
   613 F.3d 11 (1st Cir. 2010) ............... 43-45, 49, 85, 88

*U.S. v. Valle*,
   538 F.3d 341 (5th Cir. 2008) .............................. 90

*U.S. v. Voigt*,
   89 F.3d 1050 (3d Cir. 1996) ............................... 80

*U.S. v. Vrdolyak*,
   593 F.3d 676 (7th Cir. 2010) .............................. 32

*U.S. v. Wettstain*,
   __ F.3d __, 2010 WL 3384982 (6th Cir. 2010) ............. 107

*U.S. v. Whitfield*,
  590 F.3d 325 (5th Cir. 2009)............................... 93

*U.S. v. Williams*,
  458 U.S. 279 (1982)....................................... 58

*U.S. v. Zoher*,
  205 Fed. Appx. 36, 38 (3d Cir. 2006)..................... 134

*Waldorf v. Shuta*,
  142 F.3d 601 (3d Cir. 1998)............................. 130

*Weyhrauch v. United States*,
  130 S. Ct. 2971 (2010).................................... 4

*Workman v. Bell*,
  178 F.3d 759 (6th Cir. 1998)............................. 75

*Wright v. West*,
  505 U.S. 277 (1992)....................................... 12

*Zafiro v. U.S.*,
  506 U.S. 534 (1993)...................................... 119

## Federal Statutes and Court Rules

18 U.S.C. § 201............................... 85, 87, 90, 92, 97

18 U.S.C. § 666.................... 1-3, 6, 8-10, 42, 98-109, 112

18 U.S.C. § 922.......................................... 112

18 U.S.C. § 1014.......................................... 58

18 U.S.C. § 1341..................... 2-3, 57, 59, 61, 83

18 U.S.C. § 1343............................................ 3

18 U.S.C. § 1346.................... 2-4, 43, 83-85, 87, 93, 100

18 U.S.C. § 1951............................................ 2

18 U.S.C. § 1952...................................... 111-112

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3663A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

18 U.S.C. § 3664. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 138

18 U.S.C. § 3742(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## New Jersey Statutes

N.J.S.A. §2C:27-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

N.J.S.A. 43:15A-39. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

## Book

*Black's Law Dictionary*, 1587 (8th ed. 2004). . . . . . . . . . . . . . . . 139

## **TABLE OF ABBREVIATIONS**

"JA__" refers to a page number in the Joint Appendix supplied by defendants.

"DB__" refers to a page number in the Defendants' Consolidated Brief for Appellants.

"DI_" refers to a District Court Docket Item number.

"GX_" refers to a the number of a Government exhibit admitted into evidence at trial.

"SA__" refers to a page in the Supplemental Appendix supplied by the United States.

"StR" refers to the Statement of Reasons filed under seal with this Court.

## JURISDICTIONAL STATEMENT

These are consolidated appeals from the judgments in a criminal case imposed by the United States District Court for the District of New Jersey. The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction over the challenges to the convictions under 28 U.S.C. § 1291, and over the challenges to the restitution orders under 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1. Was the evidence sufficient to support the jury's verdicts of guilty on the bribery counts (1-8)?

2. Was the evidence sufficient to support the jury's verdicts of guilty on the pension fraud counts (9-13)?

3. After the Government asked grand jury subpoena recipients not to disclose their receipt of a subpoena, but did not ask them to conceal anything else, did the District Court permissibly exercise its discretion by ordering the Government to inform those persons that they could speak about anything with whomever they chose, rather than dismissing the indictment or holding an evidentiary hearing?

4. Were the jury instructions that required the Government to prove a *quid pro quo* in order to convict defendants of honest services fraud compatible with *Skilling v. U.S.*, which limited honest services fraud to bribery and kickback schemes?

5. Are defendants entitled to relief because the District Court instructed that, in order to convict defendants for bribery under 18 U.S.C. § 666(a), the Government had to prove a *quid pro quo* bribery, and that the bribe payor intended to influence the bribe recipient, and the bribe recipient intended to be influenced, even

1

though § 666(a) does not require proof of a quid pro quo?

6.   Did the District Court abuse its discretion by denying Bryant's motion for a mistrial and instead limiting to the jury's consideration of the issue of materiality the testimony about "creditable service" towards a public pension in New Jersey, where the Court properly instructed the jury about materiality and "creditable service"?

7.   Did the District Court permissibly order defendants to pay restitution in the amount of the bribe payments that Bryant received from Gallagher?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

On September 27, 2010, defendant Wayne Bryant was indicted by a federal grand jury sitting in Newark, New Jersey, and charged with twenty counts of honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346, one count of corrupt solicitation and acceptance of a thing of value involving a state government receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B), and one count of Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a).  *U.S. v. Wayne Bryant and Eric Wisler*, DNJ Crim No. 10-cr-646 (FSH).  The United States is not aware of any other related cases or proceedings in this Court or any other court.

## STATEMENT OF THE CASE

A federal grand jury sitting in Trenton, New Jersey returned a twenty-count indictment against Wayne Bryant and R. Michael

2

Gallagher on March 27, 2007.  DI 1.  Counts 1-6 charged both
defendants with a scheme to deprive the State of New Jersey and
its citizens of the honest services of Bryant while he was a
state Senator, in violation of 18 U.S.C. §§ 1341, 1343, and 1346.
The scheme involved the creation by Gallagher, then the Dean of
the New Jersey School of Osteopathic Medicine ("SOM") of a "low-
show" administrative job at SOM for Bryant, in exchange for
Bryant taking official actions as a state Senator on legislation
that awarded millions of dollars of additional state funding to
SOM.  Counts 7 and 8 charged Bryant and Gallagher, respectively,
with bribery in connection with an agency of a state government
that received federal funds, in violation of 18 U.S.C. § 666(a),
for their participation in the same scheme.  Counts 9-13 charged
Bryant alone with a second scheme, this one to defraud the New
Jersey Division of Pensions and Benefits of money.  In that
scheme, Bryant sought to more than double his anticipated pension
benefits through the acquisition of public-sector jobs, including
the SOM job, in which he performed little or no legitimate work,
in violation of 18 U.S.C. § 1341.[1]

     After the District Court denied in large part defendants'
motions to dismiss the indictment for supposed failure to

---

     [1] The District Court granted Gallagher's motion to sever
counts 14-20, which charged only him with fraud regarding his
self-allocation, as Dean of SOM, of bonuses.  DI 82.  After
sentencing, the District Court granted the Government's motion to
dismiss those counts.  DI 196.

properly charge the subject offenses, and denied their motion to
dismiss the indictment because of alleged prosecutorial
interference with their access to certain potential witnesses, DI
82, the case proceeded to trial on September 8, 2008.  On
November 18, the jury convicted Bryant on all counts, and
convicted Gallagher on all counts except for Count 4.  DI 161.[2]
On May 27, 2009, the District Court denied defendants' motions
for a judgement of acquittal or a new trial.  DI 179.

On July 24, 2009, following a protracted sentencing hearing,
the District Court granted both defendants substantial downward
variances from their recommended Guidelines ranges, and imposed
custodial sentences of 48 months on Bryant (from a Guidelines
Range of 70-87 months), and 18 months on Gallagher (from a
Guidelines Range of 63-78 months).  DI's 189 and 190; Bryant StR;
Gallagher StR.

Both defendants filed timely notices of appeal.[3]

---

[2] Count 4 dealt with the mailing of Bryant's 2003 Financial
Disclosure Statement, in which Gallagher's involvement was
attenuated.  JA133.

[3] At the request of all parties, on February 1, 2010, this
Court ordered that briefing be delayed pending the decisions in
*Skilling v. U.S.*, 130 S.Ct. 2896 (2010), *Black v. U.S.*, 130 S.Ct.
2963 (2010), and *Weyhrauch v. United States*, 130 S.Ct. 2971 (2010)
in which *certiorari* had been granted to address the scope of the
"honest services fraud" statute, 18 U.S.C. § 1346.  The decisions
in those cases were handed down on June 24, 2010.

### STATEMENT OF THE FACTS

**Overview of the Bribery and Pension Fraud Schemes.**

When defendant R. Michael Gallagher was installed as Dean of the School of Osteopathic Medicine ("SOM") of the University of Medicine and Dentistry of New Jersey ("UMDNJ") in 2002, he was facing both severe budgetary shortfalls at SOM, and the threat of state legislation that would merge UMDNJ with Rutgers University and the New Jersey Institute of Technology, causing UMDNJ to lose its institutional independence and possibly costing Gallagher his job as Dean.

To relieve his fiscal problems and simultaneously obtain a powerful political ally, Gallagher entered into a *quid pro quo* bribery scheme with New Jersey State Senator Wayne Bryant, the powerful Chairman of the Senate Appropriations Committee. Gallagher hired Bryant for a "low-show" job at SOM, supposedly as a "community relations" operative. Gallagher paid Bryant a starting annual salary (the "*quid*") of $35,000 for what was supposed to be a half day of work a week (an annualized, full-time salary equivalent of $350,000). In return, Bryant funneled over $10 million (the "*quo*") in state revenues to SOM in less than three years.

In addition to his salary and a $5,000 bonus, Bryant also sought to parlay his low-show job at SOM, along with a "no show" job at the Gloucester County, New Jersey, Board of Social

Services, a public welfare agency, into an increase of
approximately $50,000 in annual pension payments from the New
Jersey Board of Pensions and Benefits, upon his impending
retirement from public office.

The trial evidence is summarized in Points I and II of this
Brief, responding to defendants' meritless claims that the
evidence was insufficient to sustain their convictions.

### SUMMARY OF ARGUMENT

**Point I:** The evidence presented during the two-month trial
was more than sufficient to prove the bribery counts (honest
services fraud, Counts 1-6, § 666(a) bribery, Counts 7 and 8) of
which defendants were convicted.  Specifically, the evidence
proved that, after Bryant demanded an unspecified but paid job
from UMDNJ President Stuart Cook in the fall of 2002, Gallagher
and Bryant entered into an unlawful *quid pro quo* ("QPQ") bribery
scheme whereby Gallagher would provide Bryant with a part-time,
"low-show" administrative job.  In exchange for that job, Bryant
would use his considerable clout as Chairman of New Jersey Senate
Budget Committee to dramatically increase state funding of SOM.
Defendants claim that Bryant's substantial salary and his
legislative and other efforts that netted SOM an additional $10
million over three years were merely contemporaneous events but
not the result of a QPQ.  The jury could have reasonably drawn a

contrary inference about the intentions and motives of the defendants, particularly as Bryant did little if anything to champion SOM's cause before he went on its payroll, and did little if any legitimate work to earn that salary.

**Point II:** The evidence was also sufficient to prove the mail fraud counts (9-14), which charged that Bryant undertook a scheme to defraud New Jersey's public pension system by landing the SOM job through a QPQ arrangement with Gallagher, and by falsely claiming that he worked hundreds of hours in his job as a staff attorney at a public welfare agency, when in fact Bryant delegated virtually all of his duties in that job to associates in his private law firm.  Bryant's claim that he could not be prosecuted for mail fraud because he lied to his employer but not to the Pension Division, which was the ultimate victim of the fraud, founders upon this Court's rejection of any requirement of such a "convergence" between the lies and the ultimate victim.

**Point III:** The District Court permissibly exercised its discretion by denying the defense motion to dismiss the indictment because the Government asked grand jury subpoena recipients not to disclose that they had been subpoenaed.  A request not to disclose that fact did not restrict defense access to those persons, particularly since the request was merely to not disclose the subpoenas, but not to conceal anything that the witnesses knew about the facts of this case.  Moreover, the Court

responded to defendants' complaints by ordering the Government to inform all of the recipients, five months before the start of trial, that they could speak to defense counsel about anything they wanted, including the issuance of the subpoenas, and that they would suffer no adverse consequences if they did so.

**Point IV:** The jury instructions regarding the honest services fraud ("HSF") counts (1-6) fully complied with the Supreme Court's subsequent decision *Skilling v. U.S. Skilling* limited HSF to kickback and bribery schemes, and the instructions here similarly limited the HSF counts to a QPQ bribery scheme. Contrary to defendants' claims, *Skilling* did not *sub silentio* overrule prior decisions of this Court and others that such a scheme could be effectuated through a "stream of payments" to the bribe taker, that the payments did not have to be made exclusively for the unlawful official action of the bribe taker, and that payments did not have to cause the bribe taker to undertake actions he would not have otherwise undertaken.

**Point V:** Defendants mistakenly contend that the instructions regarding the bribery charges under 18 U.S.C. § 666(a) were defective because they did not require proof of a QPQ "exchange." First, there is no requirement for a QPQ exchange under § 666(a). Second, the § 666(a) instructions nonetheless required proof of a QPQ, and the QPQ instructions in their totality also required an exchange. Finally, the jury's guilty verdicts on the HSF bribery

8

counts demonstrated that it had found a QPQ exchange based on the same evidence that supported the § 666(a) bribery counts, so any error in the § 666(a) instructions counts on that score was harmless.

**Point VI**: The District Court permissibly exercised its discretion by denying defendants' mistrial motion, and instead issuing a limiting instruction, stating that testimony by the head of the New Jersey Division of Pensions and Benefits regarding "creditable service" towards one's pension could be considered only towards the hotly contested issue of materiality. Bryant did not preserve below his claims that the limiting instruction was both tardy and unintelligible to the jury.

**Point VII**: The District Court did not abuse its discretion by ordering defendants to pay the amount of Bryant's QPQ salary and bonus as restitution to UMDNJ.  The District did not clearly err by rejecting defendant's factual assertion that UMDNJ was complicit in the bribery scheme, and therefore ineligible to receive restitution.  Although the State of New Jersey and its citizens were the ultimate victims of the HSF bribery scheme, the District Court permissibly ordered payment of restitution to UMDNJ as an appropriate representative for the victims. Defendants' failure to present any evidence about the monetary value of Bryant's supposedly "legitimate work" for SOM precludes their claim that they were entitled to an "offset" against the

9

restitution amount for that work.


## ARGUMENT

### POINT I[4]

**VIEWED IN THE PROPER LIGHT, RATHER THAN DEFENDANTS' SELF-SERVING CHARACTERIZATION, THE TRIAL EVIDENCE FULLY SUPPORTED THE GUILTY VERDICTS ON THE HONEST SERVICES BRIBERY COUNTS (1-6) AND THE 18 U.S.C. § 666 BRIBERY COUNTS (7 AND 8).**

**Standard of Review: Plenary.  *U.S. v. Bornman*, 559 F.3d 150, 152 (3d Cir. 2009).**


Both defendants contend that the evidence presented over the course of two months of trial was insufficient to prove any of the guilty verdicts on the honest services bribery counts (1-6) and the 18 U.S.C. § 666(a) bribery counts (7 and 8).  Defendants effectively concede that the Government proved all of the elements of those counts except the element that defendants intentionally entered into a *quid pro quo* ("QPQ") bribery scheme. Following extensive briefing and oral argument, the District Court judge soundly rejected the same sufficiency claims that defendants recycle in this Court, and explained its reasoning for those rulings in a thorough written opinion.  *U.S. v. Bryant and Gallagher*, 2009 WL 1559796 (D.N.J. 2009), SA645-80.[5]

---

[4] This point responds to DB Point III.

[5] The very able District Court judge labored diligently over this case.  Following voluminous briefing and oral argument in
(continued...)

In seeking to overcome the District Court's thorough rejection of their sufficiency claims, defendants face a "very heavy burden." *U.S. v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996). This Court's review of the sufficiency of the evidence

> is governed by strict principles of deference to a jury's findings, such that we draw all reasonable inferences in favor of the jury verdict. We will overturn a verdict only if no reasonable juror could accept evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.

*Id.* (internal citations omitted); *accord*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

As shown herein, defendants' sufficiency claims are larded with incorrect factual assertions and self-serving inferences. Their summary of the evidence is essentially a recycling of their trial summations that the jury rejected.[6]  Their self-serving

---

[5] (...continued)
response to defendants' pre-trial motions, the Court wrote an exhaustive opinion, granting in part and denying in part defendants' motions to dismiss the indictment and, in the alternative, to sever various charges for trial. *U.S. v. Bryant and Gallagher*, 556 F. Supp.2d 378 (D.N.J. 2008), JA16-84. At sentencing, Bryant's lead counsel acknowledged the Court's prodigious workload in this case, JA5187, *see also* JA5172. The Court conducted an exhaustive charge conference that spanned an entire week, JA4306, 4662, 4902. Throughout the protracted trial, the Court demonstrated its detailed knowledge and thorough understanding of the factual and legal issues. *E.g.*, JA895-97, 899-902, 908-09, 911-12, 916-17, 922-23, 998-1001. Having invested so much time and effort into this case, the District Court was well-situated to assess defendants' claims that the evidence was insufficient to support the verdicts.

[6] *E.g.*, DB61 ("No inference arises . . . that Mr. Bryant voted for the carve-out in exchange for his salary."); DB71
(continued...)

assertions violate firmly-established principles of sufficiency

review, since

> the prosecution need not affirmatively rule out every
> hypothesis except that of guilt, and [] a reviewing court
> faced with a record of historical facts that supports
> conflicting inferences must presume-even if it does not
> affirmatively appear in the record-that the trier of fact
> resolved any such conflicts in favor of the prosecution, and
> must defer to that resolution.

*Wright v. West*, 505 U.S. 277, 296-97 (1992) (internal citations

and quotation marks omitted).[7]  According to the defendants, the

evidence proved them to be two high-minded officials who were

earnestly and honestly striving to promote the good works of

SOM.[8]  They

> contend[] that there is an "innocent explanation" for
> [their] conduct-that [they were] helping [worthy programs at
> SOM]. . . . . [But e]ven accepting that [their] ultimate

---

[6] (...continued)
(evidence was "perfectly un-illuminating on the critical issue of
the case"); DB76 ("The evidence in this case showed only a state
medical school obtaining state funding for good purposes [and]
supports no inference of a *quid pro quo*."); DB77 (the "defense
exhaustively countered at trial" evidence of Gallagher's
deception).

[7] In a telling slip of the pen, defendants concede that
certain facts advanced by the prosecution were proved "[i]f one
credits the government's witnesses."  DB71.  On sufficiency
review, however, "[w]e must credit all available inferences in
favor of the government."  *U.S. v. Rawlins*, 606 F.3d 73, 80 (3d
Cir. 2010).

[8] *E.g.*, DB60 (Bryant supposedly sought to "remedy an
imbalance within UMDNJ, which historically disadvantaged SOM");
DB61 (the SOM "carve-out had [only the] salutary [effect] it was
intended to have"); DB66 ("providing health care services to
seniors in public housing in Camden aligned perfectly with Mr.
Bryant's legislative priorities").

> motives were laudable, [they] concealed material facts from
> the [state] government in an attempt to induce it to fund
> [their] projects.  That, standing alone, is fraud.

*U.S. v. Green*, 592 F.3d 1057, 1066 (9th Cir. 2010) (rejecting

sufficiency claim).  So framed, defendants' sufficiency claims

> do[] not come close to setting [the trial evidence] forth in
> a light favorable to the Government. . . .  In fact, after
> reading [defendants'] brief one might wonder what had been
> going on here and what [defendants] did to warrant [their]
> conviction[s].

*U.S. v. Hoffecker*, 530 F.3d 137, 146, n.1 (3d Cir. 2008).

A point-by-point consideration of the evidence demonstrates

that the District Court did not err when it rejected defendants'

sufficiency claims.  Viewed in the proper light on appeal, the

trial evidence demonstrated the following:

## 1.   Gallagher's Desperate Need in 2002 and 2003 For Political "Muscle" For The SOM "Team."

Throughout the indictment period, SOM, located in Stratford,

New Jersey, was the smallest of the five schools that comprised

UMDNJ, and the only one located in southern New Jersey.  JA557-

60, 564, 952-54; GX1, GX1A.  Gallagher, while Interim Dean of

SOM, aggressively sought the position of Dean, and enlisted the

support of Wayne Bryant and other South Jersey politicians.

JA661-62, 720, 1614; GX111.  He was promoted to Dean in November

2002, becoming responsible for the day-to-day operations of the

school.  JA664-65, 946; GX116.  His bonus compensation was

dependent in part on the performance and reputation of SOM.

JA665-66, 387-89; GX116.  Contrary to defendants' assertion,

13

DB78, maximizing the school's financial resources (including contributions from the state of New Jersey) was a key institutional and personal goal of Gallagher.

As Dean, Gallagher believed that UMDNJ's Central Administration had historically underfunded SOM relative to the other four schools of the university. JA953-54, 1616, 1619-20. By 2002, state contributions to UMDNJ and SOM were consistently shrinking, resulting in a 10% reduction in the academic budget of SOM, and contributing to what Gallagher described as an "unprecedented" financial crises and "very painful" staff cuts. JA953, 980, 981-84, 993-96, 1619; GX356. Gallagher's efforts to force SOM Department Chairpersons to propose and execute budget cuts were largely unsuccessful. JA987-89.

SOM was also funded in part by fees for medical services provided by physician faculty members of the school who participated in the Faculty Practice Plan, and those fees were shrinking in 2002 and 2003. JA981, 1616-17. Plans to increase that portion of the revenue stream were upended when a new Cancer Institute that had been slated as part of SOM was transferred to a competing school, Cooper University Hospital ("Cooper") in Camden, New Jersey. JA954-55. As a result, SOM was hard-pressed to pay the high salaries of the surgeons and oncologists it had recently hired in anticipation of receiving funding for its Cancer Institute. JA954-55. Gallagher blamed that set-back on

14

the influence of George Norcross, the head of the Democratic
Party of Camden County, who was affiliated with Cooper.  JA955-
56.  Gallagher lamented to his Chief of Staff, Robert Prodoehl,
that SOM had no comparable politically powerful person in its
corner.  JA955-57.

Around 2002, the Governor of New Jersey appointed what was
called the "Vagelos Commission," which was tasked to recommend
reforms to medical education and cognate health care services in
the state.  JA609, 1617-18.  The Commission issued a report,
recommending that UMDNJ be consolidated with Rutgers University
and the New Jersey Institute of Technology.  JA612, 1617-18.
Adoption of that recommendation could have resulted in the end of
UMDNJ's institutional independence, and with it the possible
termination of Gallagher's Deanship.  JA958, 1618.  Gallagher and
other UMDNJ officials were strongly opposed to the Vagelos
Commission recommendations, and Gallagher complained that the
Commission's findings were "political," rather than objective.
JA613, 793, 972-73, 976-77; GX1202, ¶ 6.  Gallagher acknowledged
that he had to be active in the "political arena" to fight off
the Vagelos recommendations, and urged SOM faculty members to
attend expensive political fund-raising events for state and
local elected officials.  JA978-80.

### 2.    Bryant's 2002 Shakedown of UMDNJ President Cook For A Salaried Job.

In 2002, Wayne Bryant, a long-serving State Senator from

southern New Jersey, was the Co-Chairman of the New Jersey Senate Budget Committee,[9] a position that gave him substantial influence over the allocation of state revenues to numerous entities, including UMDNJ and its components such as SOM.  JA571-76, 581, 839-40, 2073-75, 2088-89.  Each Executive Branch department had to justify its annual budget in hearings before the Budget Committee.  JA2774.  UMDNJ received approximately twenty percent of its revenues from direct state funding, and employed outside lobbyists to present its funding requests to Bryant and other legislators.  JA581-82, 589-90.  UMDNJ had to compete with other state-supported universities in general, and other public medical schools in particular, for a shrinking pool of post-secondary educational funds.  JA592-93.

In 2002, Stuart Cook was the President of UMDNJ.  JA659. Bryant came to Cook's office in the fall of 2002, ostensibly to discuss pending state legislation for the "revitalization" of Camden, New Jersey and the construction of a new SOM building in that city.  JA667-68.  After asking another UMDNJ official to leave the room so that he and Cook would be alone, Bryant told

---

[9] Because the New Jersey Senate was evenly divided between Democrats and Republicans in 2002, Bryant was initially the Democratic Party Co-Chairman of the Budget Committee.  JA2086, 2262-64.  After the Democrats gained majority control of the Senate in the November 2002 elections, Bryant became the sole Chairman.  JA573, 2089-90.  Bryant's power and status was further enhanced in 2005 when he became Deputy Majority Leader in the Senate.  JA2367.

Cook that he wanted a paid part-time job from UMDNJ.  JA668-69.
Cook was "quite upset" and "quite angry" at Bryant for this
implicit shake-down, as Bryant was demanding a paid job from
UMDNJ while discussing state funding for the university.  Cook
knew, of course, that Bryant had substantial clout over the
allocation of state funding to UMDNJ.  JA677-78.

Cook told Bryant that he would "think about it," but later
told other UMDNJ officials that he had no positions for Bryant in
UMDNJ's Central Administration.  JA678-79.  Cook later stated
that he would permit SOM to hire Bryant only if it was legal and
only if Bryant was the best candidate for a "legitimate job" that
would advance the university's goals and objectives, and was not
a mere sinecure.  JA679-80.

George Hampton, then the UMDNJ Vice President for Urban and
Community Development who had previously worked with Bryant,
arranged a meeting between Gallagher and Bryant on November 21,
2002 to discuss the hiring of Bryant at SOM.  Only the three of
them were present.  JA1623, 3983, 3991, 3995-97.  Hampton took
his leave when it appeared that Gallagher and Bryant would reach
an agreement about the job, and so did not learn what the job
would entail.  JA3997, 4037.

**3.    The *Quid Pro Quo*: Gallagher's Hiring Of Bryant For A "Low-Show," Highly-Compensated Job At SOM In Return For Bryant's Exploitation of His Official Power to Funnel More State Money to SOM.**

As Dean, Gallagher had the final say on all SOM hiring. JA946.  In December 2002, he told Prodoehl that he was going to hire Bryant to work part-time at SOM, and pay him $35,000 a year. JA992, 1022.  Referring to SOM's deteriorating financial condition and the threat of the Vagelos report, Gallagher told Prodoehl that SOM needed Bryant on its "team," and that if SOM did not hire Bryant, SOM's direct competitor Cooper might do so. JA992-94, 1022, 1409-11.  When Prodoehl astutely asked Gallagher if hiring Bryant, a sitting New Jersey state Senator, would create a "conflict of interest" given the state's substantial funding of SOM's operations, Gallagher stated that he had cleared the hiring decision with the UMDNJ legal department.  JA1028.  In fact, Gallagher had concealed from UMDNJ's General Counsel his plans to deploy Bryant to increase state funding of SOM.  JA2034-35, 2057.

Because there was no available job at SOM for Bryant, Gallagher directed Prodoehl to craft a job description for a new position, eventually titled "Program Support Coordinator," for Bryant.  JA1030-32, 1044.  As starting points for drafting the job description, Gallagher gave his hand-written notes to Prodoehl and John Crosbie, SOM's director of strategic and long-term.  JA1029-30, 1626; GX201.  Crosbie prepared a first draft of

18

the job description, which he described as his "spin" for the job. JA594, 1035-37, 1626-28; GX203.  According to that description, Bryant would report directly to Gallagher.  JA1044; GX204.  As described below, Gallagher caused the creation of an official UMDNJ document that falsely stated that Bryant would work three full days a week (sixty per cent of full time, or ".6") in that job.

The fraudulent job description concealed the QPQ agreement between Bryant and Gallagher by purporting that Bryant would enhance SOM's relations with local governments and community organizations, and making no mention of his role in securing additional state funding for SOM or providing the leaders of SOM with enhanced access to high-ranking state government legislative and executive officials.  JA847-48, 1034, 1041-42.  Before Bryant had demanded a paid job from President Cook, Gallagher had never suggested that SOM had any need for the new community and public relations position, and indeed it did not.  JA1625, 1628.[10] Gallagher caused the misleading job description to be sent to the UMDNJ Human Resources Department, and the HR officials relied on the misleading description in approving the proposed salary of

_____

[10] UMDNJ already had on staff a person (Bryant's first cousin) who was paid approximately $100,000 annually to work full-time on community relations in the Camden-based area served by SOM.  JA1969-75; GX1100A.  Bryant and his cousin did not meet even once during Bryant's three-year tenure to discuss Bryant's supposed "community relations" work.  JA1975-77.

$35,000 for the proposed .6 position.  JA1540-43, 1559-63.
Gallagher later approved the final version of the job description
that was generated by UMDNJ's Human Resources Department.
JA1037-38, 1628-29; GX205A.  Had the description disclosed that
Gallagher intended Bryant to use his position as state Senator to
funnel additional money to SOM, the HR officials would have
raised questions about the job with their superiors.  JA1543,
1557-58.

UMDNJ officials went through the motions of posting the new
position on its Internet web page so interested persons could
apply for it, and Crosbie and others went through the formality
of interviewing Bryant and another candidate who was married to a
politically prominent person.  JA990-91, 1053-55, 1629, 4040.
The job was Bryant's from the outset, however, and the interviews
were designed to further conceal the QPQ.  JA1048, 1059-64, 1580-
84, 1629, 4040; GX216.  Even though Gallagher typically
participated in such job interviews, he did not interview Bryant
because Gallagher had already decided to hire him.  JA1054-55,
1629-30.

New Jersey's annual budget would be proposed by the
Governor's office in January or February, and finalized by July.
JA1641-42, 2075-77.  Gallagher was eager to hire Bryant to
influence SOM"s budget for 2003-04, urged his subordinates to
expedite the hiring, and kept frequent tabs on the progress of

20

the hiring.  JA1069, 1632.  Bryant was hired and began work at SOM on March 19, 2003.  JA1069.

Six days later, on March 25, Bryant met with Gallagher, Crosbie, and Prodoehl to discuss the tasks that Bryant would perform for SOM.  JA1069, 1072.  Before Bryant's arrival at SOM, officials of the school frequently had been unable to arrange meetings with key state legislators to present their funding needs.  JA1635.  In advance of the March 25 meeting, Crosbie sent Gallagher a memorandum, stating that SOM should use Bryant to facilitate meetings between SOM officials and state government officials, and to obtain "supplemental funding" from the state for SOM's operating costs and capital improvements.  JA1634-36; GX305.

During the March 25 meeting, Gallagher, Bryant, and Crosbie discussed those issues, as well as obtaining "pork items," colloquially known as "Christmas tree" grants.  JA1637; GX304.  Gallagher complained to Bryant that SOM was "underfunded per student" compared to the other UMDNJ schools.  JA1640-41.  Gallagher also sought additional funding for multi-disciplinary programs operated by SOM, such as the Center for Child Support and the Institute for Successful Aging.  JA1641.  Bryant directed Gallagher and Crosbie to provide him with a list of SOM's funding needs for the current budget cycle.  JA1638.  Bryant also directed them to coordinate with his legislative assistant to set

21

up meetings with other legislators involved in the budgeting
process.  JA1640.

After that March 25 meeting, Crosbie produced a memorandum,
GX304, summarizing the tasks that Gallagher had hired Bryant to
actually perform, as opposed to the phony, publicly-disseminated
job description.  Bryant would:

- "[f]acilitate meetings with key lawmakers," and
  "[i]dentif[y] processes for identifying key lawmakers SOM
  should be meeting with on budget and other issues," and

- prepare a "Supplemental funding strategy" for SOM.

A1075-76, 1636-40; GX304.  Meanwhile, Crosbie would:

- "[p]rovide [a] concise white paper on SOM capital projects
  that were not funded and outline plan for what should be
  restored," and

- "[w]ork with Valerie (Bryant's legislative chief-of-staff)
  to arrange meetings with Budget committee members ASAP.

*Id.*

Crosbie provided a copy of that memorandum to Bryant and
Gallagher following the meeting.  JA1643.

### 4.    Bryant's Lies About Obtaining Approval For His SOM Job.

While interviewing Bryant, Crosbie asked if there were any
legal impediments to his working for SOM while serving as a state
Senator.  Bryant promised to check with the New Jersey Office of
Legislative Services ("OLS"), the administrative arm of the
Legislature with jurisdiction over such matters.  JA1630-31.  In
a subsequent telephone conversation, Bryant assured Crosbie that
OLS had given Bryant the green light to take the job.  JA1631.

22

That was a lie.  The OLS officials who would have responded to
any such request all testified that they had never spoken to
Bryant about taking any job at SOM, much less a job in which he
would exercise his official power as a Senator to funnel revenues
to SOM.  JA1932-33, 1943-45, 2024-26, 2029-31.

### 5.  Gallagher's Fabrications About Bryant's Level Of Effort In The Low-Show Job.

Before Bryant was hired, Gallagher's office submitted a
"Staff Position Transaction Form ("SPTF") to the UMDNJ
Compensation Office regarding Bryant's job.  JA1044-45, 1602-03.
Even though Gallagher had initially told Prodoehl that Bryant
would work only one day a week, the SPTF described Bryant's job
as being a twenty-two and one-half hour per week, or ".6" (sixty
per cent, or three full days per week) position.  JA1044-48,
1679-80; GX209.  Gallagher himself directed his subordinates to
describe Bryant's job as ".6" and 22.5 hours per week on the
SPTF.  JA1453-58, 1489.

As it turned out, Bryant never worked even one full day a
week in his SOM low-show job, and often did not appear at SOM at
all.  When he started the job, other SOM employees who worked in
the "Dean's Suite" where Bryant's office was located noted the he
would show up for two to three hours per week on Tuesday
mornings, during which he would read the newspapers and speak on
the telephone, often about legislative matters.  JA1195-96, 1461-
62, 1911, 1996-97, 2004, 2521.  Bryant produced no written work

23

product, and never called upon the secretarial staff for
assistance.  JA1461-62, 1689, 1997, 2004, 3748.  Eventually, he
stopped showing up at SOM altogether.  JA1461, 1471, 2004.

Defendants assert that "Mr. Bryant appeared in [his SOM]
Office regularly."  DB78.  The evidence, viewed in the proper
light, proved that Bryant did no such thing.

### 6.    Bryant's Official Acts That Funneled Increased State Funding To SOM.

Before Bryant went on the SOM payroll he did little if
anything to advance its interests.  JA1633, 2097, 2249-51, 2253,
2274, 2469-70, 2602.  During the approximately three years that
Bryant was on the SOM payroll, he was instrumental in securing
over $10 million in additional funding for the school.  JA1679,
4505.  Even though Bryant had not completed all of the lobbying
and revenue-generating tasks he had promised to undertake during
2003, Gallagher directed Crosbie to write a highly favorable
review of Bryant for that year, because Gallagher was "very
pleased" with Bryant's efforts on behalf of SOM.  JA1666-68.
Crosbie prepared the memorandum, which contained no mention of
Bryant's revenue-generating activities on behalf of SOM, even
though that was Bryant's primary task for SOM.  JA1668, 1670;
GX311, GX312.  The evaluation falsely stated that in his work for
SOM, Bryant had "avoided even the appearance of conflict in his
role with the State Legislature."  JA1668; GX311.  After reading
the evaluation, Gallagher approved it.  JA1669.  Gallagher then

approved a $5,000 bonus for Bryant, even though no other part-
time SOM employee received any bonus.  JA1670-71.  Crosbie wrote
a similarly misleading evaluation of Bryant for the following
year.  JA1671-72.

Defendants erroneously contend that "[t]he government's own
witnesses supposedly did not dispute that Mr. Bryant had been a
long-time supporter of SOM."  DB58.  Bryant cites the testimony
of President Cook that Bryant received a medal for his supposed
support of SOM, but Cook's tepid testimony was that he "could not
recall" the reason for the medal.  JA711-12.  Crosbie testified
that he had "given interviews" that Bryant had been a supporter
of SOM, but did not say that Bryant's support pre-dated his SOM
job, or even confirm that his prior statements were true.
JA1777-78.  Dr. Cavalieri's flattering email to Bryant, seeking
financial support for his own program at SOM, merely stated that
Bryant supported "senior citizens."  JA2545-46.  That certainly
did not prove that Bryant had advocated additional funding of SOM
before he went on its payroll.  Given the evidence that Bryant
first became a vigorous, high revenue-generating advocate for SOM
only after he went on SOM's payroll, the jury could reasonably
conclude that it was the QPQ and not any other considerations
that caused that support.

### A.    The Recurring $2.325 Million "Carve-Out" Of State Funds To SOM.

Very shortly after Gallagher hired Bryant, Bryant became the

driving force behind securing additional funding for SOM.
JA2271-72, 2488-89.  Crosbie provided Gallagher with
documentation that SOM needed an $2 million per year to bring it
to parity with the other UMDNJ schools in per-student funding.
Gallagher transmitted that information to Bryant.  JA1646-47.

As Chairman of the Senate Budget Committee during
negotiations and drafting of the 2003-2004 state budget, Bryant
personally secured a $2.325 million "carve-out" of UMDNJ's annual
allocation, which was added to SOM's "base funding" and would
therefore be allocated every year thereafter.  JA2271-72.  During
a June 2003 meeting with the Governor's Chief of Staff, Bryant
insisted that the $2.325 million carve-out be written into the
budget legislation.  JA2267-70, 2272-74.  The budget language
directed UMDNJ officials to allocate that amount to SOM without
reducing any other sums that the university would otherwise
allocate to SOM as part of the university's annual budget.
JA1653, 2103-07, 2270-71; GX14Q, p. 153, lines 39-40.  SOM
received that carve-out in 2003 and in succeeding years, even
though it had never received such an allocation in previous
years.  JA1653-54, 2271-74, 2687-88, 3313-40; GX15006.  Although
Bryant argued after he was hired by Gallagher that SOM was
historically underfunded relative to the other UMDNJ schools, he
had never advocated for additional funding for SOM before going
on the SOM payroll.  JA2274, 2469-70.  The evidence supported an

26

inference that the carve-out was a *quo* in the QPQ scheme.

Defendants contend that Bryant was merely one of many legislators who approved of the carve-out and not its driving force. DB60-61. They erroneously rely on the testimony of a defense witness, David Matos, a UMDNJ employee who worked on legislative matters, JA4158, that he had a conversation about the $2.325 million carve-out with "a member of the Assembly [Greenwald], and not Mr. Bryant." DB59-60. But Matos admitted that he had no idea what role Bryant played in crafting the carve-out legislation. JA4183. He also admitted that, although he assumed that Greenwald was the legislative author of the carve-out, Matos had no knowledge to support that assumption. JA4178-80. Even if Matos' testimony advanced the defense, the evidence of guilt can never be insufficient simply because it was contradicted by a defense witness. A reviewing court must presume that the jurors discredited all evidence that undermined the verdict. *See U.S. v. Baptiste*, 264 F.3d 578, 589 (5th Cir. 2001) (rejecting sufficiency challenge; jury "was . . . entitled to discredit . . . the defense witnesses"); *opinion amended on other grounds*, 309 F.3d 274 (5th Cir. 2002); *see generally U.S. v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("jury was entitled to disbelieve [defendant's] . . . testimony and use its disbelief to add weight to the government's case").

27

### B. The $800,000 Allocation For The SOM Center For Child Support.

During the March 25, 2003 meeting, Gallagher stressed to Bryant the need for additional state funding for SOM's Center for Child Support ("CCS", later renamed "NJ CARES"). JA1641. Thereafter, at Gallagher's direction, Crosbie and Martin Finkel, the Director of CCS, enlisted Bryant's assistance in securing additional state funding for CCS. JA1664-65, 1896-99; GX603. Bryant attended a meeting at CCS at which Finkel described the work of CCS and its need for additional funding. JA1645-46; GX688.

In early June of 2003, Bryant informed Gallagher that Bryant had convinced other members of the Senate Budget Committee that CCS should receive additional state funding. JA1648. Days later, Bryant bragged to Crosbie that he had convinced other legislators and the Governor to approve an $800,000 appropriation of additional funding for CCS. JA1650; GX694. George LeBlanc, the chief Democratic Party staffer on the Budget Committee, confirmed that Bryant was responsible for the $800,000 allocation to SOM. JA2274-77.[11]

Crosbie drafted language for inclusion in the annual budget

---

[11] In previous years before Bryant went on the SOM payroll, other South Jersey legislators, but not Bryant, had obtained legislative approval of additional funding for CCS. On two occasions, the appropriation had been "line-item vetoed" by the Governor. JA2142-43, 2204-07, 2235-37, 2249-50, 2253. After Bryant got behind CSS, the vetoes ended.

28

bill that would allocate to CCS that money for 2003 and the two
subsequent years, and sent it to Bryant.  J1649.  At Bryant's
insistence, the appropriation was in the form of a "carve out"
from the budget of the Division of Youth and Family Services
("DYFS").  JA2094-96, 2101-02, 2241, 2275-78.  Crosbie's draft
language made it into the final budget bill.  JA1649, 1651-53,
2091-96; GX604A, GX14Q.  After working for SOM for a little more
than three months as of July 2003, as a result of the $2.325
million carve-out to SOM and the $800,000 carve-out for CCS,
Bryant was responsible for an additional $3.1 million in state
funding for SOM.  JA1659.

Defendants erroneously contend that the evidence proved only
that "Bryant . . . pass[ed] along to legislative staff some
language that the constituent suggested."  DB67; *see also* DB68.
They also irrelevantly argue that Bryant could not have caused
the $800,000 allocation without the support of other legislators.
DB67.  As shown above, the evidence, viewed in the proper light,
shows that Bryant claimed personal credit for obtaining the
allocation, and LeBlanc confirmed that Bryant was correct in
doing so.  The jury was entitled to take Bryant at his word when
speaking candidly to his SOM handlers that he was chiefly
responsible for obtaining the $800,000 for the CCS.

Defendants throw another red herring into the fray by
arguing that the CCS "carve out" did not increase total state

29

expenditures.  DB68.  That Bryant funneled money to SOM, causing
funds in the zero-sum budgeting process to be denied to other
potential recipients, and did not seek "new money" for CCS, has
no bearing on the proof that he was engaged in a QPQ bribe.

###   C.   Bryant's Shakedown Of the DHS Commissioner On Behalf Of NJ CARES And The "Rollover" Of Unspent State Funding to NJ CARES.

In early 2004, when James Davy took over as Commissioner of
the New Jersey Department of Human Services ("DHS"), the state
was subject to a federal district court settlement decree issued
in a lawsuit brought on behalf of children who had been
inadequately served by DYFS.  JA2873.  Under that decree, the
state had to reform the child welfare services provided by DHS
and DYFS.  The reforms would cost $15 million in the short term
and over $300 million in the long term.  JA2874-75.  There was
enormous pressure on DHS to promptly formulate a workable
proposal, including funding, to satisfy the decree.  JA2818-19.

After Davy secured the agreement of the plaintiff class and
the federal judge for his reform proposals, Bryant publicly
denounced Davy's proposals.  JA2876, 2879.  Thereafter, the Joint
Budget Oversight Committee ("JBOC") of the New Jersey
Legislature, which Bryant chaired, approved only $7 million of
the needed $15 million for the first phase of the reform
proposals.  JA2875-79.  When Davy explained to Bryant that the
state was legally bound to comply with the settlement decree,

Bryant blithely replied that only the Executive Branch of the state, but not the Legislative Branch, was so obligated.  JA2877.

In March 2004, after the Governor directed Davy to reach an accommodation with Bryant, Bryant arranged a meeting between himself, Davy and Finkel, the Director of NJ CARES.  JA2820, 2880-82, 2884-85.  After Finkel described the services that NJ CARES could provide as part of the child welfare reform proposal, Bryant intoned ominously to Davy that he would have "a problem with me [Bryant]" if Davy and DHS did not support NJ CARES.  JA2821, 2882-83.

Davy was worried about Bryant's obvious ability to carry out that threat.  JA2885.  Davy instructed his staff to reach an accommodation with NJ CARES, and DHS subsequently authorized approximately $1.5 million in new funding to NJ CARES for contract services (on top of other funding that NJ CARES was already receiving from DHS).  JA2821-22, 2887-90.  Only then did the JBOC approved the $8 million balance of the $15 million DHS needed for child welfare reform.  JA2888.

By the summer of 2005, NJ CARES had failed for two successive years to spend $600,000 of its annual allocation from the state.  JA2822.  Kathy Way, the Deputy Commissioner for DHS, was adamantly opposed to NJ CARES's proposal to "roll-over" that money so that it would be available without restriction in the subsequent fiscal year.  JA2822-25, 3955-56.  When Way informed

31

Davy about this disagreement, Davy told her to reach an accommodation in order to avoid another confrontation with NJ CARES's powerful patron, Senator Bryant.  JA2827, 2891.  Sure enough, the following day, Bryant called Davy and asked for a meeting on the roll-over of the $600,000.  JA2891-92.  Davy told Bryant that a meeting was not necessary, as he had already authorized the roll-over.  JA2892-93.  NJ CARES retained the $600,000 without restriction in subsequent years and without suffering a reduction in state funding.  JA3002-08, 3014-15.

Defendants argue that "the $1.5 million was actually compensation for contracted services that NJ CARES provided on behalf of" DYFS, and that NJ CARES had previously provided services to DYFS before Bryant twisted Davy's arm.  DB68-69.  Neither of those irrelevant facts gainsay that Bryant forced Davy to grant NJ CARES the new contracts as an additional *quo*.  Depriving the public of an elected official's honest services through bribery is unlawful, regardless of whether the bribe-directed public funds are diverted to projects with some public value, and even if the same outcome would have occurred without the bribery.  *See U.S. v. Vrdolyak*, 593 F.3d 676, 684 (7th Cir. 2010) (rejecting the notion in a prosecution for illegal kickbacks that "defendant had acted with the best interests of the medical school in mind-which is untrue because the school's interest was to have an honest bidding process").  "Where there

32

is [an] illegal [] agreement, it is no defense that . . .
defendant's motives were benevolent." *U.S. v. All Star
Industries*, 962 F.2d 465, 475 (5th Cir. 1992), *disapproved on
other grounds, U.S. v. Calverley*, 37 F.3d 160 (5th Cir. 1994);
*see also U.S. v. Malinowski*, 472 F.2d 850, 855 (3d Cir. 1973) (in
tax evasion prosecution, defendant's objection to funding the
Viet Nam war could not excuse the crime).

Defendants also contend that the jury could not infer that
Bryant leveraged his official power against Davy to obtain the
additional contract for NJ CARES because that entity was "already
integral" to the proposed welfare reform program, supposedly
developed "best practices" for dealing with victims of child
abuse, and was not the "brainchild of Mr. Bryant." DB70-71. But
however beneficial the past services provided by NJ CARES to
DYFS, and whatever the level of state-funding for NJ CARES before
Bryant arrived on the scene, Gallagher wanted that level to be
higher, and the jury could reasonably conclude that Bryant's
"forceful advoca[cy]," in defendants' euphemism (DB71), was a
*quo*.

### D.   Bryant's Efforts To Secure Cancer Research Funding For SOM.

The New Jersey Cancer Center in New Brunswick was the only
such center in New Jersey that was endorsed by the prestigious
National Cancer Institute. As such, it received substantial
federal funding for research, treatment, and education. JA1660.

In 2003, the New Jersey Legislature allocated $5 million to expand the Center's activities to South Jersey, and delegated the allocation of that money to the New Jersey Commissioner of Health, Clifford Lacey.  JA1660-62.  Gallagher wanted SOM to receive a "sizeable portion" of that money, which otherwise would have all gone to Cooper.  JA1662, 2776-77.

SOM had recently hired a respected cancer surgeon, Dr. James Weese, and Gallagher tasked Weese to lead SOM's efforts to obtain some of the cancer funding.  JA1661.  In August of 2003, Bryant arranged for a meeting at SOM's campus, attended by Bryant, Gallagher, Lacey, Weese and Crosbie, regarding Gallagher's push for the cancer money.  JA1662-63, 1905-08, 2777-80; GX701, GX702. Crosbie prepared a list of "talking points" for each of the "people on our side," which included Bryant, in advance of the meeting.  JA1664-65; GX706.  At the meeting, Bryant spoke highly of SOM's cancer program, and explained pointedly to Lacey that the state Senate had appointed the Department of Health to act as an "honest broker" for the $5 million.  JA1665, 2780.  Gallagher stated that SOM needed to be a "key player at the table" and should receive $1.5 to $2 million of the $5 million appropriation.  JA2779-80, 2805.

Defendants seek to downplay this evidence by claiming that "the issue was not increasing a line item in a budget, but dividing the money that was already allocated."  DB62.  But

34

obtaining a more favorable division of that money for SOM was precisely the "*quo*" that Gallagher sought from Gallagher.

Defendants' contention that Bryant merely "helped assure that meeting," DB62-63, is entirely at odds with the evidence that Bryant actively lobbied Lacey to deliver some of the cancer money to SOM. Defendants also claim that Bryant was unsuccessful in those efforts, DB63-64, but their "attempt to minimize the [bribery scheme] . . . by emphasizing its lack of completion" of their goals in the scheme is "unavailing" because "[t]he wire [and mail] fraud statutes criminalize the fraudulent acts undertaken to secure illicit gains, not their ultimate successes." *U.S. v. Lupton*, __ F.3d __, 2010 WL 3419889, *13 (7th Cir., Sept 1, 2010).

### E.    The $200,000 "Christmas Tree" Grant To The SOM Institute For Successful Aging.

Beginning with the 2004-2005 state budget cycle, the New Jersey legislature created a program of discretionary grants or "earmarks" from individual legislators to local governments and "community organizations" of their choosing. JA2108-10, 2278-79, 2364-66, 2644-45. The program was popularly called the "MAC Account" (referring to both a particular legislator and an ATM machine) and the grants were referred to as "Christmas Tree" items. JA1637, 2108-10, 2633-35. As the powerful Chairman of the Senate Budget Committee, Bryant controlled $4 million of Christmas Tree grants, ten per cent of the total. JA2467-68,

35

2646-48; GX907A.  All Christmas Tree grants had to be approved by
the JBOC, of which Bryant was the Chairman.  JA2129-30, 2229,
2647.  In July 2005, Bryant engineered a change in the statutory
language to permit Christmas Tree grants to go to colleges and
universities.  JA2111-12, 2122-23, 2286-88, 2645, 2653, 3036-46;
GX927, GX928.

    One morning in December 2005, Gallagher contacted Thomas
Cavalieri, the head of SOM's Institute for Successful Aging
("ISA"), and told him to immediately prepare a proposal for a
$200,000 grant.  JA2522-23.  When Cavalieri inquired about the
source of the grant, Gallagher replied, "[i]t's payback time,"
but did not explain what he meant.  JA2523.  Cavalieri submitted
the application, and eventually received the $200,000.  JA2523-
25; GX908, GX914.

    As it turned out, the "payback" was another of Bryant's *quos*
for his SOM salary.  The $200,000 came from the MAC Account
program, and Bryant was the legislator who had designated ISA as
the recipient of that grant.  JA2129-30, 2368-70, 2649-51;
GX908B, GX909, GX910.  Bryant's involvement in securing the money
for ISA was not publicly disclosed, however.  JA2369.  Before
securing that grant for ISA, Bryant had never previously
advocated for additional funding for that program.  JA2602.

    Defendants contend that "notifying SOM [about the
availability of the grant] was something of an afterthought for

36

Mr. Bryant." DB65. As Bryant did not testify at trial, there was no direct evidence that bore on his thought processes. Nor was there any testimony from anyone else with personal knowledge about what Bryant's "legislative priorities" were, much less that the $200,000 grant "aligned perfectly with those priorities." DB66. Although Bryant allocated most of his $4 million in Christmas Tree grants to other entities before turning to ISA for this particular *quo*, Bryant still used his legislative power to procure more funding for SOM, and did so only after he went on the SOM payroll.

Defendants assert, without citation to the record, that "[t]he prosecution's proof focused almost entirely on its view that the grant program itself was improper." DB66. To the contrary, emphasizing Gallagher's "it's payback time" remark, the Government properly argued in summation that the grant was an improper *quo*. JA4501. It never asserted that the defendants should be convicted because the grant program was improper.

### 7. Defendants' False Statements And Omissions Regarding The Illegal *Quid Pro Quo* Job At SOM.

Compelling evidence of defendants' mens rea regarding the QPQ bribery scheme included their repeated lies and material omissions about the nature of Bryant's SOM job. For instance, in 2003, a reporter from the South Jersey Courier-Post newspaper made a request to UMDNJ under New Jersey's "Open Public Records Act" ("OPRA") for information about Bryant's SOM job. JA691,

37

635-38, 748-51, 1112.  The reporter later wrote newspaper
articles that were critical of SOM's hiring of Bryant.  JA851.
Gallagher "strategized" with Prodoehl and others before directing
them to release only the "official" and misleading job
description that Bryant's work was limited to "community
relations" and working as a liaison with local governments.
JA1112-15, 1659-60.  Gallagher directed Crosbie to coordinate
SOM's response to the OPRA request with Bryant's office.  JA1116.
When Bryant later appeared before the <u>Philadelphia Inquirer</u>
editorial board to confront the allegations of corruption, he
falsely told the editors that his SOM job was limited to
"external affairs" and "municipal relations," and declined to
disclose his official acts as a state Senator on SOM's behalf.
JA4536; GX357.

When the fraudulent SPTF form surfaced and became the
subject of public scrutiny, Gallagher falsely attempted to
distance himself from the document even though it was he who had
directed that it state that Bryant would be working sixty per
cent of full time.  After falsely denying any role in creating
the fraudulent SPTF, Gallagher angrily admitted to Crosbie that
he had falsely characterized the job as sixty per cent of full
time rather than twenty per cent because he believed that
otherwise, Bryant would not earn credit towards his state-funded

pension from his SOM position.  JA1681-83.[12]  Gallagher demanded

that Crosbie and Prodoehl falsely memorialize their recollections

that Gallagher had always characterized Bryant's job as a ".2"

(one day per week) position, rather than .6.  JA1172-74, 1680-82;

GX319, GX320.  Gallagher demanded that Crosbie "create a paper

trail" to claim that Bryant's work for SOM was legitimate, so

Crosbie created a phony calendar that purported to do so.

JA1683-84.

    As a state Senator, Bryant was required by the New Jersey

Legislative Code of Ethics to annually disclose in writing all

sources of income in excess of $1,000.  JA1928.  Bryant failed to

disclose his SOM salary on his 2003 Legislator's Financial

Disclosure Statement ("LFDS"), which he filed on April 19, 2004.

JA1929-31; GX3003.  It was only after UMDNJ announced a formal

investigation into a possible breakdown in financial controls in

April 2005 that Bryant first identified his SOM salary on an

LFDS.  JA1929-31; GX3004.

    When Bryant intervened on SOM's behalf with various New

Jersey government officials, he never told them that he was on

SOM's payroll.  JA1665-66, 2131, 2371-72, 2489-90, 2786, 2827,

2836-37, 2881-82, 2897.  But when Gallagher was conferring

---

[12] UMDNJ's internal rules specified a minimum of fifty
percent in order to earn benefits.  JA1579-80, 1606.  However, a
a public employee in New Jersey was eligible for a pension by
earning as little as $1500 per year.  JA4428-29.

privately with his trusted staff members about Bryant's real role
for SOM, he occasionally let slip that he had hired Bryant to
funnel state money to SOM.  For instance, Gallagher agreed with
Prodoehl's assessment that the $2.325 million increase in New
Jersey's appropriation to SOM engineered by Bryant was a very
good "return on investment" of Bryant's $35,000 salary.  JA1123.
As stated above, Gallagher told Cavalieri that the $200,000
Christmas tree grant that Bryant had engineered for ISA was a
"payback," JA2518-2525.  When one of Gallagher's subordinates
spoke unguardedly about that "payback," however, she was severely
chastised by Gallagher.  JA1155-58.

Gallagher also lied to his superiors at UMDNJ about Bryant's
role.  Gallagher falsely told his immediate supervisor, Lawrence
Feldman, that Bryant's job would involve "community relations."
JA3745-46.  Gallagher never told Feldman that Bryant would secure
additional funding for SOM.  JA3748-49.  Although Feldman told
Gallagher that Bryant's job had to be "a real job" with "real
work product" to which Feldman would have access, Feldman never
saw any work product from Bryant.  JA3746-48.

Gallagher also told Robert Saporito, the Vice-President for
Academic Affairs, that Bryant had a part-time job at SOM for
community relations.  JA3862, 3882-83.  Saporito directed
Gallagher to keep an accurate record of the tasks that Bryant
performed for SOM.  But Gallagher never told Saporito that Bryant

40

was using his legislative power to secure additional funding for
SOM, or arrange meetings between SOM officials and key lawmakers.
JA3881-86.  Nor did Gallagher tell Saporito anything to disabuse
him of the notion that Bryant's work was limited to community
relations.  JA3886-87.

Even George Hampton, who introduced Bryant to Gallagher and
who participated in drafting the fraudulent job description for
Bryant, testified that he was led to believe that Bryant's job
would primarily involve community relations, "serving as a
liaison, opening doors", teaching a class, and "recruiting people
of color for the health professions" at UMDNJ.  JA4008-09, 4012.

Defendants claim that "the [foregoing] evidence of deception
. . . cannot provide the missing element of offered exchange."
DB77.  But the deception evidence did not need to prove, on its
own, the QPQ, which was well established by SOM's payments to
Bryant and his subsequent official acts that benefitted SOM.
Rather, defendants' lies were powerful circumstantial and
corroborative proof of defendants' consciousness of guilt.  *See*
*U.S. v. Berryman*, 322 Fed. Appx. 216, 220 (3d Cir. 2009) (not
precedential); *see generally U.S. v. Levy*, 865 F.2d 551, 558 (3d
Cir. 1989); *Govt. Virgin Islands v. Lovell*, 378 F.2d 799, 806 (3d
Cir. 1967).

### 8.   **Defendants' Sufficiency Challenges are Meritless.**

Defendants argue that they could not be convicted of any of

41

the honest services and § 666(a) bribery counts because the
Government failed to prove that "the funding received by [SOM]
was undeserved." DB76. This is another red herring. Bryant's
intervention on behalf of his bribe-payer distorted state
funding. There was always competition between SOM and Cooper
(among others) for the shrinking pool of state funding. JA4177.
Fair competition for public funding provides a benefit to
society: rigged competition harms both the losing bidder and
society as a whole. *See In re Insurance Brokerage Antitrust
Litigation*, ___ F.3d ___, 2010 WL 3211147, *21 (3d Cir., Aug. 16,
2010). In order to provide honest services, Bryant was required
to judge that competition fairly and without bias caused by QPQ
payments, and Gallagher was forbidden from inducing Bryant to
favor SOM with such payments. As the District Court told Bryant
at sentencing:

> even if you might have taken these acts, many of them to the
> benefit of certainly UMDNJ and perhaps ultimately the
> citizenry, you gave up your impartiality when you acted as
> you did, and we could never determine whether you would have
> acted the same way because . . . by entering into a *quid pro
> quo* bribery agreement, you ceased making decisions according
> to your best judgment as a legislator on behalf of all the
> citizens you served because you allowed the [bribe] payer to
> place a thumb on the scale of your decision-making.

A5197. Under defendants' unduly straitened conception of the
prohibition against bribery, legislators could publicly and
permissibly offer their votes for sale to the highest bidding
public agency, which, in turn, paid for those favorable votes

42

with public funds, so long as the public agencies did public work.  The fact that defendants engaged in numerous acts of deception to conceal the QPQ is testament to their own understanding that such an arrangement was unlawful.

In a related claim from Point I(D) of their brief, defendants contend that HSF does not extend to QPQ bribery where the payor of the bribe seeks the allocation of public funds to "public agencies."  DB41.  According to defendants, highly compensated executives of public agencies such as Gallagher, whose bonus compensation is at least indirectly driven by the amount of public funding the agency receives, may bribe legislators to funnel public money to the agency, even though the same conduct by a private person seeking governments for a private entity would be a federal crime.  Defendants cite no case that so holds, but claim that principles of federalism require such a result.  To the contrary, in *Skilling v. U.S.*, 130 S.Ct. 2896 (2010), the Supreme Court held that HSF prosecutions of bribery and kickbacks did not violate federalism concerns, and did not require proof of a violation of state law.  130 S.Ct. at 2933-34 and n.45 (noting that "[t]he principal federal bribery statute . . . generally applies only to federal public officials, so § 1346's application to state and local corruption . . . reaches misconduct that might otherwise go unpunished."); *see also U.S. v. Urciuoli*, 613 F.3d 11, 15 (1st Cir. 2010) (post-

*Skilling* decision rejecting defendant's "concerns about federalism" [and] holding that "[n]othing in Rhode Island [state] Island law purports to authorize or protect QPQ bribery") (internal quotation marks omitted).  Even under pre-*Skilling* law, this prosecution did not involve an undue federal intrusion into the affairs of state government, because New Jersey law, like federal law, makes bribery a criminal offense.  *See* N.J.S.A. § 2C:27-2 (prohibiting bribery "in official and political matters"); *U.S. v. Panarella*, 277 F.3d 678, 693-94 (3d Cir. 2002) (federalism concerns did not preclude prosecution for honest services fraud where "the intrusion into state autonomy is significantly muted, since the conduct that amounts to honest services fraud is conduct that the state itself has chosen to criminalize.").

Defendants also claim that, because no other reported judicial opinion involved a QPQ in which a public employee paid bribes to an elected official to secure additional state funds for the employee's public employer, the Government was precluded by principles of fair notice from prosecuting defendants for that conduct here.  DB41-42.  In *Urciuoli*, the First Circuit rejected defendant's "fair notice" challenge to HSF bribery conviction. 613 F.3d at 15.  There is no reason in logic or policy to treat bribes paid to state legislators out of public funds by public university administrators seeking public contracts or funding any

differently than bribes paid by, *e.g.*, private contractors seeking public contracts and funding.

Defendants argue that the Government's proof of the QPQ was undermined by evidence that "Bryant did quite a bit for SOM" that was lawful and legitimate, and not the *quo* of the QPQ.  DB74. That may have been the defense spin at trial, but the jury could have reasonably drawn a contrary inference from the totality of the evidence: that Bryant performed little if any legitimate work at SOM, and that the few largely ceremonial functions he undertook were so paltry that their real purpose was to further conceal his QPQ bribery arrangement with Gallagher.  Bryant's meager efforts that are now trumpeted by the defense supported, rather than undermined the verdicts, because

> [t]he government's evidence permitted the jury to find that
> [Bryant]'s work for [SOM] was modest given his ample salary
> (roughly [$113,000] total between [March 2003] and [January
> 2006]); that his limited work for [SOM] decreased over the
> years while his contract was renewed and his [salary was
> increased] . . .

*Urciuoli*, 613 F.3d at 14.  "That [Bryant] performed some [legitimate] services did not prevent the jury from regarding the payments as primarily intended by [Gallagher] to secure [Bryant]'s legislative help."  *Id.*  Accordingly,

> a rational jury could find that [Gallagher]'s purpose was
> for [Bryant] to use his office on behalf of [SOM] and that
> [Bryant] did so, that the compensation nominally for [public
> relations] was in reality for [Bryant]'s misuse of his
> powers, and that the result was a conspiracy to deprive [New
> Jersey] citizens of [Bryant]'s honest services as a [New
> Jersey] Senator.

*Id.*

Defendants also improperly rely on defense evidence to advance a sufficiency claim. For instance, defendants repeatedly cite the testimony of a defense witness, Meredith Schalick, in support of their assertions that Bryant performed legitimate work for NJ CARES. DB74. But as the jury was properly instructed, JA4407, it was entitled to reject all of Ms. Schalick's trial testimony on these matters. On sufficiency review, when viewing the evidence in the light most favorable to the Government, this Court must presume that the jury did so. *Baptiste*, 264 F.3d at 589. Defendants also reference the testimony of prosecution witnesses Crosbie, Prodoehl, and Cavalieri in support of their assertions that Bryant provided other "legitimate" work for SOM, DB72-74, but as the District Court properly instructed, JA4407, the jury was "free to believe all, some, or none of a witness's testimony." *U.S. v. Bates*, 614 F.3d 490, 495 (8th Cir. 2010) (quoting *U.S. v. Candie*, 974 F.2d 61, 65 (8th Cir. 1992)); *see also Conklin v. Schofield*, 366 F.3d 1191, 1200 (11th Cir. 2004). Viewing the evidence in the proper light, this Court must again presume that the jury did precisely that.

Defendants point to evidence that Bryant:

- "taught classes," DB72, but the evidence was that Bryant was merely a one-day per semester guest lecturer at classes taught by others, JA1138-39, and there was no evidence about what he said or did in preparation for or during those appearances;

- "had duties [that] included planning a joint degree program," DB72, but there was no evidence that he actually performed those duties, and Crosbie testified that Bryant failed to perform various tasks assigned to him, JA1667;

- "advised [Cavalieri and others] on the expansion of the [Cavalieri's program and the availability of community resources," DB72, but the jury could have reasonably concluded that the email from Cavalieri to Bryant on this point, GX926, to the extent that it suggested that Bryant had provided vaguely described "important insights," was insincere flattery offered in the hope of gaining additional funding from Bryant;

- arranged for various public officials to serve as commencement speakers at SOM, "helped arranged meetings," and "reached out to" legislators "to meet at SOM," DB73, but there was no evidence of the actual extent or effect of Bryant's actions on those matters;

- brought the Acting Governor to SOM for a bill-signing ceremony, creating "positive publicity" for SOM, DB74 (again without any evidence of the extent or effect of Bryant's supposed efforts in this regard); and

- spoke for some unidentified period of time at a training event involving NJ CARES, "facilitated a meeting" for NJ CARES, attended "five meetings" with CARES personnel, and gave unspecified "marketing advice" to those persons, DB74, but there was no evidence about what advice, time, or effort was involved.

But even if credited at all by the jury, that evidence supported an inference that those activities played little if any role in Gallagher's decision to pay Bryant $113,000 in salary and bonus, and Gallagher instead gave Bryant those benefits in exchange for his efforts to secure the additional $10 million in funding that Bryant secured for SOM. Moreover, as neither Bryant nor Gallagher testified at trial, there was no direct evidence any direct evidence of their supposedly pure motives to counter

47

the entirely reasonable inferences of a QPQ bribery.

According to defendants, this case involves nothing but "legislative log-rolling" and "horse trading." DB43. Because Gallagher was not a legislator and could not engage in such horse-trading, and because he purchased Bryant's votes with money rather than with promises to support particular legislation, there is no danger that affirming the bribery convictions in this case would place legislative log-rolling at risk of being criminalized. The Court instructed that, to convict defendants on the bribery counts, the Government had to prove not only a QPQ exchange but that defendants "knowingly and willfully devised or participated in a scheme to defraud the citizens of New Jersey of their right to [Bryant's] honest services as a state Senator." JA4414-15. A "scheme to defraud" was defined as a

> plan, device or course of action to deprive another of a protected interest by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of reasonable prudence.

JA4415. Plainly, legislative horse-trading does not come within the purview of such a fraudulent scheme. QPQ bribery of elected government officials, on the other hand, is uniformly condemned in American law.

Contrary to defendants' suggestion that the Government had to prove the exchange of "cash in a bag," DB77, it was entitled to prove defendants' mens rea with circumstantial evidence. *U.S. v. McKee*, 506 F.3d 225, 235 n.9 (3d Cir. 2007) (citing cases).

48

Defendants argue that Bryant took official actions "while he was [the SOM] payroll," but not that he took that official action <u>because</u> he was on the payroll. DB75. Defendants were "free to make such arguments to the jury, but the jury could fairly reject them." *Urciuoli*, 613 F.3d at 15. Accordingly, all of defendants' challenges to the sufficiency of the evidence regarding the SOM QPQ bribery scheme, and to the guilty verdicts on Counts 1-8, were properly rejected by the District Court.

## POINT II[13]

**THE EVIDENCE WAS ALSO SUFFICIENT TO PROVE BRYANT'S SCHEME TO DEFRAUD THE NEW JERSEY DIVISION OF PENSIONS AND BENEFITS.**

**<u>Standard of review</u>: Same as for Point I.**

The District Court also properly rejected Bryant's claim that the evidence was insufficient to support the mail fraud charges in Counts 9-13 of the indictment. The indictment charged and the evidence proved that Bryant fraudulently sought increased pension payments from the New Jersey Public Employee Retirement System for his low-show job at SOM and his "no-show" job at another public entity. Apart from his meritless reliance on the "convergence theory" of mail fraud (discussed *infra*) Bryant does not dispute that his pension fraud convictions could rest entirely on his efforts to receive increased benefits based on the low-show job he received as the *quid* of a QPQ bribery scheme.

---

[13] This Point responds to DB Point VI(B)&(C).

As shown in Point I, Bryant was guilty of obtaining that job because of the bribery scheme.

The evidence also proved that, in addition to seeking increased pension benefits on account of the low-show SOM job, Bryant blatantly and repeatedly lied on official attorney time reports that he was personally performing hundreds of hours of work while employed as a staff attorney for a public welfare agency.  In fact, he sent associate lawyers from his law firm to do the work that he was hired to perform personally.  According to Bryant, there was no fraud because he lied about the work he did not perform to his employer, the Gloucester County Board of Social Services ("GCBSS"), and relied on the GCBSS to convey that false information to the ultimate victim of the fraud, the New Jersey Board of Pensions and Benefits ("NJDPB").  Unfortunately for Bryant, the federal prohibitions against fraud are not so easily evaded.

### A.    Bryant's Pension Fraud Scheme.

#### 1.    New Jersey's Pension Retirement System Administered By The Division Of Pensions And Benefits.

The NJDPB administered New Jersey's Public Employee Retirement System ("PERS"), the beneficiaries of which are the legitimate employees of New Jersey's state and local governments.  JA3252.  Persons who perform services for state and local governments as independent contractors do not qualify for PERS.

50

JA3253.  Employees could accumulate pension benefits from
multiple qualifying jobs.  JA3258, 3269-70.

The amount of a particular pension benefit is based on a
formula that includes the employee's years of service and "high
three," the average salary during the three years when the
employee's salary was at its highest.  JA3259, 3286.  If an
employee's "high three" salary experienced a large increase at
any time, such as near the conclusion of their public service,
that increase would cause a substantial increase in the
employee's pension.  JA3259-60.

### 2.  Bryant's Accumulation Of Multiple "Pensionable" Public-Sector Jobs.

Bryant initially enrolled in PERS in 1981, after he was
first elected as a Camden County Freeholder.  JA3266; GX6036.
With over twenty years as a New Jersey public official as of
2002, Bryant was conditionally entitled to a pension upon his
retirement from the NJDPB.  JA3272, 4231.  Through his
accumulation of multiple public-sector jobs towards the end of
his career, Bryant was able to dramatically increase his "high
three" salary and consequently, his anticipated pension benefits.
 JA3278, 3284, 3286.

The GCBSS was a public social services and welfare agency
that was responsible for administering programs such as
Supplemental Nutrition Assistance, Medicaid, and Temporary
Assistance to Needy Families.  JA5668-69.  Bryant was hired as a

51

part-time associate counsel by GCBSS in May 1996, and enrolled
for pension benefits with NJDPB with respect to that job.
JA5671, 5686; GX6236.

In 2002, Bryant was placed on the payroll of Rutgers
University as a part-time lecturer, and was enrolled in pension
benefits for that job.  JA3268; GX6010.  Shortly after Bryant was
hired by SOM in March 2003, he enrolled for pension benefits for
that job as well.  GX6014.  By 2003, in addition to his
partnership in a law firm, SA61, Bryant, then in his late
fifties, simultaneously held four pensionable public-sector jobs:
(1) state Senator; (2) employee of SOM; (3) staff attorney for
GCBSS; and (4) lecturer for Rutgers University.

### 3.   Bryant's No-Show Job As A Staff Attorney For The Gloucester County Board of Social Services.

Bryant was hired by GCBSS at an annual salary of $31,000.
JA5671-73; GX6224E.  By the time he resigned from that agency in
December 2006, his annual salary had been periodically increased
to $58,000, partly due to an increase in his required court
appearances.  JA5673-74, 5682-83, 5701-02.  The annual
resolutions of the GCBSS Board of Directors approving Bryant's
continued employment and annual salary increases all described
his responsibilities as including "attendance in court,
representation of the child in support, paternity establishment
and related matters."  JA5674, 5701-02.

Although Bryant was a name partner in the law firm of Zeller

and Bryant ("Z&B"), the GCBSS Board of Directors hired Bryant in
his individual capacity to work as a salaried employee.  A5674-
75, 5692.[14]  As such, Bryant received an IRS W-2 form from GCBSS
each year, which is provided only to salaried employees, and not
to independent contractors.  JA5684-85; GX6206.  GCBSS did not
enter into a fee for services agreement with Z&B to represent the
agency.  JA5675.  After April 2003, Bryant's paychecks from GCBSS
were sent to his home rather than to Z&B.  JA5683-84.  Bryant's
status as an employee for GCBSS, and not an independent
contractor, made him eligible for PERS benefits.  JA5682, 5686;
GX6236.

Bryant nevertheless treated his GCBSS job as though he was
an independent contractor.  In 1996, Joseph Manganello, a member
of the Board of Directors of GCBSS, supervised the work of the
agency's staff attorneys.  JA3646-47.  Shortly after Bryant began
working for the GCBSS, Manganello received complaints from union
officials who represented GCBSS employees that Bryant was not
personally appearing in court on behalf of the agency.  JA3647-
48.  The union officials complained to Manganello that Bryant was
receiving benefits as an employee of GCBSS, but was using others
to perform the work, as if he was an independent contractor.
JA3649.  Manganello contacted Bryant, informed him of the

---

[14] The three other attorneys who worked for GCBSS during
Bryant's tenure there were also hired as salaried employees, not
as private contractors.  JA5689-91.

complaint, reminded Bryant that GCBSS had hired Bryant in his
individual capacity and had not hired his law firm, and told
Bryant that he was required to personally perform the attorney
services he was hired to perform for GCBSS.  JA3648, 3650, 3657.
Bryant apologized to Manganello for embarrassing him, and
promised him that the problem would not recur.  JA3648.

That promise was another of Bryant's falsehoods.  Instead of
performing the services he was hired to personally perform, for
years Bryant sent young and inexperienced associate attorneys
from Z&B to perform those services.  SA3-5, 15-17, 26-28, 36-37,
48, 54-55, 61-62.  Bryant did not attend any of the child support
hearings for GCBSS, and did little if any work for GCBSS.  SA18,
62-63.  Bryant did not even train or supervise the associates who
performed that work on his behalf, but delegated the training and
supervision to one of his subordinate partners at Z&B.  SA4-5,
17, 28-29, 37, 49, 55, 62.

### 4.    Bryant's Systematic Lies That He Was Personally Performing Pensionable Work For GCBSS.

Bryant repeatedly and falsely told GCBSS that he personally
performed the attorney work that he had delegated to the Z&B
associates.  GCBSS required all of its employees, including its
staff attorneys such as Bryant, to submit an accurate written
report of the time they personally spent working on GCBSS
matters.  JA5675-76, 5680; GX6219.  The "Attorney's Time
Accountability Work Unit Report" ("Attorney Time Report")

instructed Bryant to "[f]ill out the hours actually worked for each unit."  JA5680; GX6220.  Bryant signed each of those reports underneath a printed statement that read:

> I hereby submit that the above entries represent the hours I have worked in the listed work units and the other compensable hours I have used during this pay period.

JA5680-81; GX6220.  Accuracy of those written reports was crucial to GCBSS's operations, because it used those reports to determine the amount of work that its employees performed for the various services and programs that GCBSS operated.  Moreover, federal, state, and local government entities used that data to determine the level of funding that GCBSS should receive.  JA5676.

In submitting his bi-weekly Attorney Time Reports from 2002 through 2006, Bryant drastically and fraudulently inflated the number of hours that he personally worked on GCBSS matters.  For instance, Bryant's time-keeping records maintained by Z&B demonstrated that he worked "zero hours" for GCBSS in 2002; 10.3 hours in 2003; 4.5 hours in 2004, and zero hours in 2005 and 2006.  JA3688-90; GX6300A.  Those time records corroborated the testimony of the associate attorneys and the supervising partner from Z&B that Bryant did little or no work for GCBSS, particularly in handling child support matters that were the bread and butter of his duties there.  On the bi-weekly Attorney Time Reports that Bryant submitted to GCBSS, however, he falsely represented that he was personally working as many as twenty-two

55

hours every two weeks, with entries frequently over ten hours.
GX6213-GX6223.  Because neither members of the Board of Directors
of GCBSS nor the Executive Director of that agency attended the
judicial or administrative hearings that Bryant was supposed to
attend and handle, they had no way to insure that Bryant's
written representations about the time he personally worked on
GCBSS were accurate.  JA5730-32.

### 5.  Bryant's Application For Pension Benefits.

In January 2006, Bryant contacted Frederick Beaver, the
Director of the NJDPB, to obtain a determination of his
anticipated pension benefits upon his retirement.  JA3270-72.  By
taking the jobs at Rutgers and SOM, Bryant's combined public-
sector income had ballooned from $64,755 in 2001 to $177,701 by
the end of 2005.  JA3274.  Relatedly, his anticipated pension
benefits shot up from a range (depending on the particular
surviving beneficiary option he selected) of between
approximately $28,000 to $37,000 in 2001, to a range of
approximately $71,000 to $77,000 in 2005.  JA3274-87, 3368-71;
GX6017, GX6020, GX6034, GX6035.  Bryant called Beaver again in
November 2006 for an updated determination of his anticipated
pension benefits.  JA3276-78; GX6020.  By that time, the range of
Bryant's anticipated pension benefits had grown to $71,560 to
$83,696.  JA3278-79; GX6020.

On December 26, 2006, Bryant submitted his application for

retirement benefits to the NJDPB.  JA3280-81; GX6021.  He wrote
that he intended to retire in January 2007, and selected the
pension option that would have paid annual benefits of $81,268.
JA3284; GX6020.  Without Bryant's low-show, QPQ job at SOM, and
his no-show job at GCBSS, his high three salary from his jobs in
the Senate and with Rutgers would have been $82,367 (less than
half of what it was with the addition of the SOM and GCBSS
salaries).  JA3284-85; GX6035.  His pension benefits without the
SOM and GCBSS salaries would have been in the range of
approximately $32,000 to $37,000, substantially less than half of
what it was with those salaries.  JA3286-87, 3369-70; GX3,
GX6035.

**B.    The Baseless Doctrine of "Mail Fraud Convergence"
       Provides no Basis to Disturb the Pension Fraud
       Convictions.**

Bryant claims that the evidence did not satisfy the so-
called "doctrine of mail fraud convergence."  DB114-16.
According to Bryant, his application to the NJDPB for pension
benefits was a mere request for funds, like a check, not a
statement.  DB115.  But the mail fraud statute is not limited
only to "a scheme or device . . . for obtaining money or property
by means of . . . false or fraudulent . . .  representations, or
promises."  It also prohibits schemes "for obtaining money or
property by means of false or fraudulent pretenses."  18 U.S.C. §
1341.  A false or fraudulent pretense need not involve a factual

57

assertion, it also includes "an inadequate or insincere attempt to attain a certain condition."

http://www.merriam-webster.com/dictionary/pretense.  Bryant's application to the NJDPB for pension benefits based on service he did not perform and for which he knew he was not eligible was such a false pretense and can serve as the basis for criminal liability under the mail fraud statute, in the same way that writing a series of checks based on insufficient funds can be if part of a scheme to defraud.  *See, e.g., U.S. v. Pihakis*, 224 F.2d 898, 899 (3d Cir. 1955).[15]  Bryant conveyed in his application to the NJDPB for benefits the false pretense that he was eligible for those benefits, so "[e]ven if the 'convergence theory' is applicable, which we do not decide, its requirements are met here."  *U.S. v. Eisen*, 974 F.2d 246, 253 (2d Cir. 1992).

This Court, moreover, like most of the other Courts of Appeals that have addressed the issue, has concluded that the

---

[15] *U.S. v. Williams*, 458 U.S. 279 (1982) is not to the contrary, as it involved a prosecution under 18 U.S.C. § 1014, which prohibits only "false statements," not "false pretenses." Although *U.S. v. Frankel*, 721 F.2d 917 (3d Cir. 1983) involved a mail fraud charge, it did not address whether a scheme involving the presentation of n.s.f. checks could amount to "false pretenses."  Rather, while acknowledging that *Williams* "involved prosecution under a different statute," this Court in *Frankel* held that "the Supreme Court's holding [in *Williams*]-that the presentation of a check is not a representation or statement of any kind-is fatal to the government's theory here."  *Id*. at 919.

"convergence theory" is **not** applicable in the context of the mail
and wire fraud statutes, and rightly so.  In *U.S. v. Olatunji*,
872 F.2d 1161 (3d Cir. 1989), the indictment charged that
defendant, a foreign national living in the United States,
schemed to marry a United States citizen (the coconspirator) in
order to obtain immigration status that made him eligible for
student loans from the United States Department of Education
("DOE").  In his application to the United States Immigration and
Naturalization Service ("INS") for permanent resident alien
("green card") status, defendant and his co-conspirator falsely
stated that they resided together.  After defendant received his
green card, he used it to obtain student loans from DOE.  *Id*. at
1162-65.

Citing the "convergence theory," Olatunji moved to dismiss
the indictment.  He argued that, because his false statements
about his marital status were made to INS, and not to the
ultimate victim of the scheme, the DOE, the charged scheme did
not violate the mail fraud statute.  This Court disagreed.
Citing with approval *U.S. v. Perkins*, 748 F.2d 1519 (11th Cir.
1984), as well as its own prior decisions in *U.S. v. Rankin*, 870
F.2d 109, 112 (3d Cir. 1989), and *U.S. v. Pearlstein*, 576 F.2d
531 (3d Cir. 1978), this Court "decline[d] the defendant's
invitation [to hold] that an indictment alleging 'false and
fraudulent pretenses and representations' under 18 U.S.C. § 1341

59

must specifically allege that such false statements and

representations were made directly to the ultimate victim."

*Olatunji*, 872 F.2d at 1168.[16]  As the First Circuit has

explained:

> Turning to whether we should now adopt a convergence theory,
> we see little reason to do so.  Nothing in the mail and wire
> fraud statutes requires that the party deprived of money or
> property be the same party who is actually deceived.  The
> phrase "scheme or artifice ... for obtaining money or
> property by means of false or fraudulent pretenses,

---

[16] *Accord*, *U.S. v. Newmark*, 374 Fed. Appx. 279, 282 (3d Cir.
2010) (not precedential) (rejecting convergence theory challenge
to sufficiency of the evidence to prove wire fraud; defendant
argued that "the scheme alleged in the indictment was to defraud
the Walkers, and the only misrepresentations by [defendant] were
directed at Morgan Stanley [the bank holding the victims' funds],
not the Walkers"), *cert. denied*, __ S.Ct. __, 2010 WL 2888112
(U.S., Oct. 4, 2010); *U.S. v. McMillan*, 600 F.3d 434, 448 (5th
Cir. 2010) ("we disagree [with defendants' argument] that their
indictment is invalid because misrepresentations made to the
state Department of Insurance . . . did not implicate any
property rights in the hands of the alleged victims of the
scheme"); *U.S. v. Blumeyer*, 114 F.3d 758, 768 (8th Cir. 1997)
("[A] defendant who makes false representations to a regulatory
agency in order to forestall regulatory action that threatens to
impede the defendant's scheme to obtain money or property from
others is guilty" of mail fraud); *U.S. v. Kennedy*, 64 F.3d 1465,
1476 (10th Cir. 1995) (rejecting convergence theory because the
plain language of the mail fraud statute "requires only the
devising of a scheme for obtaining money or property by means of
false or fraudulent pretenses, representations, or promises--not
the making of misrepresentations to any particular individuals");
*U.S. v. Cosentino*, 869 F.2d 301, 307 (7th Cir. 1989) (affirming
convictions where defendants made false representations to state
insurance officials to enable themselves to continue defrauding
their insurance company and policyholders); *U.S. v. Fumo*, 628 F.
Supp.2d 573, 593 (E.D.Pa. 2007) (rejecting, based on *Olatunji*,
motion to dismiss indictment based on convergence theory); *cf.*
*Schmuck v. U.S.*, 489 U.S. 705, 707 (1989) (affirming conviction
of auto distributor who rolled back odometers and sold cars to
dealers but had no contact with ultimate customers; convergence
theory not specifically addressed).

> representations, or promises," 18 U.S.C. § 1341, is broad
> enough to include a wide variety of deceptions intended to
> deprive another of money or property. *McNally [v. United
> States*, 483 U.S. 350, 360 (1987)] itself says nothing about
> convergence. *See U.S. v. Evans*, 844 F.2d 36, 39 (2d Cir.
> 1988). We see no reason to read into the statutes an
> invariable requirement that the person deceived be the same
> person deprived of the money or property by the fraud.

*U.S. v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998). *Olatunji*
is binding on this Court unless and until it is overruled by the
Court en banc or by the Supreme Court. Third Circuit Internal
Operating Procedure 9.1 (2010); *South Camden Citizens in Action
v. New Jersey Department of Environmental Protection*, 274 F.3d
771, 792 (3d Cir. 2001).[17] Accordingly, Bryant's reliance on
decisions from other Circuits, DB114, are of no moment.

The shortcomings of the convergence theory are well
illustrated by this case. The jury could reasonably conclude
that Bryant understood that had he accurately reported to GCBSS
that he was doing virtually nothing for GCBSS while receiving a
salary of as much as $58,000 a year, GCBSS would not have
continued to pay him that pensionable salary. The jury could
also reasonably conclude that Bryant, an attorney, legislator,

---

[17] Bryant claims that this Court's flat rejection of the
proposition that, "as a matter of law, [] an indictment alleging
'false and fraudulent pretenses and representations' . . . must
specifically allege that such false statements . . . were made
directly to the ultimate victim," 872 F.2d at 1168, is mere
dicta. DB 115, n.31. In *Newmark*, however, this Court described
*Olatunji* as "**holding** that misrepresentations need not be made to
the ultimate victim for mail fraud," 374 Fed. Appx. at 282
(emphasis added) (citing *Olatunji*, 872 F.2d at 1168).

and a decades-long participant in PERS, knew that he could claim pension benefits for his GCBSS salary only if GCBSS was reporting to the NJDPB that he was in fact receiving that salary. Finally, the jury could reasonably find that, when Bryant sought a PERS pension from NJDPB for his job at GCBSS, he knew and intended that NJDPB officials would rely on information provided to them by GCBSS about Bryant's pensionable salary in order to compute, *inter alia*, Bryant's "high three."

The NJDPB would not have taken Bryant's word for what he earned at GCBSS, but required documentation from GCBSS. JA3259. Bryant thus had to direct his lies about his work to GCBSS in order to deceive NJDPB. Because Bryant's scheme could only have worked by lying indirectly rather than directly to the intended victim, the convergence theory would effectively immunize conduct that was designed to defraud the NJDPB. *Olatunji* appropriately precludes such an unjust result.

### C. Bryant's Legalistic Challenges to the Sufficiency of the Evidence to Prove His Intent to Defraud the NJDPB are Meritless.

Bryant argues that the evidence was insufficient to prove the pension fraud counts because: (1) Bryant's application to the NJDPB for pension benefits was a request, not a false "statement," DB115-16; (2) to the extent those counts were based on Bryant's attempt to receive pension benefits for his low-show job at SOM, the evidence was insufficient to prove his guilt on

62

the bribery counts, DB117; and (3) NJDPB did not specifically disallow pension credit for work performed by someone other than the employee, so Bryant had insufficient notice that what he did was improper, and thus could not have intended to defraud NJDPB. DB118.

As for the first argument, Bryant simply ignores the false statements he made to GCBSS that he personally performed his job duties for that agency.  Although Bryant claims that those false statements "don't count" under the convergence theory, it is that theory that does not count in this Court.

As for the second argument, as shown above in Point I, the evidence thoroughly proved Bryant's guilt on the SOM/bribery counts.  Bryant does not dispute that proof that he sought pension benefits for a "low-show" job that was in actually a QPQ bribery scheme was sufficient, standing alone, to prove that he intended to defraud the NJDPB, without even considering his lies to GCBSS.

As for the third argument, Bryant again ignores that he systematically lied that he was personally performing the pensionable work.  Those lies were undertaken in furtherance of the fraudulent scheme, regardless of whether Bryant believed that he could earn a pension for work performed by his subordinates. Of course, Bryant's lies are powerful proof that he understood that he was not entitled to pension benefits on those terms.

Nevertheless, Bryant claims that Fred Beaver, the Director of the NJDPB, testified that the NJDPB "was well-aware that the practice [of delegating pensionable work] was common among lawyers [and] never attempted to revoke a pension on that basis" until 2006. DB118, citing JA3436.  To the contrary, Beaver rejected the suggestion that the practice was "ongoing" or commonplace. JA3436.  Nor did Beaver testify that NJDPB had ever intentionally authorized pension benefits for purely delegated work about which it had been informed.  Rather, Beaver testified that he had become aware of a few attorneys who had delegated their pensionable work to others, and had tried to put a stop to it by bringing those cases before the appropriate pension boards.  *Id*. Beaver explained that, before 2007, there was no specific statutory prohibition against such delegation practices because "there was a presumption" by those administering PERS "that the member [employee] is performing the work."  JA3437.  Most significantly, there was no evidence that anyone other than Bryant had systematically lied about personally performing his pensionable job assignments.  That NJDPB only took action against this particular form of abuse after it became more widespread hardly demonstrates that Bryant's conduct was not fraudulent. Although Bryant asserted during the trial that other PERS participants who were lawyers engaged in the same delegation of their employment duties that he did, *e.g.*, JA3475-76, he

presented no evidence to support that assertion.

In any event, the determination of whether Bryant intended to defraud the NJDPB did not turn upon whether the NJDPB had expressly prohibited the delegation practices that Bryant had engaged in.  The District Court made precisely that point in a jury instruction about "creditable service" that Bryant does not challenge on appeal.[18]  Rather, the issue was whether unrebutted evidence that Bryant lied to GCBSS that he was personally performing the work, knowing that those lies would conceal his delegation activities from the NJDPB and result in higher pension benefits, created an inference that he intended to defraud the NJDPB.  It certainly did, because "intent [to defraud] may be inferred from evidence that the defendant attempted to conceal activity . . . . from the defendant's misrepresentations, knowledge of a false statement, [and] whether the defendant profited or converted money to his own use."  *U.S. v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003); *see generally In re Kaufhold*, 256 F.2d 181, 185 (3d Cir. 1958) ("the making of a false oath is

---

[18] The instruction stated:

The question before you is not whether the Division of Pensions and Benefits would have approved Wayne Bryant's application for pension benefits.  You are to decide only whether the government has proven beyond a reasonable doubt that Wayne Bryant intended to defraud the Division of Pensions and Benefits of money and property by the use of the mails.

JA4430.

sufficient to justify an inference of an intent to defraud creditors").

There is no valid claim that the mail fraud statute itself failed to provide adequate notice that it prohibited the kind of scheme at issue here.  "The statutory provisions proscribing wire and mail fraud are clearly defined and have been upheld in the face of numerous vagueness challenges." *U.S. v. Bailin*, 1990 WL 114741, *5  (N.D.Ill. 1990) (citing, *e.g., U.S. v. Feinberg*, 535 F.2d 1004, 1010 (7th Cir. 1976); *U.S. v. Bohonus*, 628 F.2d 1167, 1173-75 (9th Cir. 1980)).[19]  *See also U.S. v. Fenzl*, __ F. Supp. 2d __,  2010 WL 3236774, *2 (N.D. Ill., Aug. 16, 2010) ("well established mail and wire fraud statutes" were not undermined by *Skilling [v. United States*, 130 S. Ct. 2896 (2010)]); *accord, U.S. v. Harkonen*, 2010 WL 2985257, *16 n.5 (N.D. Cal., July 27, 2010).  This Court has explained that

> fraud is a broad concept that "is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community."

*U.S. v. Monostra*, 125 F.3d 183, 186 (3d Cir. 1997) (quoting *U.S. v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987)).  Bryant knew that GCBSS required him to personally perform his job duties, he lied to GCBSS that he was performing those duties, and he

---

[19] *See also Badders v. United States*, 240 U.S. 391, 394 (1916); *U.S. v. Louderman*, 576 F.2d 1383, 1388 (9th Cir. 1978); *U.S. v. Gartman*, 145 F. Supp. 420, 421 (E.D. Pa. 1956).

intended that NJDPB would rely on those lies to afford him a
higher pension.  That conduct fell squarely within the mail fraud
statute.  *See generally Durland v. United States*, 161 U.S. 306,
313 (1896) (mail fraud statute "includes everything designed to
defraud by representations as to the past or present, or
suggestions and promises as to the future.  The significant fact
is the intent and purpose.").

**POINT III**[20]

**THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING
TO DISMISS THE INDICTMENT, WHERE THE GOVERNMENT'S REQUEST
THAT GRAND JURY WITNESSES NOT DISCLOSE THAT THEY HAD BEEN
SUBPOENAED TO TESTIFY DID NOT IMPEDE DEFENSE COUNSELS'
ACCESS TO THOSE PERSONS, AND THE DISTRICT COURT NEVERTHELESS
ORDERED THE GOVERNMENT TO INFORM THOSE WITNESSES THAT THEY
WERE FREE TO SPEAK TO DEFENSE COUNSEL ABOUT ANYTHING THEY
CHOSE.**

**Standard of Review**:  **Abuse of discretion.  *U.S. v. Lee*, 612
F.3d 170, 193 (3d Cir. 2010).**

**Background of the Claim.**

On the face of many grand jury subpoenas issued during the
investigation of this case, the Government printed a request that
the subpoena recipients "not disclose the existence of this
subpoena," explaining that such disclosure could "obstruct and
impede a criminal investigation into alleged violations of

---

[20] This Point responds to DB Point IV.

federal law." JA5639.[21]  During the questioning of several

witnesses in the grand jury, the prosecutor reiterated this

request.  JA5572.[22]  Contrary to defendants' assertion that those

requests "served no legitimate testimonial purpose," DB84, the

requests were a precaution against witness meddling and the

disclosure of the investigation's path and progress.[23]

   Based on those requests, defendants moved pre-trial to

---

[21] Defendants overreach by claiming that the Government
created the false impression that the request bore the imprimatur
of the District Court.  DB80, 82, 86.  The statement could not
have been more clear about the identity of the requesting party:

   "THE UNITED STATES ATTORNEY REQUESTS THAT YOU DO NOT
   DISCLOSE THE EXISTENCE OF THIS SUBPOENA."

A5639 (emphasis added).

[22] Defendants erroneously contend that a prosecutor, on one
occasion, "demand[ed]" that the witness George Hampton not
disclose the subpoena, DB87, citing JA5570-72, and "elicited the
witness's commitment under oath not to disclose . . . the matters
occurring before the grand jury." DB81, citing JA5570-71.  To
the contrary, the prosecutor reiterated that he was making a
"request," not a demand, and explained that the rule of grand
jury secrecy "does not apply to witnesses." JA5571.  Hampton
simply replied "yes," id., which was hardly a promise to honor
the request.  Hampton later testified as a defense witness at
trial, JA3981, so the prosecutor's request certainly did not
deter him from cooperating fully with the defense.

[23] As defendants acknowledge, DB87-88, the Government's
requests to the subpoena recipients failed to conceal the
existence of the investigation: newspaper reports disclosed the
investigation shortly after the subpoenas were issued.
Defendants claim that disclosure of the subpoenas could not have
"impeded and obstructed" the investigation given those newspaper
reports.  Id.  To the contrary, the newspaper reports did not
identify the grand jury witnesses, JA5525, so preservation of
their anonymity could still advance the investigation.

dismiss the indictment or in the alternative to grant them an
evidentiary hearing to explore alleged interference with their
access to witnesses.  The Government opposed the motion, pointing
out that the subpoena legend merely requested but did not direct
the witnesses to do anything, and that the request was limited to
the non-disclosure of the subpoena, but did not ask the recipient
to refrain from talking to anyone about any other matter,
including any information known to the recipient about the
matters under investigation.

Without finding a violation of any of defendants' rights,
the District Court nevertheless concluded that the Government's
request was "not a good policy."  JA358, 369.  The Court directed
the Government to place the defendants in the same position in
which they would have been without those requests by issuing a
letter in early April 2008 (five months before the start of
trial) to all subpoena recipients.  The letter referenced and
described in detail both the grand jury legend and any requests
that the prosecutor may have made during grand jury testimony,
and then made the following points:

• the grand jury investigation was now completed;

• the witnesses had "an absolute right to speak to anyone,"
   including defense counsel "about anything you know about any
   of the matters under investigation, including the fact that
   you were subpoenaed and you testified before the grand
   jury";

• the government "would not take any adverse action against
   you or your employer because you chose to speak to the

69

defense or anyone else about these matters";

• the witnesses also had an "absolute right not to speak about the case to any particular person";

• the decision was entirely up to the witness; and

• the Government "takes no position with regard to your decision on these matters."

A5473.  Defendants objected neither below nor on appeal to the wording of the curative letter.  They effectively concede that the letter said all that could be said to convince even the most skeptical and cautious witnesses that they would suffer no adverse consequences from speaking to the defense.

**Argument.**

**A.   The Government Did Not Interfere with Defense Counsel's Access to Witnesses by Merely Asking Grand Jury Subpoena Recipients Not to Disclose That They Had Received a Subpoena.**

The Government has legitimate interests in preserving the secrecy of on-going grand jury investigations.  See Fed. R. Crim. P. 6(e)(2); *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1074-76 (D.C. Cir. 1998) (permitting sealed submissions and in camera review of matters to preserve the secrecy of an on-going grand jury investigation).  Although "no **obligation** of secrecy may be imposed" on a grand jury witness, Fed. R. Crim. P. 6(e)(2)(A) (emphasis added), the Government is permitted to make a mere request, as opposed to a directive, to a subpoena recipient not to disclose the subpoena.  Such a request does not "artificially

70

restrict the defendant's ability to obtain evidence." *U.S. v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997) *See also id*. at 1192 (no violation of defendant's right to access to witnesses where the prosecutor's letter to a witness "suggests that, in the worst light, [the prosecutor] **requested** that [the witness] not speak to *anyone* about his testimony.  Governmental interference occurs when the Government **instructs** the witness not to speak, or **artificially restricts** defense counsel access to the witness.") (emphasis in original, internal citation omitted); *see also U.S. v. Kemp*, 379 F. Supp.2d 690, 714 (E.D.Pa. 2005) (district court refused to allow defense counsel to interview a witness shortly before she testified without an FBI agent present; no showing that "the prosecution told [the witness] not to talk to [defense] counsel or in any other way denied [defendant] access to witnesses"), *aff'd on other grounds*, 500 F.3d 257 (3d Cir. 2007). *Compare U.S. v. Blumberg*, 1998 WL 136174, *1 (D. Conn. 1998) (letter that "request[ed] recipients of grand jury subpoenas not to disclose either the existence or contents of the subpoena, as such disclosure may impede a grand jury investigation," was permissible) *with In re Grand Jury Proceedings (Appeal of Diamante)*, 814 F.2d 61, 68 (1st Cir. 1987) (letter sent to subpoena recipients stating that they "are not to disclose the existence of this subpoena or the fact of [their] compliance for a period of 90 days from the date of the subpoena" violated Rule

71

6(e)(2)).  "The inability of a defendant to interview witnesses is a constitutional problem only if the state artificially restricted the defendant's ability to obtain evidence." *Agostino*, 132 F.3d at 1191; *see also U.S. v. Celis*, 608 F.3d 818, 841 (D.C. Cir. 2010) (rejecting claim of prosecutorial interference with defense access to witnesses absent evidence "that the government acted in bad faith to keep witnesses from talking with lawyers for the defense").  Although defendants cite to the ABA and New Jersey professional conduct rules for attorneys, DB83, they cite no case or ethical opinion stating that the kinds of requests that the Government made here ran afoul of any of those rules.

Because the Government's mere request in this case not to disclose a grand jury subpoena did not purport to impede a witness's ability to speak to defense counsel or investigators about the relevant facts of the investigation, defendants received all they were entitled to when the District Court ordered the Government to issue the curative letter.

### B.   Defense Counsel's Affidavit Confirmed That The Government Did Not Deter Any Witness From Speaking To Counsel.

Before the curative letter was issued, defendants claimed, by way of an affidavit of defense attorney Carl Poplar (the "Poplar Affidavit"), that Mr. Poplar had been frustrated in his attempts to interview three people.  The affidavit did not

allege, however, that any of those persons attributed their refusal to speak to any actions of any Government officials. Rather, the affidavit averred that each of those persons declined to speak to Mr. Poplar after consulting with an employer, former employer, or a lawyer who did not represent the United States. JA5753-56.

The Poplar Affidavit shows that the three persons contacted by Mr. Poplar made their own decisions, sometimes based on discussions with non-government lawyers, not to speak to defense counsel.  JA5753-56, ¶¶ 4-18.  That was entirely permissible. "[W]hile it is true that a witness is not to be prevented from speaking to the defense by the prosecution, it is equally true that a witness cannot be required to speak to an investigator or an attorney.  The matter rests, or at least it should rest, entirely with the witness." *U.S. ex rel. Trantino v. Hatrack*, 408 F. Supp. 476, 481 (D.N.J. 1976), *aff'd*, 563 F.2d 86 (3d Cir. 1977); *U.S. v. McGhee*, 495 F. Supp.2d 1024, 1026 (D.S.D. 2007) ("Witnesses can refuse to be interviewed, and a defendant's right of access is not violated when witnesses choose, of their own volition, not to talk") (citation omitted); *U.S. v. Pena*, 17 F. Supp.2d 33, 37 (D. Mass. 1998) ("Of course, a witness cannot be compelled to submit to a pre-trial interview in a criminal

73

case.").[24]

The Poplar Affidavit also asserted that attorneys for UMDNJ and Rutgers University had advised potential witnesses who were current or former employees of those institutions not to speak to defense counsel before trial.  JA5520, ¶ 9, 5522, ¶ 21.[25] Defendants nonetheless claim that the Government was responsible for legal advice given by private attorneys because those attorneys were seeking to curry favor with the Government and avoid prosecution of their institutional clients.[26]  Even

---

[24] Defendants identified a single person who vaguely claimed that he was told by an FBI agent not to disclose the subpoena "or words to that effect."  JA5518.  Even assuming the truth of that assertion, it had no chilling effect on the subpoena recipient, who promptly reported the supposed warning to defense counsel, and signed an affidavit to that effect at defense counsel's request.  JA5517-18.  Defendants never claimed that the alleged warning had any adverse effect on their ability to speak to that person.

[25] Defendants now claim that the UMDNJ and Rutgers employees who declined to speak to Poplar did so because of a "threat of adverse employment action."  DB92, n.23.  The Poplar Affidavit, made no such allegation.  Further, counsel for UMDNJ assured Poplar that it would inform all of its employees that they "would not suffer adverse employment action if they chose to speak to defense counsel."  *Id*.  (emphasis added).

Defendants complain that witnesses who spoke to lawyers for their employers "were not advised by separate counsel protecting their personal interests." *Id*.  They do not contend, however, that the Government had any involvement in who the employees chose to seek counsel from.

[26] Defendants' claim seeks to exploit the "Deferred Prosecution Agreement" ("DPA") between the United States Attorney's Office ("USAO") and UMDNJ.  Former federal judge Herbert Stern was appointed by the USAO to serve as the Monitor
(continued...)

assuming that those attorneys were so motivated, their private motivations do not demonstrate misconduct by the Government, even if private counsel supposedly "reinforced the Government's [requests]." DB96. *Workman v. Bell*, 178 F.3d 759, 771-72 (6th Cir. 1998) (no right to relief because a witness was told by her boss not to speak to a defense investigator); *see also U.S. v. Arboleda*, 929 F.2d 858, 867-68 (1st Cir. 1991) (no relief where a witness's own lawyer told him "not to talk to nobody but the government" and a DEA agent told the witness "it would be a good idea" not to talk to "anyone"). Thus, the Poplar Affidavit provides no proof that the Government impaired the defense.

## C.    The Curative Letter Remedied Any Possible Harm.

In any event, the issuance of the curative letter, five months before trial, removed any impediment to the defense investigation, so defendants are not entitled to any further relief. In *U.S. v. Terzado-Madruga*, 897 F.2d 1099 (11th Cir. 1990), the Court ruled that, "[t]o the extent that the

---

[26] (...continued) of the DPA. The Poplar Affidavit recited that Leslie Aron, an in-house lawyer for UMDNJ, informed Poplar that Aron did not want Schalick, a former UMDNJ employee, to speak to the defense attorney out of concern that such a meeting might jeopardize UMDNJ's efforts to relieve itself of its obligations under the DPA. JA5519-21, ¶¶ 3-11. However, the affidavit further recites that Aron spoke to a lawyer who works with Mr. Stern, and that lawyer <u>declined</u> to give Aron any advice about whether any UMDNJ employee should or could speak to Mr. Poplar. JA5521, ¶¶ 13-14. Thus, the Poplar Affidavit failed to show that the Government, or even the Monitor, prevented Schalick (or anyone else, for that matter) from speaking to Mr. Poplar.

[government] agent's suggestion to [a potential defense witness] that it would be in her 'best interest' not to talk to the defense's investigator was improper, this comment was later cured or at least mitigated by the government's advice that she was free to do so." *Id*. at 1108.  Similarly, in *Diamante*, after the Government sent to a letter to subpoena recipients, improperly directing them "not to disclose the existence of" their grand jury subpoenas, the Court directed the Government to inform those persons that they were "under no legal obligation to keep secret the subpoena or the fact of [their] compliance with it."  814 F.2d at 70.  The District Court here provided the very relief that the First and Eleventh Circuits found sufficient to cure even an improper <u>demand</u>, let alone a mere <u>request</u>, as here.

Furthermore, defendants are not entitled to additional relief for alleged Government interference because they "do not call [] attention [to] any specific prejudice resulting from non-access." *Kines v. Butterworth*, 669 F.2d 6, 10 (1st Cir. 1981).  "[A] defendant, when claiming improper denial of access to a potential witness on due process grounds, must make a showing of more than merely the witness' inaccessibility." *Id*. at 9.

Events subsequent to issuance of the curative letter confirmed that defendants suffered no harm from the challenged request.  Defendants presented numerous witnesses at trial, and

76

never complained to the District Court during or after trial that their investigation or their access to witnesses or other evidence had been impeded in the slightest after the Government mailed the curative letter.  Although defendants complained in their pre-trial submission that an in-house lawyer for UMDNJ had informed Mr. Poplar that he did not want a former UMDNJ employee, Meredith Schalick, to speak to defense counsel, JA5519-21, Poplar Affidavit at ¶¶ 3-11, Schalick testified at length as a defense witness at trial after being obviously and carefully prepared for that testimony by Bryant's lawyers.  JA3913-53.

Finally, this case bears no resemblance to *U.S. v. Morrison*, 535 F.2d 223 (3d Cir. 1976), cited by defendants.  There, this Court found that the prosecutor's threat to prosecute a proposed defense witness if she testified on the defendant's behalf prevented her from giving testimony at defendant's trial that she had previously told defense counsel she would give.  *Id*. at 226. *See also Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) (prosecutor improperly directed a witnesses not to speak to defense counsel outside the presence of the prosecutor, the witnesses complied with that request, and the district court refused to provide any curative relief).

Here, the prosecutors did not threaten any witness with prosecution, and defendants have not identified anyone who would have given favorable testimony on their behalf but did not

77

because of conduct by the prosecution.  Furthermore, unlike in *Morrison*, the prosecution informed the witnesses that they would face no adverse consequences if she cooperated with the defense. This Court stated in *Morrison* that the Government could extinguish any harm from its prior warnings to the witness by promising not to prosecute her for her testimony on behalf of the defense.  *Id*. at 229.  The Government's curative letter here had the same ameliorating effect.

### D.   Defendants' Speculative Claims of Harm Do Not Merit Relief.

Defendants nevertheless claim that their convictions should be vacated without any showing of prejudice.  DB96.  The cases they cite, *Kines*, *Diamante* and *Terzado-Madruga*, repudiate that claim. Lacking any evidence of prejudice, defendants resort to speculation.  They first speculate that, because some time passed between the request not to disclose the subpoenas and the curative letters, "the defense's investigation was irretrievably impaired by the <u>inevitable</u> diminution in witness's memories." DB95 (emphasis added).  Defendants' blithe assertion must be rejected as lacking any evidentiary support.  *See U.S. v. Davis*, 154 F.3d 772, 785 (8th Cir. 1998) (rejecting as "pure speculation" the claim that witnesses were "obviously coached" by Government officials not to speak to defense counsel).  Nothing in the trial testimony of Schalick, the one supposedly

"compromised witness" who defendants actually presented at trial, suggested any such loss of memory.  JA3914-60.  Nor do defendants identify a particular witness who claimed such a loss of memory.

Defendants also speculate that, owing to the supposedly "intimidating experience of grand jury testimony," some unidentified witnesses "were <u>naturally</u> unwilling to reopen the matter in response to" the curative letter.  DB95 (emphasis added).  Defendants' failure to identify a singe witness who declined to speak to defense counsel following issuance of the curative letter demonstrates that "naturally" masks an inability to provide any facts to support their claim.

Notwithstanding their failure to show any prejudice, defendants claim they are entitled to an extreme remedy. Defendants' claim, taken to its unstated but logical conclusion, is not only that their convictions be vacated and the indictment dismissed, but that they can never be prosecuted for their crimes, because their ability to secure favorable testimony from any grand jury witness who received any subpoena with the challenged legend has supposedly been forever and fatally undermined.  Defendants provide nothing by way of authority or logic that would support such a draconian result.[27]

---

[27] In *Morrison*, this Court ordered a new trial, but did not hold that defendant could never be reprosecuted.  535 F.2d at 229.

(continued...)

79

In the alternative, defendants continue to seek an evidentiary hearing to permit them "to develop further proof of prejudice." DB79. As the District Court properly found, JA366, 377-78, defendants failed to present sufficient justification for such a hearing before trial. *Cf. U.S. v. Armstrong*, 517 U.S. 456, 465 (1996) (discovery on a claim of selective prosecution requires substantial and credible evidence to support it); *U.S. v. Voigt,* 89 F.3d 1050, 1068-69 (3d Cir. 1996) (defendant seeking evidentiary hearing on claim of outrageous government conduct must present a "colorable claim" for relief to obtain a pre-trial hearing); *U.S. v. Holloway*, 778 F.2d 653, 658 (11th Cir. 1985) ("[because] the affidavits given by the prospective [grand jury] witnesses were largely conclusory in their language, rather than expressly stating facts from which the court could determine that they were actually intimidated, we conclude that the facts before the trial court were neither sufficient to cause the court to

---

[27] (...continued)

In *U.S. v. Carrigan*, 804 F.2d 599 (10th Cir. 1986), the Court of Appeals declined to grant the Government's request for a writ of mandamus to overturn the district court's order that defendants be permitted to depose prosecution witnesses pre-trial based on that court's "findings of fact that the prosecutors . . . discouraged the witnesses from communicating with the defense" and "substantially chilled these witnesses' previously expressed willingness to discuss the facts with the defense." *Id.* at 601. That case did not involve the dismissal of the indictment or vacating of a conviction. Unlike *Carrigan*, the District Court here made no factual findings that the Government had chilled any witness from speaking to the defense, and appropriately so, as defendants made no showing of such chilling.

dismiss the indictment nor to have a hearing on that issue"). After a two-month trial, defendants lack any proof that their investigation or trial presentation had been compromised. They have even less justification for such a hearing now than they had before trial.

POINT IV[28]

**THE JURY INSTRUCTIONS COMPLIED WITH *SKILLING v. U.S.*, WHICH LIMITED HONEST SERVICES FRAUD PROSECUTIONS TO BRIBERY OR KICKBACK SCHEMES.**

**<u>Standard of Review</u>: Plenary as to whether the jury instructions stated the proper legal standard, and abuse of discretion as to the refusal to give a particular instruction or as to the wording of an instruction. *U.S. v. Flores*, 454 F.3d 149, 156 (3d Cir. 2006).**

**A.    The Jury Instructions Required the Government to Prove a *Quid Pro Quo* Bribery.**

Relying on *Skilling v. U.S.*, 130 S. Ct. 2896 (2010), defendants argue that the jury instructions for the honest services fraud ("HSF") counts (1-6) failed to properly instruct that the Government was required to prove a QPQ bribery. Defendants decline to quote the challenged instructions in their brief, and for good reason. The instructions could not have more clearly explained that the jury was required to find a QPQ between Bryant and Gallagher:

> Counts 1 through 6 charge the defendants with committing honest services fraud by means of a quid pro quo bribery scheme. Bribery requires a quid pro quo; that is, a

---

[28] This Point responds to DB Point I.

specific intent to give or receive something of value in exchange for one or more official acts.

In order to find that a defendant engaged in *quid pro quo* bribery, you must find that the government proved each of the following beyond a reasonable doubt with respect to that defendant:

First: that R. Michael Gallagher gave, offered or promised something of value, particularly a stream of payments in the form of a salary and other financial benefits to Wayne Bryant;

Second: that Wayne Bryant was, at that time, a public official;

Third: that with respect to R. Michael Gallagher, he intended to give the stream of payments in the form of salary and other financial benefits in exchange for one or more official acts.

That with respect to Wayne Bryant, he intended to perform one or more official acts in exchange for his salary and other financial benefits from the School of Osteopathic Medicine.

A *quid pro quo* agreement may be implicit as well as explicit. The improper benefit may consist of money and other financial benefits whether given on a one time basis or as a stream of payments to the public official. In other words, when payments are accepted by a public official from a payor with the intent to obtain that official's actions on an "as needed" basis, so that when the opportunity presents itself that public official takes specific official action on the payor's behalf in return for those payments, that constitutes a breach of the public official's duty of honest service.

You may find that the payor and/or the recipient has engaged in bribery even though the recipient could have lawfully engaged in the official conduct in question.

JA4418-19, 5437-38. "Read fairly, the instructions . . .

repeatedly emphasized the critical *quid pro quo*, explaining that

'[t]o establish such bribery the government must prove beyond a

82

reasonable doubt that there was a *quid pro quo*, ... that the benefit was offered in exchange for the official act.'" *U.S. v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007) (rejecting challenge to QPQ instructions).

**B.** ***Skilling* Upheld Honest Services Fraud So Long As The Jury Had To Find *Quid Pro Quo* Bribery or Kickbacks.**

Prior to *McNally v. U.S.*, 483 U.S. 350 (1987), courts had held that the mail and wire fraud statutes, not only prohibited "schemes or devices to defraud another of money or property," 18 U.S.C. §§ 1341 and 1343, but also schemes to deprive the public of the intangible right of the honest services of their public officials. *Skilling,* 130 S.Ct. at 2926-27. "The 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." 130 S. Ct. at 2930.[29]

In *McNally*, the Supreme Court held that only property rights, not intangible rights, were protected from schemes to defraud. 483 U.S. at 360. The following year, for the specific purpose of overruling that portion of *McNally*, Congress enacted the HSF statute, 18 U.S.C. § 1346. *Skilling,* 130 S.Ct. at 2927.

---

[29] *E.g., U.S. v. Conner*, 752 F.2d 566, 573, 574 (11th Cir. 1985) ("fiduciary" duty of corporate employee); *U.S. v. Mandel*, 591 F.2d 1347,1362 (4th Cir.), *vacated*, 602 F.2d 653 (4th Cir. 1979) (per curiam) ("fiduciary" duty of public official); *U.S. v. George*, 477 F.2d 508, 514 (7th Cir. 1973) ("fiduciary" duty of corporate purchasing agent).

That statute provides that, under the mail and wire fraud statutes, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Thereafter, the lower federal courts adopted various interpretations of the scope of § 1346, leading to a host of vagueness challenges to the statute. *E.g., Panarella*, 277 F.3d at 694.

In *Skilling*, the Supreme Court rejected defendant's vagueness challenge by interpreting § 1346 to criminalize "only the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 2905.[30] The *Skilling* Court held that § 1346 did not encompass "undisclosed self-dealing by a public official . . . *i.e*, the taking of official action by the [official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 2932.

Skilling held, however, that § 1346 validly prohibits "the bribe and kickback core of the pre-Mcnally caselaw." *Id.* at 2931 &n.43. Limited in that fashion, § 1346 was not vague. *Id.* at 2933. The Court explained that the prohibition against bribes

_____

[30] The *Skilling* Court stated that its construction of the statute "establish[ed] a uniform national standard," 130 S. Ct. at 2933 (citations, quotations omitted), and emphasized that the statute draws its content from the pre-*McNally* cases as well as from other federal statutes defining bribes and kickbacks. *Id.* at 2933-34.

84

and kickbacks

> draws content not only from the pre-*McNally* case law, but
> also from federal statutes proscribing-and defining-similar
> crimes [such as 18 U.S.C. §§ 201(b) [and] 666(a)(2)].    A
> criminal defendant who participated in a bribery or kickback
> scheme, in short, cannot tenably complain about prosecution
> under § 1346 on vagueness grounds.

*Id.* at 2933 (citations omitted).   Under those statutes and

caselaw, the bribery or kickback scheme must involve an actual or

intended exchange of a thing of value for official action.   *See*

*U.S. v. Sun-Diamond Growers*, 526 U.S. 398, 404 (1999) (under the

federal bribery statute, 18 U.S.C. § 201(b), "there must be a

*quid pro quo*-a specific intent to give or receive something of

value in exchange for an official act")；" *Kemp*, 500 F.3d at 281

("The Supreme Court has explained, in interpreting the federal

bribery and gratuity statute, 18 U.S.C. § 201, that bribery

requires a *quid pro quo*") (quoting *Sun-Diamond*); *U.S. v. Ganim*,

510 F.3d 134, 148 (2d Cir. 2007) (bribery involves "an intent to

effect an exchange").

Here, with remarkable foresight, two years before *Skilling*,

the District Court granted defendants' motion to dismiss the

concealment of a conflict of interest allegations in the HSF

counts, and limited those counts to an HFS QPQ bribery scheme.

*U.S. v. Bryant*, 556 F. Supp. 2d 378, 419-21 (D.N.J. 2008).

Accordingly, the HSF convictions here were proper.   *See Urciuoli*,

613 F.3d at 17 (post-*Skilling* affirmance of HSF convictions based

on bribery).

Defendants nonetheless contend that *Skilling* rendered the QPQ instructions here legally deficient.  Their claims fail.

## C. Defendants' Arguments Misinterpret *Skilling* by Imposing Requirements That *Skilling* Rejected or Did Not Impose.

Defendants argue that bribery schemes were outside of the pre-*McNally* "core" unless the Government alleged and proved that the public official (1) altered his course of conduct because of the bribe; (2) was paid a particular *quid* for a particular *quo*, rather than by a "stream of benefits"; and (3) was motivated solely by the bribe to perform the official act.  DB28.[31] Defendants claim that the QPQ jury instructions here were defective because they did not limit the HSF bribery charge in those three ways.  These claims misconstrue the holding and logic of *Skilling*.

### 1. *Skilling* Does Not Hold That QPQ Bribery Requires a Payment That Is Intended to "Alter," Rather than to "Influence," the Public Official's Conduct.

The instructions in this case made clear beyond cavil that the Government had to prove the defendants' intention to exchange

---

[31] Defendants raise four challenges in this point of their brief, but only three of them pertain to the QPQ jury instructions.  The fourth argument, that defendants could not be guilty of QPQ bribery because Bryant's official acts involved "reallocation of public funds" to the bribe payer, DB41, has no bearing on the propriety of the jury instructions, and is addressed in Point I, *supra*.

the SOM job for Bryant's official actions.  JA4418-20.

Defendants nevertheless argue that the instructions were

deficient because, while requiring proof of a an intent to

exchange, they did not also require proof that Gallagher

"intended to alter [Bryant's] official action."  DB28.

Defendants improperly ignore the Court's instruction that

> not every payment to a public official constitutes a bribe.
> A payment made in a general attempt to build goodwill or
> curry favor with a public official, without more, does not
> constitute a bribe. . . .  **What distinguishes a bribe from
> other payments that would not constitute violations is that
> a bribe is offered or accepted with the intent to influence,
> or to be influenced, in an official act**.

JA4419 (emphasis added).  Defendants cannot prevail by "reading

certain sections of the jury charge out of context" because that

is "not the way [this Court] review[s] jury instructions, [] a

single instruction to a jury may not be judged in artificial

isolation, but must be viewed in the context of the overall

charge."  *Kemp*, 500 F.3d at 281.

    As *Skilling* explained, § 1346 encompasses those QPQ bribery

schemes that would violate the federal bribery statute, 18 U.S.C.

§ 201.  130 S.Ct. at 2933-34.  The District Court's use of the

phrase "intent to influence" rather than "intent to alter,"

comports with the text of that statute, which prohibits the

giving or receiving of "anything of value . . . with intent . . .

**to influence any official act** [or] **to be influenced** in the

performance of any official act."  18 U.S.C.A. § 201 (b)(1)(A),

87

(b)(2) (emphasis added).  "Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act."  *U.S. v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999).

Defendants admit that "the intent to influence or to be influenced" is the "intent requirement central to the pre-*McNally* caselaw, which carried through to *Kemp*."  DB34.  They argue, however, that such an intent cannot exist unless the defendants had an intent to "alter" an official act.  There is no meaningful difference between the phrase "intent to influence," as used by the District Court, and "intent to alter," which defendants claim was necessary.  The words "alter" and "influence" are virtually synonymous.  *See* http://www.merriam-webster.com/dictionary/influence (definition of "influence" is "to affect or **alter** by indirect or intangible means") (emphasis added).  "[T]he trial judge retains discretion to determine the language of the jury charge . . . . [and] [s]o long as the court conveys the required meaning, the particular words used are irrelevant."  *U.S. v. Flores*, 454 F.3d 149, 161 (3d Cir. 2006).

Defendants also appear to argue that the Government had to prove that Bryant actually "altered" his official actions because of the bribe.  DB31.[32]  The Supreme Court long ago rejected the

---

[32] Contrary to defendant's claim, DB28-29, *Urciuoli* did not hold that such an instruction was required.  613 F.3d at 15 (HSF (continued...)

notion that the Government must prove that the bribe taker actually performed the official act for which the bribe was paid. *U.S. v. Brewster*, 408 U.S. 501, 527 (1972) ("Inquiry into the legislative performance itself is not necessary; evidence of the [official]'s knowledge of the alleged briber's illicit reasons for paying the money is sufficient to carry the case to the jury."); *U.S. v. Hood*, 343 U.S. 148, 151 (1952) ("[t]he sale [of influence] is what is here alleged.  Whether the corrupt transaction would or could ever be performed is immaterial."). The Courts of Appeals  routinely so held before and after *McNally*.[33]  They also held, before and after *McNally*, that a QPQ bribery scheme occurs when the public official solicits a bribe

---

[32] (...continued)
QPQ instructions appropriately established "that the Government must prove . . . that Defendant [] **intended** the payment to cause [the public official] to alter his official acts," without requiring that the payment actually caused the public official to do so) (emphasis added).

[33] *See U.S. v. Gordon*, 183 Fed. Appx. 202, 207-08, 215 (3d Cir. 2006) (not precedential) (reversing dismissal of HSF charges, and rejecting the claim that the indictment was defective because it failed to allege that the public official was "actually influenced" by interest-free loans); *U.S. v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004) ("it does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations"); *U.S. v. Paschall*, 772 F.2d 68, 71, 74 (4th Cir. 1985) ("it is not necessary for the government to prove . . . that the public official misused his office in the sense that he granted some benefit or advantage to his benefactor to which the benefactor was not entitled"); *U.S. v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980) ("it need not be shown that the public official to whom the bribe was offered was actually corrupted by the offer").

knowing that the bribe-payer intends an exchange, even if the public official does not in fact intend to carry out the paid-for official action. *See U.S. v. Valle*, 538 F.3d 341, 346-47 (5th Cir. 2008) (§ 201(b)); *U.S. v. Myers*, 692 F.2d 823, 841-42 (2d Cir. 1982) (§ 201(b), then designated as § 201(c)).   If the Government need not prove that an official act was undertaken at all, there can be no requirement that the Government show that the official act was undertaken for one reason rather than another.

Defendants point to this Court's statement in *Kemp* that the loans from the defendant bankers to the defendant public official in that case were an unlawful *quid* because the bankers would not have provided the loans to the official except in exchange for his official acts.  DB30-33.  From this, defendants argue that there is no QPQ unless the public official also changes his conduct in response to the *quid*.  DB33.  This contorted argument ignores the various holdings of *Kemp*, which found the evidence sufficient to prove the bribery charges, 500 F.3d at 284-86, and rejected the challenges to the bribery jury instructions, *id*. at 282.  Additionally, as the District Court explained in rejecting this argument:

> the Third Circuit's description of the loans in *Kemp* was not meant to impose a requirement that an official must take actions that he otherwise would not have taken to be convicted under the quid pro quo bribery theory.  First, the court simply did not say that.  To the contrary, when

> discussing the sufficiency of the evidence of the quo, the court found that "accepting money in exchange for an official action is a form of honest services fraud." *Kemp*, 500 F.3d at 280.

*Bryant*, 556 F. Supp.2d at 393.  Moreover, *Kemp* could not and does not purport to  overrule the Supreme Court cases cited above, holding that proof of public official performance of the *quo* is not required.[34]

Defendants point to nothing in the language or logic of *Skilling* that purports to overrule existing law that the Government need not prove that the bribe caused the public official to do what he otherwise would not have done.  Nor do they identify a single pre-*McNally*, "core" bribery case that required proof of that cause and effect.[35]  Defendants argue that

---

[34] Defendants cite *Kemp* for the proposition that "when in response to a payment a public official merely continues in a course that he 'has already determined to take,' he has received a gratuity and not a bribe."  DB35.  Notwithstanding defendants' use of quotation marks, the quoted phrase appears nowhere in *Kemp*.  And nowhere in that opinion, which affirmed the bribery convictions in all respects, 500 F.3d at 284-86, did this Court require proof that the *quid* caused performance of the *quo*.

[35] Defendants quote out of a context (DB31) a snippet from *U.S. v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974) that the bribery statute "incorporate[s] a concept of the bribe being the prime mover or producer of an official act."  *Id*. at 82.  But that was not the issue in *Brewster*, where the jury instructions failed in several ways to meaningfully distinguish between the mental states required for the charged offense of bribery, the lesser included offense of an illegal gratuity, and the legal acceptance of campaign contributions.  *Id*. at 78-83.  *See U.S. v. Campbell*, 684 F.2d 141, 149 (D.C. Cir. 1982) ("In *Brewster*, we remanded for a new trial because the jury instructions did not define the distinction between these requisite intents 'with indisputable
(continued...)

91

without requiring the *quid* to cause the performance of the *quo*,

they could have been convicted for the giving and receiving of a

lawful "gratuity" as opposed to a "bribe."  But the difference

between a bribe and an unlawful gratuity is that the giver of

gratuity does not intend to influence the official act, but only

to reward it.  *Compare* 18 U.S.C. § 201(b)(1)(A) (bribe is given

"with the intent to influence an official act") *with* §

201(c)(1)(A) (gratuity is given "for because of any official

act").  Here, the QPQ instructions required the Government to

prove the intent to influence or be influenced.  JA4419.[36]

In any event, the charge here precluded the jury from

---

[35] (...continued)
clarity.'").  The Court of Appeals did not incorrectly hold that
bribery required proof that illegal payment was the "but for"
cause of the official act.

The only citation in the paragraph quoted by defendants is
to the Supreme Court's prior decision in that case which rejected
the notion that actual performance of the bribed official conduct
must occur.  *Brewster*, 506 F.3d at 82, nn. 49, 36, citing
*Brewster*, 408 U.S. at 527.  Like *Brewster*, neither *Campbell* nor
*U.S. v. Strand*, 574 F.2d 993 (9th Cir. 1978) (both of which
affirmed the bribery convictions in those cases), required proof
that the bribe was the "prime mover" of the public official's
conduct.

[36] Defendants misread *Sun-Diamond Growers* when they argue
that "the Supreme Court . . . endorsed . . . [the] analysis" that
"payments to a public official for acts that would have been
performed in any event" are gratuities rather than bribes.  DB31-
32.  There, the Supreme Court simply held that the federal anti-
gratuity statute, 18 U.S.C. § 201(c)(1)(A), requires proof of a
link between the thing of value given to the public official and
a specific "official act" for or because of which it was given.
526 U.S. at 405-07.

92

convicting based on a mere gratuity when it instructed that "a payment made in a general attempt to build goodwill or curry favor with a public official, without more, does not constitute a bribe." JA4419. Such a goodwill payment is the very essence of a lawful gratuity. *See Sun-Diamond Growers*, 526 U.S. at 405.

> **2.    The Supreme Court in *Skilling* Approved, Rather than Overruled, this Court's Holding in *Kemp* That a "Stream of Benefits" Given in Exchange for Official Conduct is Bribery.**

The "prohibition on bribes and kickbacks [in § 1346] draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing-and defining-similar crimes." *Skilling*, 130 S.Ct. at 2933. The Supreme Court cited with approval three cases from the Courts of Appeals that affirmed honest services fraud convictions involving bribery. 130 S. Ct. at 2934 (citing *Kemp*, 500 F.3d at 281-86, *U.S. v. Whitfield*, 590 F.3d 325, 352-53 (5th Cir. 2009), and *Ganim*, 510 F.3d at 147-49). On the cited pages of those three decisions, this Court in *Kemp*, the Fifth Circuit in *Whitfield*, and the Second Circuit in *Ganim* all held that HSF bribery includes a scheme in which the payer gives a "stream of benefits," such as a salary, as the *quid* in exchange for the public official's promise to perform official acts.[37] Despite the Supreme Court's approving citations,

---

[37]    In *Kemp*, this Court approved a charge that the jury

(continued...)

defendants anomalously argue that *Skilling* overruled *Kemp* on that precise point.

Defendants' claim contravenes the pre-*McNally* caselaw that *Skilling* identified as the "core" of honest services fraud. Although defendants claim that the stream of benefits theory is not part of the pre-*McNally* "core" of bribery, they cite no pre-*McNally* cases that so hold, and ignore the pre-*McNally* cases that reached the same conclusion as this Court did in *Kemp*. *E.g., U.S. v. Gorny*, 732 F.2d 597, 599 (7th Cir. 1984) (affirming conviction of tax appeals board member who accepted bribes not for a specific, identified case, but for favorable handling of attorney's cases over time); *U.S. v. Alessio*, 528 F.2d 1079, 1082 (9th Cir. 1976) ("Clearly, the intent necessary to establish a violation of this section may be present whether or not there was an agreement between appellant and Santiago regarding particular acts Santiago had performed or would perform.").

---

[37] (...continued)
could convict upon finding a "stream of benefits" . . . . The key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action; the government need not prove that each gift was provided with the intent to prompt a specific official act. . . . Thus, payments may be made with the intent to retain the official's services on an "as needed" basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf.

500 F.3d at 282 (internal citations and quotation marks omitted). The instructions here were substantially similar to those approved in *Kemp*.  JA4418-19.

The First Circuit's post-*Skilling* decision in *Urcioli* confirms that the "stream of benefits" theory of bribery was not undermined by *Skilling*. 613 F.3d at 14-15 ("Nor does it matter whether [the state Senator] expressly agreed to help [the bribe payor's for-profit hospital] on specific bills, for the jury could infer an understanding that he provide [the hospital] general support in exchange for money").

In addition, defendants offer no good reason why QPQ bribery should be limited to schemes were particular bribe payments were designated for particular official acts. As the District Court aptly observed in denying defendants' motion to dismiss the indictment in this case, bribery is wrongful, not because a particular *quid* is given for a particular *quo*, but because

> [w]hen an official makes a *quid pro quo* bribery agreement, . . . he ceases making decisions according to his best judgment as a legislator on behalf of all the citizens he serves, and allows the payor to place a thumb on the scale of his decision-making process.

556 F. Supp.2d at 392. The District Court's pre-trial observations were born out by the trial evidence, which proved that Gallagher's stream of payments to Bryant improperly "placed a thumb on the scale of [Bryant's] decision-making process." Before he went on the SOM payroll, Bryant did little or nothing to help SOM. After he went on the payroll, he helped secure over $10 million in additional funding, bragged to his co-schemers that he was responsible for securing that money, and aggressively

95

lobbied New Jersey executive branch officials on SOM's behalf. The gravamen of the crime of bribery is the unlawful agreement to exchange money for official action; defendants' claim implicates merely the accounting methods of the scheme, and should be rejected.

### 3. *Skilling* Did Not *Sub Silentio* Legalize What Was until Then QPQ Bribery So Long as the Bribe Taker Had a Motive for His Official Actions in Addition to Getting the Bribe.

Defendants contend that the District Court "instructed . . . that any degree of corrupt purpose sufficed to convert the *quid* into a bribe, even if legitimate purposes predominate." DB38. The challenged instruction, however, said nothing about "degrees" or "predominate." Rather, it stated:

> You may find that any salary and other financial benefits accepted by Wayne Bryant was a bribe even if you also find that it was paid, in part, for legitimate work if it was also paid, in part, in return for Wayne Bryant's official action.

JA4419. Defendants cannot seriously contend that Gallagher placed primary importance, not on Bryant's official actions in funneling over $10 million to SOM, but on his supposedly legitimate "work" of obtaining commencement speakers and the like.[38] Accordingly, they are left to complain that the instruction was improper because it allowed the jury to convict

---

[38] Defendants point out that the Court rejected their request for a "de minimis" instruction regarding the motive for Bryant's official actions, DB38, but do not claim on appeal that the Court erred in this regard.

even if the *quid* had a "dual purpose," *e.g.*, that Gallagher's motivation to hire Bryant was not exclusively to perform official acts as a state Senator.  According to defendants' unsavory theory, one can pay reams of cash with impunity to a legislator with the admitted intention to cause the legislator to use his official power to reward the payer so long as the bribe payer or recipient can articulate some additional motive, regardless of how implausible, for the official conduct.

Defendants argue that the "dual purpose" instruction has been limited to prosecutions of unlawful kickbacks and illegal gratuities, and has not been extended to true QPQ bribery cases. DB38-41.  The contrary is true.  *U.S. v. Biaggi*, 909 F.2d 662 (2d Cir. 1990) involved the prosecution of a former Congressman and others for, *inter alia*, bribery under 18 U.S.C. § 201(b).  There, the Court rejected the claim that a payment cannot be a bribe if it was made for illegitimate as well as legitimate purposes:

> Thus, the issue as to the $50,000 payment becomes whether a payment may be found to constitute a bribe and an extortion where it is sought and paid for both lawful and unlawful purposes.  We think it may.

909 F.2d at 683.  The *Biaggi* Court affirmed the bribery convictions notwithstanding evidence that the payment was made both to obtain the Congressman's official action and to obtain legitimate legal services from a law firm where he was of counsel.  *Id*.

The Second Circuit reaffirmed *Biaggi* in *U.S. v. Coyne*, 4

97

F.3d 100, 113 (2d Cir. 1993), involving a prosecution under 18 U.S.C. § 666 for bribery, the Court rejected a defense challenge to an instruction that

> the government must prove . . . that the defendant accepted or solicited the thing of value, at least in part, for or because of his conduct or intending to be influenced in connection with any business or transaction of Albany County.

*Id.* at 113.  The Court explained that the instruction was "entirely appropriate in light of [defendant]'s argument that he was motivated by friendship." *Id.* at 113.  The same is true here, where defendants argued at trial, as they do on appeal, that Bryant's official acts that benefitted SOM were motivated by altruism, not venality.  *E.g.*, JA4668-69, 4686-88, 4695-97, 4709, 4715-16, 4728-29, 4739.  The *Coyne* Court explained that

> there could be dual purposes for payments, [and] a valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability.

Defendants here were on notice when the charged crimes in this case occurred that QPQ bribery included schemes where the *quid* was not the sole motive for the *quo*.  Their challenges to the QPQ instructions should be rejected.

POINT V[39]

**THE DEFENSE-FAVORABLE INSTRUCTIONS REGARDING 18 U.S.C. § 666(a) PROVIDE NO BASIS FOR RELIEF.**

**Standard of Review**: Same as for Point IV.

**Introduction.**

Defendants' challenges to the instructions regarding their convictions under Counts 7 and 8 fair no better.  Count 7 charged Bryant with receiving from Gallagher "a stream of payments and pensionable income"

> intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of New Jersey . . . in violation of 18 U.S.C. § 666(a)(1)(B).

A135-36.[40]

Count 8 charged Gallagher with giving Bryant a "stream of

---

[39] This Point responds to DB Point II.

[40] Section 666(a)(1)(B) states:

(a)  Whoever, if the circumstance described in subsection (b) of this section exists--

* * * *

(B)  corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of [an] organization, government, or agency involving any thing of value of $5,000 or more;

[is guilty of an offense].

18 U.S.C. § 666(a)(1)(B).

payments and pensionable income"

> with intent to influence and reward [Bryant] in connection
> with a business, transaction, and series of transactions of
> the State of New Jersey . . . in violation of a 18 U.S.C. §
> 666(a)(2).

A137.[41]

Defendants complain that the jury instructions regarding

Counts 7 and 8 were deficient because they did not state that the

Government was required to prove a QPQ "exchange."  DB44-45.[42]

To the contrary, the instructions imposed an unnecessary burden

on the Government to prove a QPQ in order to obtain a conviction

---

[41] Section 6666(a)(2) states:

(a)    Whoever, if the circumstance described in subsection
       (b) of this section exists--

       * * * *

       (2)    corruptly gives, offers, or agrees to give
              anything of value to any person, with intent to
              influence or reward an agent of an organization or
              of a State . . . or any agency thereof, in
              connection with any business, transaction, or
              series of transactions of such organization,
              government, or agency involving anything of value
              of $5,000 or more;

[is guilty of an offense].

18 U.S.C. § 666(a)(2).

[42] As defendants effectively concede, *Skilling* has no
bearing on their challenge to the § 666(a) counts, because "the
Court's analysis [in *Skilling*] consisted of an in-depth
historical analysis of honest-services mail fraud and § 1346," so
"the Court's interpretation of § 1346 does not have broader
implications" for other statutes, such as § 666(a).  *U.S. v.
Saladino*, 2010 WL 3221427, *3 (D.Or.  Aug. 11, 2010).

100

under § 666(a).  In addition, any error was harmless.

**Argument.**

**A.   By Including a *Quid Pro Quo* Requirement, The § 666(a)
Instructions Were Erroneously Favorable To The Defense.**

The District Court charged the jury as follows regarding

Counts 7 and 8:

> Under [18 U.S.C. § 666], the government must prove a *quid
> pro quo* bribery, that is: with respect to Wayne Bryant
> [, t]hat Wayne Bryant corruptly accepted, agreed to accept,
> solicited, or demanded salary payments and other financial
> benefits from UMDNJ/SOM, the *quid*; while intending to be
> influenced in taking favorable actions toward SOM in his
> capacity as a state legislator, the *quo*.  With respect to R.
> Michael Gallagher, that R. Michael Gallagher corruptly gave,
> agreed to give, or offered salary payments and other
> financial benefits from UMDNJ/SOM, the *quid*; while intending
> to influence Wayne Bryant in taking favorable actions toward
> SOM in his capacity as a state legislator, the *quo*.

JA4425 (hereafter, the "QPQ" instruction).

The District Court's inclusion of a QPQ requirement for the

§ 666(a) counts was a windfall for defendants.  The majority view

of the Courts of Appeals that have addressed the issue have

"expressly [held] there is no requirement in § 666(a)(1)(B) or

(a)(2) that the government allege or prove an intent that a

specific payment was solicited, received, or given in exchange

for a specific official act, termed a *quid pro quo*." *U.S. v.*

*McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010).  As the Eleventh

Circuit pointed out:

> the statutory language [of] . . . . § 666(a)(1)(B) and
> (a)(2) [does] not contain the Latin phrase *quid pro quo*.

101

> Nor do those sections contain language such as "in exchange
> for an official act" or "in return for an official act." In
> short, nothing in the plain language of § 666(a)(1)(B) nor
> § 666(a)(2) requires that a specific payment be solicited,
> received, or given in exchange for a specific official act.

605 F.3d at 1187-88. The "requirement of a 'corrupt' intent in

§ 666 does narrow the conduct that violates § 666 but does not

impose a specific *quid pro quo* requirement." *Id.* at 1188.

Rather, under § 666:

> [a]s to the defendant County employees, the government must
> show only what § 666(a)(1)(B) says: that a County employee
> "corruptly" accepted "anything of value" with the intent "to
> be influenced or rewarded in connection with any business,
> transaction, or series of transactions" of the County. And
> as to the contractor-defendants, the government must show
> only what § 666(a)(2) says: that the defendant "corruptly"
> gave "anything of value" to a County employee with the
> intent "to influence or reward" that person "in connection
> with any business, transaction, or series of transactions"
> of the County.

*Id.* That is precisely what the District Court charged here,

while adding the unnecessary requirement that the Government had

to prove a QPQ bribery. JA4425.

The Eleventh Circuit's conclusion is aligned with decisions

from the Sixth and Seventh Circuits. *Id.* at 1189.[43] The *McNair*

Court was also unimpressed with defendants' policy arguments that

---

[43] *See U.S. v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009) and
*U.S. v. Gee*, 432 F.3d 713, 714-15 (7th Cir. 2005). Although this
Court has not ruled on the issue, its Model Jury instructions
state that "[t]he government does not have to prove that (agent
of a government entity) accepted the bribe offer or that the
bribe actually influenced the final decision of (the government
entity)." Third Circuit Model Jury Instructions (Criminal)
6.18.666A2-2. Nor do those instructions require a QPQ.

"would permit a person to pay a significant sum to a County employee intending the payment to produce a future, as yet unidentified favor without violating § 666." *Id.* at 1188. The Court noted that even the Fourth Circuit[44] and the Second Circuit[45] had required only a "modified *quid pro quo*." Id. at 1189.[46]

---

[44] *U.S. v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (the "corrupt intent" element in § 666 requires the government to prove a QPQ that "is satisfied so long as the evidence shows a 'course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor'" and "the intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this for that'" (citations omitted)).

[45] *Ganim*, 510 F.3d at 142 (rejecting the notion that "a direct link must exist between a benefit received and a specifically identified official act" ). Rather, "the requisite *quid pro quo* for the crimes at issue [which included § 666(a)(1)(B)] may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." *Id.* (emphasis added).

[46] None of the other cases cited by defendants remotely undermine the majority view. In *U.S. v. Cicco*, 938 F.2d 441 (3d Cir. 1991), this Court held that the legislative history of § 666 demonstrated that the statute did not apply to the retaliatory firing of police officers who had failed to support the Democratic Party candidate in a local election. Although this Court stated, in *dicta*, that "a solicitation of specific election day services with municipal employment as the *quid pro quo*, might come within the literal language of § 666," *id.* at 444, it never held that QPQ was an element of the statute.

In *U.S. v. Mariano*, 983 F.2d 1150 (1st Cir. 1993) the Court did not purport to impose a QPQ exchange requirement on § 666. Rather, the Court merely held that the district court did not clearly err by applying the Chapter Two Guideline for bribery offenses, U.S.S.G. § 2C1.1, rather than the Guideline for giving
(continued...)

103

Defendants nonetheless argue that the QPQ instruction was deficient because it did not contain "the critical concept of an exchange of payment for an official act." DB45, and that the QPQ instruction permitted the jury to find "a mere temporal co-existence between the *quid* and the *quo*, without the necessary "causal nexus," DB46-47. Even in Fourth and Second Circuits that require a "modified QPQ" for § 666(a) charges, the Government need not prove a "causal nexus" between the *quid* and the *quo*. *See Jennings*, 160 F.3d at 1014; *Ganim*, 510 F.3d at 142.

Although defendants convinced the District Court to include a QPQ element in the § 666(a) charges, under the majority view, because "the instructions went beyond what was required, [] the error, if any, was harmless." *U.S. v. Hernandez-Garcia*, 284 F.3d 1135, 1139 (9th Cir. 2002). This Court "may affirm for any

---

[46] (...continued)
illegal gratuities, U.S.S.G. § 2C1.2, where the defendants admitted that they had engaged in QPQ bribery. *Id*. at 1159.

Defendants cite *U.S. v. Baumann*, 684 F. Supp.2d 1140 (D.S.D. 2009), but it provides them with no comfort. There, the court denied a motion to dismiss a § 666 charge for the failure to expressly allege a QPQ, because the indictment alleged the defendant's "intent to give something of value with an intent to influence, [which] is synonymous with an allegation of a "*quid pro quo*." *Id*. at 1144.

Other cases defendants cite do not involve § 666 at all. *Cf. Kemp*, 500 F.3d at 264 (defendants charged with conspiracy to commit HSF, substantive honest services mail and wire fraud, extortion, and perjury, but not § 666); *Govt. Virgin Islands v. Carmona*, 422 F.2d 95 (3d Cir. 1970) (first-degree felony-murder); *U.S. v. Martin*, 507 F.2d 428 (7th Cir. 1974)(failure to file income tax returns).

104

reason supported by the record, even if the grounds we rely upon differ from the grounds the district court relied upon." *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 297 n.3 (3d Cir. 2004).

### B.    Properly Read In Context, The Challenged Instructions Required Proof Of A *Quid Pro Quo* "Exchange."

In any event, the QPQ instruction was not erroneous even if § 666 requires proof of a QPQ exchange.  The instruction required the Government to prove that Gallagher gave the low-show job to Bryant while intending to influence him to funnel money to SOM, and to prove that Bryant accepted that job while intending to funnel money to SOM.  Thus, the QPQ instruction required a finding of a contemporaneous, reciprocal, and mutually reinforcing intentions by the two schemers.  Such a finding is an exchange, as the District Court explained in rejecting this claim below:

> The Supreme Court has made clear that an allegation that an official "exchanged" official acts for a bribe . . . is just another way of stating that the official intended to be influenced (citing *Sun-Diamond Growers*, 526 U.S. at 404-05). Thus, the "specific intent to ... receive something of value in exchange for an official act" is another way of stating that the official had an intent " 'to be influenced' in an official act."  *Id.*

*Bryant*, 556 F. Supp.2d at 390.

Reading the final charge as a whole further demonstrates that the QPQ instruction required an exchange.  In its prior instructions regarding Counts 1-6 (the "exchange instructions"),

the Court had clearly defined a QPQ as requiring an exchange.[47]
The final charge contained an "integration instruction":

> You are to consider these instructions as a whole. Each
> part or phase of these instructions is to be considered and
> applied together with all the other parts and phases of the
> instructions. In other words, you must not pick out some
> particular instruction or some particular portion of an
> instruction and over-emphasize it and apply it without
> considering and keeping in mind all of the other
> instructions given to you as the whole law of the case.

JA4389.

In applying the QPQ instruction in the § 666 counts, the
jury must be presumed to have applied the integration instruction
and considered the exchange instruction's requirement that a QPQ
must have an exchange. *See generally U.S. v. Hakim*, 344 F.3d
324, 326 (3d Cir. 2003). There is nothing to rebut that
presumption here. The QPQ instructions did not state that the
QPQ in Counts 7-8 was different from the QPQ in Counts 1-6.
Rather, a reasonable reading of the QPQ instructions, viewed in
light of the integration instruction, is that a QPQ includes both

---

[47] The Court instructed that,

> **[i]n order to find** that a defendant engaged in **_a quid pro
> quo, you must find that the government proved_** [that
> Gallagher] intended to give **the stream of payments** in the
> form of salary and other financial benefits **in exchange for**
> one or more **official acts** [**and** that] Bryant [] intended to
> perform one or more **official acts in exchange for** his **salary
> and other financial benefits** from the School of Osteopathic
> Medicine.

JA5437 (emphasis added).

106

an exchange and an intent to influence or be influenced.

Defendants offer unconvincing arguments why "[t]he different jury instructions on the HSF counts do not save the defective § 666 instructions." First, they stress that the District Court instructed the jury to consider each count separately. DB54. Under the integration instruction, however, the jurors had to consider the instructions as a whole, even though they had to reach a verdict on each count individually.

Second, defendants contend that the different instructions for the two sets of counts would have led the jurors to conclude they required different findings. DB54. To the contrary, the exchange instructions for Count 1-6 and the QPQ instruction regarding Counts 7 and 8 were quite similar, and the integration instruction told the jury to consider them all together.

Third, defendants speculate that the jurors may have sought "clarification" of the law from the indictment. DB54. But the District Court instructed that the jurors at the outset of the trial that they could apply only the law provided to them by the Court, JA446, and that the indictment was "only an accusation and nothing more," *id*. This Court will not assume, as defendants invite it to, that the jurors disregarded those instructions and looked to the indictment to help them understand the concept of a QPQ. Rather, a reviewing court "presume[s] that the jury followed the [district] court's instructions on the law." *U.S.*

107

*v. Wettstain*, __ F.3d __, 2010 WL 3384982, *10 (6th Cir. 2010).

Fourth, defendants argue that "the rhetorical focus" of the HSF counts, unlike the § 666 counts, was Bryant's breach of his fiduciary duty, not a QPQ. DB53-54. But the issue is what the jury was required to find under the instructions, not the "rhetorical focus" of the parties' arguments. In any event, the distinction drawn by defendants between a QPQ "exchange" and a QPQ "intended to influence the public official" was never an issue, rhetorical or otherwise, during trial. Counts 1-6 unambiguously charged that Bryant breached his fiduciary duty by committing a QPQ bribery. JA4418-19. As for any "rhetorical" component in the case, the Government's summation made clear that the same evidence that proved the QPQ bribery scheme in the HSF counts also proved the same bribery scheme with respect to the § 666 counts. JA4561. The Government never suggested during its summations that even if it had not proved an exchange, the jury could still convict on the § 666 counts because no exchange was required for those counts.

Likewise, defendants never argued in their summations that, at most, they were guilty of a QPQ that did not involve an exchange, but only one that involved an intent to influence. Rather, the consistent themes sounded by the defense at trial, which they recapitulate on appeal, was that Bryant had little or no involvement in the SOM-favorable budget legislation that was

108

enacted while Bryant was head of the Budget Committee, JA4685-86, 4688, 4691-93, 4695, 4697; Gallagher "hired Wayne Bryant to do good things for" SOM, JA4754-55; Bryant provided "real work" in exchange for his salary, JA4757, 4809-13, 4871-73, 4884; his salary was not intended to influence his voting on SOM, JA4816-18, 4820-22, 4825-27, 4862; and Bryant and Gallagher sought additional funding because of the merits of the SOM programs, JA4824, 4860, 4879-80.

Given the respective theories presented by the parties, any supposed distinction between a QPQ exchange and a QPQ intending to influence Bryant was simply not an issue at this trial. Accordingly, the absence of the word "exchange" from the § 666 instructions did not rise to the level of reversible error. *See generally U.S. v. Kaplan*, 490 F.3d 110, 127 (2d Cir. 2007) (court's failure to explain in full an element that defendant had essentially conceded was harmless)*; cf. Neder v. U.S.*, 527 U.S. 1, 16 (1999) (district court's failure to instruct the jury on the element of materiality of a tax offense did not contribute to the guilty verdict because materiality was uncontested during trial).

Defendants may argue that the words, "that is," in the "while intending to influence" instructions, A4425, excluded the need to prove a QPQ exchange. But such an argument ignores the *caveat* that jurors do not parse "instructions for subtle shades

109

of meaning in the same way that lawyers might." *Boyde v. California*, 494 U.S. 370, 380-81 (1990). Rather, they view the instructions contextually and arrive at a "commonsense understanding of the instructions in the light of all that has taken place at trial." *Id.* at 381. Contrary to their protestations, defendants' challenge to the QPQ instruction is indeed a mere "linguistic technicality." DB46.

### C. Given The Jury's Finding Of A *Quid Pro Quo* Exchange With Respect to Counts 1-6, Any Error In The Instructions Regarding Counts 7 and 8 Was Harmless.

In any event, any error was harmless because Counts 1-6 and 7-8 addressed the same scheme. Based on the same evidence, the jury convicted Bryant of the QPQ charges in Counts 1-6 and convicted Gallagher of the QPQ charges in Counts 1-3, 5 and 6. Under the QPQ instructions for the those counts, the Government was required to prove an "exchange."

Counts 7 and 8 incorporated by reference all of the factual allegations regarding the bribery scheme that were set forth in Counts 1-6, and set forth no other factual allegations. JA135, 137. As explained during the Government's summation, all of the evidence that proved the QPQ bribery scheme alleged in Counts 1-6 (and only that evidence), also proved the same bribery scheme charged in Counts 7 and 8. JA4561. When the jurors convicted Bryant on Counts 1-6 and Gallagher on Counts 1-3 and 5 and 6, they necessarily concluded that the Government had proved that

Gallagher and Bryant had agreed that Bryant's SOM salary was given "in exchange" for his official acts in support of SOM. As shown above in Point I, the evidence was clearly sufficient to support that finding.

Where the verdicts on one count demonstrate that the jury found an element of the offense charged in that count, the failure of the instructions to require a finding with respect to the same element in a different count is harmless, so long as the evidence supporting the two counts is the same. *See generally California v. Roy*, 519 U.S. 2, 7 (1996) (Scalia, J., concurring) (such error is harmless "if the jury verdict on other points effectively embraces this [element] or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well.").

This case is materially indistinguishable from *U.S. v. Hairston*, 46 F.3d 361 (4th Cir. 1995). There, defendants were convicted at trial of Hobbs Act extortion by color of official right and of the Travel Act, 18 U.S.C. § 1952, for using a facility of interstate commerce to promote bribery. Both the extortion and the Travel Act bribery convictions required a finding of a QPQ. *Id*. at 373-74.

On appeal, defendants complained that the extortion instructions did not require the jury to find a QPQ. *Id*. at 372. The Court of Appeals stressed that "[t]he evidence pertaining to

111

bribery was the same evidence pertaining to extortion under color of official right." *Id.* at 374.  Given the jury's guilty verdicts on the Travel Act bribery counts, the Court of Appeals "confidently conclude[d] that the omission of a specific instruction on *quid pro quo* [with respect to the extortion counts] was harmless beyond a reasonable doubt." *Id.* at 373. Here, as in *Hairston*, the same evidence supported the HSF counts and the § 666 counts.

Even the complete omission of an element of an offense may be harmless.  *Neder*, 527 U.S. at 10-12.  Here, the disagreement is merely over the proper definition of an element, not its complete omission.  The Courts of Appeals have consistently held harmless the failure to include an essential element of an offense when the jury's verdict on other counts demonstrated that it had found that element beyond a reasonable doubt.[48]  Because

---

[48] *E.g., Bilzerian v. U.S.*, 127 F.3d 237, 242 (2d Cir. 1997) ("The failure to include materiality as an element of an offense under § 1001(a)(2) was harmless [] because . . . . [t]he jury returned a special verdict form in each of the two counts of securities fraud specifically finding that the misrepresentations [defendant] made were material," and "[t]he underlying facts in the securities fraud counts are identical to the underlying facts in the § 1001 counts."); *U.S. v. Forbes*, 64 F.3d 928, 935 (4th Cir. 1995) ("we can be certain that the error was harmless" where district court failed to instruct, with respect to charges of receiving a firearm while under indictment, in violation of 18 U.S.C. § 922(n), that the Government had to prove that defendant knew he was under indictment when he received the guns, because the jury also convicted him of knowingly making a false statement in order to purchase a firearm, in violation of § 922(a)(6); the "jury found beyond a reasonable doubt that [defendant] knew his
(continued...)

the jurors necessarily found a QPQ exchange regarding the bribery
scheme charged in Counts 1-6, they also would have found that the
same evidence established a QPQ exchange regarding the same
bribery scheme that was charged in Counts 7-8.  Accordingly,
there is no basis to vacate the convictions on Counts 7 and 8.

### POINT VI[49]

**THE DISTRICT COURT PERMISSIBLY EXERCISED ITS BROAD
DISCRETION BY DENYING BRYANT'S MISTRIAL MOTION AND INSTEAD
LIMITING TESTIMONY ABOUT WHAT CONSTITUTES "CREDITABLE
SERVICE" TOWARDS A PUBLIC PENSION TO THE ISSUE OF
MATERIALITY, WHERE THE COURT'S INSTRUCTIONS ON CREDITABLE
SERVICE WERE PROPER AND UNCHALLENGED.**

**Standard of Review**:  **Abuse of discretion as to the denial of
Bryant's mistrial motion.  *U.S. v. Gambino*, 926 F.2d 1355,
1365 (3d Cir. 1991).  Plain error as to Bryant's unpreserved
challenges to the limiting instruction.  *U.S. v. Ozcelik*,
527 F.3d 88, 96 (3d Cir. 2008).**

**Introduction.**

Bryant argues that the District Court should have granted a
mistrial based on certain testimony by NJDPB Director Frederick
Beaver because that testimony was improperly offered to establish
a legal principle: what kind of conduct constituted "creditable

---

[48] (...continued)
statement-'I am not under indictment'-was false" and could not
have made that finding "without also finding that he knew the
truth-he was under indictment"); *U.S. v. Smith*, 223 F.3d 554,
567-68 (7th Cir. 2000) (in a prosecution for CCE, failure to
require the jury to unanimously identify three predicate drug-
trafficking offenses committed by defendants was harmless, where
the jury also convicted those defendants of charges that
constituted such predicate crimes).

[49] This Point responds to DB Point VI(A).

service" that could be taken into account in determining pension benefits under PERS.  Although the District Court limited that testimony to the issue of the materiality of Bryant's false statements to GCBSS that he personally performed hundreds of hours of attorney work, Bryant attacks the limiting instruction on two grounds: the instruction supposedly came too late in the trial to be perform its function; and (2) the instruction directed the jurors to draw a distinction between materiality and the law that they were supposedly incapable of drawing.  DB111-12.  These claims were not preserved below, and the District Court did not plainly error or abuse its discretion by concluding that its instruction was temporally and substantively sufficient to properly cabin Beaver's testimony, so a mistrial was not required.

The District Court did not abuse its discretion by denying the mistrial motion.  As shown herein, Beaver's testimony about creditable service was properly admitted and limited to the issue of materiality.  Bryant did not dispute at trial that his statements to the GCBSS that he performed the duties of his job were not true.  Rather, the fighting issues on the pension fraud counts were whether Bryant intended to defraud the NJDPB, and whether his false statements were material to the NJDPB's determination of the level of pension benefits to which Bryant was entitled since, according to Bryant, GCBSS was satisfied with

the work performed by Bryant's associates.  JA4744-49.

Bryant was guilty of the pension fraud counts if he intended to defraud the NJDPB and used the mails in furtherance of a scheme to accomplish that intent, regardless of whether that agency would have granted increased pension benefits had Bryant told the truth about his shirking of his job duties at GCBSS.[50] Whether Bryant's delegation of his duties to others actually amounted to "creditable service" was hardly the crux of the pension fraud counts, and the District Court permissibly exercised its discretion by denying a mistrial based on the dispute about this minor matter.

Based on his experience as the Director of NJDPB, Beaver testified about what, in his view, constituted "creditable service" towards a public pension in New Jersey.  JA3264-65.  He testified that for service to be "creditable," the employee had

---

[50] Bryant contends, without explanation or citation to authority, that because the Government failed to prove that he was ineligible for pension benefits, he could not be convicted of defrauding the NJDPB.  DB105.  But Mail fraud has only three elements: "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails . . . in furtherance of the scheme."  *U.S. v. Carbo*, 572 F.3d 112, 116 (3d Cir. 2009). Bryant did not dispute the mailing element.  By lying about his creditable service in order to increase his benefits, Bryant intended to defraud the NJDPB, even if that agency might have awarded him benefits had he told the truth and provided a reasonable explanation for delegating his work to others. Whether or not Bryant was entitled to the increased benefits was not determinative of the Bryant's guilt on the pension fraud counts, as the District Court properly instructed without objection.  JA4429-30.

to personally perform the work.  JA3265, 3380.  As the Director, it mattered to Beavers personally whether or not the employee performed the work, and he would have wanted to know if someone was seeking or receiving pension benefits for work performed by another person.  JA3379.  He also testified an attorney who repeatedly "sends someone else" to perform the attorney's duties is not performing creditable service.  JA3266.

At the outset of trial, the District Court instructed the jury that it could not consider any testimony that the Court subsequently excluded or told the jury to disregard.  JA449.  Two days before delivering the final charge, the Court instructed the jury that:

> Mr. Beaver is not an expert witness and may not opine on legal issues.  You must disregard any of his testimony that touched on his interpretation of any legal issue including the legal definition of creditable service.  Mr. Beaver's testimony regarding the importance of PERS members personally performing work was admitted for the limited purpose of showing materiality.

JA4343.[51]

---

[51] The Court also instructed that, although Beaver was both a Director and Board member of NJDPB, "only his testimony as a Director is relevant to this case," so the jury had to "disregard [his] testimony as a Board member."  JA4342-43.  Although Bryant points out that a prosecutor made reference at one point during summation to Beaver's views as a Board Member, DB111-12 & n.29, the District Court gave a curative instruction regarding that remark, the sufficiency of which Bryant does not challenge.  *Id.*

**Argument.**

**A.**   **Beaver's Testimony Was Properly Admitted to Prove the Materiality to the NJDPB of Bryant's False Statements to the GCBSS.**

Contrary to Bryant's contention that Beaver's testimony about credible service should have been excluded, the District Court did not abuse its discretion by admitting that testimony to determine whether Bryant's false statements to the GCBSS were material to NJDPB's determination of whether Bryant was entitled for pension benefits for the work he did not perform at GCBSS. The materiality of those statements was sharply contested at trial.[52]   The Government was therefore entitled to present all admissible evidence that bore on materiality.   Beaver, a key decision-maker of the NJDPB, testified that he regarded the failure of a PERS applicant to personally perform the work for which he was seeking pension benefits as relevant to the decision about whether that person was eligible for benefits.   JA3379. Although "[t]he standard of materiality is an objective one,"

---

[52] Attempting to show that his false statements to GCBSS were immaterial, Bryant cross-examined Beaver hoping to show that PERS-participating lawyers besides Bryant had delegated their work to others, and the NJDPB had not withheld pension benefits because of that practice.   JA3436.   Bryant also called a supervisory employee at GCBSS, hoping to show that his delegation practices were well known at that agency, and that GCBSS had never attempted to stop them.   SA81-88.   Bryant also cross-examined Carol Pirrota, the Director of GCBSS when Bryant was on the payroll there, hoping to show the same thing.   JA5704-23. Bryant cross-examined the former Z&B associates, hoping to show that GCBSS had been satisfied with their work.   SA13, 25, 34, 43, 52.

*Panarella*, 277 F.3d at 696, testimony of an actual decision-maker about whether a particular fact would be material is admissible to prove materiality. *See U.S. v. Ferguson*, 2007 WL 4556625, *3 (D.Conn. 2007) (permitting "government's witnesses [to] provide their opinions as to whether information about AIG's loss reserves was significant to investors, provided that the government lays a proper foundation that the witnesses formed these opinions based upon personal knowledge"); *see also U.S. v. Conley*, 186 F.3d 7, 16 (1st Cir. 1999) (in grand jury perjury prosecution, the testimony of a grand juror as to the scope and purpose of the grand jury's investigation was properly admitted at trial to prove materiality); *U.S. v. Anderson*, 798 F.2d 919, 927 (7th Cir. 1986) (testimony of attorney who called a witness in a prior trial was properly admitted to demonstrate that the testimony of that witness had been material in that trial). Beaver's testimony that it mattered to him whether an employee personally performed the work for which he sought pension credit was properly admitted to prove the materiality of Bryant's false statements that he had performed that work.

**B.    Bryant Cannot Show That The Jury Disregarded The Limiting Instruction Regarding Beaver's Testimony.**

Because Beaver's testimony was properly admitted on the issue of materiality, Bryant's argument is reduced to a claim that the jury could not follow the limiting instruction.  But

"[a]bsent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *U.S. v. Lee*, 558 F.3d 638, 649 (7th Cir. 2009) (rejecting challenge to sufficiency of limiting instruction); *see generally Zafiro v. U.S.*, 506 U.S. 534, 539 (1993) (in the context of joint trials, "limiting instructions [ ] often will suffice to cure any risk of prejudice"); *U.S. v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (when evidence is admitted for a limited purpose under Fed. R. Evid. 404(b), "[w]e must presume that juries will follow the district court's limiting instructions"). In the analogous context of instructions to strike, a reviewing court "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence ... unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (internal quotation marks and citations omitted). "Whether or not a jury can be expected, under proper instructions, to disregard particular evidence is a judgment call, and one as to which appellate courts typically cede a high degree of deference to the trial court." *U.S. v. Bradshaw*, 281 F.3d 278, 284 (1st Cir. 2002). "Declaring a mistrial is a last resort, only to be

119

implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." *U.S. v. Sepulveda*, 15 F.3d 1161, 1184 (1st Cir. 1993).  The District Court reasonably concluded that it did not have to  implement the last resort.

### 1.    Bryant's Claim That The Instruction Came Too Late Fails To Establish Plain Error.

Although Bryant never objected to the limiting instruction below, he contends that this was the exceedingly rare case in which an appellate court will not presume that the jury followed a limiting instruction.  He does not identify any deficiency in the wording of instruction.  Rather, he argues first that the jury could not have followed the instruction because it "was given nearly a month after [Beaver] testified."  DB111.  Bryant is in a poor position to complain about the timeliness of the instruction, because he waited for nearly a month to ask for the instruction, and the District Court gave the instruction as soon as he asked for it.

Although Bryant moved for a mistrial shortly after Beaver testified about what constituted "creditable service," JA3291-92, he did not request that the testimony be stricken or limited. *Id*.  Later, while Beaver was still on the witness stand, Bryant again objected to his testimony about creditable service, but

120

again declined to seek a curative instruction.  JA3384-86.[53]
When Beaver's testimony concluded on October 16, 2008, Bryant
renewed his mistrial motion, and asked for an instruction
striking Beaver's testimony about a 2006 NJDPB administrative
case involving one Bernard Reilly.  JA3473-74, 3476.  The Court
denied the mistrial motion, JA3479, and later granted Bryant's
motion to strike Beaver's testimony about the Reilly case.
JA3616-17.  Bryant did not request that Beaver's testimony about
"credible service" be stricken or limited.

     In the joint defense requests to charge filed on October 27,
eleven days after Beaver's testimony concluded, Bryant never
requested that any portion of Beaver's testimony be stricken or
limited.  JA5366-91.  Bryant's first mention of "striking the
testimony of Mr. Beaver" (presumably all of that testimony, not
merely his testimony regarding creditable service)[54] occurred on

---

[53] At Bryant's request, the Court struck Beaver's testimony
about NJDPB's handling of a PERS-participant attorney who
delegated his work after the indictment period in this case.
JA3465-66.

[54] On direct examination, Beaver testified about numerous
subjects regarding PERS and the NJDPB other than creditable
service.  JA3251-60.  The bulk of Beaver's testimony on direct
examination focused on his review of NJDPB documents pertaining
to Bryant's public-sector jobs, his enrollment in the PERS system
for each of those jobs, his application to begin receiving
pension benefits in January 2007, and the pension benefits that
he would have received based on each of those jobs.  JA3266-93,
3369-70.  On appeal, Bryant does not challenge any of Beaver's
testimony on those points, effectively conceding that his request
to strike all of Beaver's testimony was groundless.

121

the following day, October 28, when Bryant submitted a letter to the Court.  JA5479.  Even in that submission, however, Bryant did not ask for a limiting instruction.  *Id*.  In other letters to the Court addressing instructional issues, Bryant neither requested that Beaver's testimony about credible service be stricken or limited.  JA5488-94 (letter of November 6, 2008), JA5495-5500 (letter of November 9, 2008).

The next mention of Beaver's testimony occurred on November 10, when the District Court, two days before giving its final charge to the jury, noted that the parties had jointly participated in drafting the limiting instruction.  JA4292.  Although Bryant objected to various portions of the Court's final charge, he did not object to the wording or timing of the limiting instruction regarding Beaver's testimony.  JA4309-20.  Thus, the Court's limiting instruction was timely delivered after Bryant eventually asked for it.

Because Bryant failed to preserve any complaint about the timing of the delivery of the limiting instruction, he must show plain error.  *See U.S. v. Ozcelik*, 527 F.3d 88, 96 (3d Cir. 2008).  Because he does not even attempt to show plain error, his claim should be rejected.  *See U.S. v. Marcus*, 130 S.Ct. 2159, 2164 (2010).[55]  Nor could Bryant show plain error if he tried.

---

[55] To establish plain error, Bryant must show

(continued...)

122

He does not cite a single case in which the timing of a limiting instruction, *vel non*, resulted in plain error or an abuse of discretion.  This case should not be the first.  Beaver's challenged testimony about the antiseptic issue of creditable service was hardly so central to the pension charges or emotionally charged that a properly worded limiting instruction could not cabin it.  *See U.S. v. Newby*, 11 F.3d 1143, 1147 (3d Cir. 1993) (district court's curative instruction cured erroneously admitted hearsay that the assault victim had identified defendant as the assailant); *see also Marshall v. Hendricks*, 307 F.3d 36, 78 (3d Cir. 2002) (jurors presumably followed trial judge's instruction to disregard prosecutor's summation remark that "there's a place in hell" for defendant who obtained a contract to murder his wife).  Bryant's challenge to the timing of the limiting instruction fails to show an abuse of discretion, let alone plain error.

---

[55] (...continued)
that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*Id*. at 2164.

### 2. Bryant's Claim That The Jury Could Not Possibly Understand The Limiting Instruction Also Fails To Demonstrate Plain Error.

Bryant's second complaint is that the limiting instruction was incomprehensible because the Court did not define materiality at the same time that it limited Beaver's creditable service testimony to materiality. DA112. Bryant's attorneys helped to craft the limiting instruction, and did not object to the instruction on any ground, including on the ground that it did not define materiality. JA4292-4320. Thus, Bryant must again show plain error.

There was no error, much less plain error. The District Court directed the jury at the outset of the trial that it was not to begin its deliberations until after it had received all of the instructions on the law. JA444. Bryant's contention that the jury could not understand the limiting instruction before materiality was defined is predicated on the unwarranted assumption that the jury violated that directive and deliberated about Beaver's testimony before it had received the final charge. A reviewing court, however, presumes that the jury followed a prohibition against premature deliberations. *See U.S. v. Diaz*, 597 F.3d 56, 63 (1st Cir. 2010). Before the jury deliberated, the District Court did define materiality and instructed on the law of creditable service.

Bryant is left with the argument that the jury could not

124

follow these complete instructions, including the limiting
instruction, because there was in fact no difference between
materiality and the law of creditable service because Beaver
could not identify any "decision-making criteria outside of the
law." DB112. This argument is misplaced for two reasons.

**First**, neither Beaver nor the Government conflated the distinct
issues of "creditable service" and the materiality of Bryant's
false statements to GCBSS. Indeed, Beavers never testified that
Bryant's false statements to GCBSS were material. Rather,
Beaver's testimony that an employee's failure to perform the
tasks of his pensionable job would have been important to Beaver
in deciding if he performed creditable service was circumstantial
proof that Bryant's false statements to GCBSS were material to
the NJDPB.

**Second**, Bryant ignores the jury instructions regarding
materiality and "creditable service," which differentiated those
distinct concepts. This Court is required to evaluate the
challenged limiting instruction in the context of the entire
charge. *See U.S. v. Simon*, 995 F.2d 1236, 1244 (3d Cir. 1993).
The Court gave a standard materiality instruction, which Bryant
does not challenge.[56] The concept of creditable service is

---

[56] The Court instructed that

[a] material fact is one which would reasonably be expected
to be of concern to a reasonable and prudent person in
(continued...)

125

wholly absent from that instruction.  JA4417.

Likewise, Bryant raises no objection to the Court's instruction about creditable service under the New Jersey pension laws.  That instruction tracked the statutory definition of "creditable service," N.J.S.A. 43:15A-39, and did not mention materiality or any other objective standard.[57]  It did not import

---

[56] (...continued)
making a decision.  This means that if you find a particular statement of fact was false, you must determine whether that statement was one that a reasonable person would have considered important in making his or her decision.

JA4417.

[57] The Court gave the following instructions regarding "creditable service":

With respect to the mail fraud charged in counts [9] through 13, you have heard the term "creditable service" as it relates to the Gloucester County Board of Social Services. I instruct you that the relevant New Jersey statute states:

"The retirement system shall credit the member with the time of all service rendered by the member since that member's last enrollment and in addition with all the service to which the member is entitled and with no other service."

You have heard testimony that associates from Zeller & Bryant performed legal work for the Gloucester County Board of Social Services in connection with the board's retention of Wayne Bryant as one of its part-time attorney employees. There is no statute, regulation, directive, or posted notice specifically permitting or prohibiting a public employee retirement system -- and I'll refer to that as PERS -- member who is an attorney from claiming pension benefits for work performed on his behalf by another attorney.  You may consider the absence of a specific prohibition when deciding whether or not Wayne Bryant had the required intent to defraud the New Jersey Division of Pensions and Benefits.
(continued...)

126

any objective standards about what a "reasonable person" would believe to be creditable service.  Thus, neither the testimony nor the instructions improperly conflated "creditable service" with materiality.  Bryant's claim that the jury necessarily conflated the two concepts founders on those facts.

Bryant argues that the jury could not follow the limiting instruction not to consider Beaver's testimony about what constituted credible service because there was no other evidence about the meaning of creditable service.  DB113.  As Bryant insisted and the District Court ruled, however, the meaning of creditable services was an issue of law.  The jury had the Court's instruction, which incorporated the controlling New Jersey statute, that the PERS system "shall credit the member with the time of all service rendered by the member since that member's last enrollment. . ."  JA4429.  The jury also had

---

[57] (...continued)
While the government bears the burden of proving all elements of the offense beyond a reasonable doubt, including intent, the government is not required to prove that there was a statute or regulation that specifically prohibited a PERS member who is an attorney from claiming pension benefits for work performed on his behalf by another attorney.  The question before you is not whether the Division of Pensions and Benefits would have approved Wayne Bryant's application for pension benefits.  You are to decide only whether the government has proven beyond a reasonable doubt that Wayne Bryant intended to defraud the Division of Pensions and Benefits of money and property by the use of the mails.

JA4429-30.

127

unrebutted evidence from one of Bryant's former law partners and six former associates of his law firm that Bryant performed virtually "no services" for GCBSS, much less creditable services. SA5, 17-18, 28, 37, 49, 55, 62-63.  Thus, Bryant cannot show plain error, *i.e.*, that the error "affected the outcome of the district court proceedings." *Marcus*, 130 S.Ct. at 2164.  Bryant did not deny at trial that he lied for years to the GCBSS about the work he did not perform, then sought pension benefits based on his GCBSS salary.  Nor did he dispute that NJDPB relied on the accuracy of GCBSS's reports about Bryant's salary at GCBSS. Given those concessions, the inference that Bryant intended to defraud the NJDPB was compelling.  *See U.S. v. Noel*, 581 F.3d 490, 500 (7th Cir. 2009) (instruction defining child pornography was not plainly erroneous where "defense counsel admitted that the outcome of the case did not turn on the issue of whether the photos were pornographic [but] on [defendant's] knowledge" that the offending images were on his computer).

Moreover, Beaver's testimony about the law of creditable service was more helpful to Bryant's cause than to the Government's.  On cross-examination, Beaver conceded that the concept of "creditable service" was defined by statute and administrative regulation, and that he was unaware of any statute, regulation, or judicial or administrative opinion which barred pension benefits to a PERS participant because he

128

delegated his job responsibilities to another person.  JA3391-
3409.  On appeal, Bryant highlights Beaver's concessions on those
points.  DB113.  But those concession rebut Bryant's argument
that Beaver's testimony about creditable service was so
prejudicial that the jury could not follow the limiting
instruction.

Finally, Beaver's testimony about creditable service could
have been properly admitted without limitation, and would be at
any new trial.  Had Beaver been qualified and testified as an
expert, the District Court would not have abused its discretion
by admitting his opinions about "creditable service," even though
those opinions were informed by his understanding of the law.
*See U.S. v. Stadtmauer*, __ F.3d __, 2010 WL 3504321, *27 (3d Cir.
Sept. 9, 2010) (expert testimony about the "proper tax
consequences of a transaction" was properly admitted, even though
that testimony was "bound to touch on the law to some extent,"
where the Court "gave extensive instructions on the applicable
tax laws, and during [the expert's] testimony emphasized to the
jury that it was 'bound to follow the law as [the Court] tell[s]
you it applies in this case'").

Beaver would have been readily qualified as an expert
regarding the NJDPB's decision-making process about how pension
benefits are calculated and awarded.  Although the Government
presented Beaver as a lay rather than expert witness, it gave the

defense a summary of Beaver's anticipated testimony, as it would have had to do under Fed. R. Crim. P. 16(a)(1)(G) had it offered Beaver as an expert. JA5736. By the time of trial, Beaver had been the Director of NJDPB for six years. JA3251-52. Before that, he had been a benefits manager for a large utilities company for thirty years. JA3252. He had a B.Sc. degree in operations and had completed some graduate work. *Id.* That work experience and education was sufficient to meet the relaxed threshold for qualification of an expert under Fed. R. Evid. 702. *See Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1998) (affirming district court's qualification of expert witness regarding the subject of vocational rehabilitation, despite her lack of formal training in that field, because she was a social worker who helped disabled persons find employment).

Given that Beaver could have testified without limitation about what constituted "creditable service" had he been qualified as an expert, no relief is due. At any retrial, the Government would successfully move to qualify Beaver as an expert, then elicit his unlimited testimony about creditable service. A new trial is not warranted because evidence was improperly admitted under one ground where the Government would be permitted to present the same evidence at a new trial under a different theory.

**POINT VII**[58]

**THE DISTRICT COURT PERMISSIBLY ORDERED DEFENDANTS TO PAY RESTITUTION IN THE AMOUNT OF THE STREAM OF BRIBE PAYMENTS THAT BRYANT RECEIVED.**

**Standard of review: Plenary as to whether restitution is permitted by law, and abuse of discretion as to the appropriateness of the particular award.** *U.S. v. Quillen*, **335 F.3d 219, 221 (3d Cir. 2003). Clear error as to the Court's factual findings.** *U.S. v. Sain*, **141 F.3d 463, 476 (3d Cir. 1998).**

**Background.**

The District Court ordered both defendants to jointly pay restitution to UMDNJ in the amount of $113,167, Bryant's corrupt salary and bonus from SOM as a result of the bribery scheme. JA154. *See McNair*, 605 F.3d at 1220-22 (restitution amount was appropriately based on the "losses suffered by the County," which was the $850,000 paid in bribes). "The district court's determination is consistent with Supreme Court precedent stating that when a public official acquires an ill-gotten benefit as a result of his office, the government suffers losses in that amount." *Id*. (citing *U.S. v. Carter*, 217 U.S. 286 (1910)); *see generally U.S. v. Gaytan*, 342 F.3d 1010, 1010-12 (9th Cir. 2003) (affirming restitution order in the amount of the value of the bribes received by the defendant mayor, and rejecting the defense argument that "any harm to the City is 'speculative and conjectural . . . . The City . . . lost the honest service of a

---

[58] This Point responds to DB Point V.

public servant whose vote was purchased"). The evidence showed that Bryant received his SOM job only because he was willing to sell his official power in exchange for his SOM salary. In such instances, restitution in the amount of the full salary earned by the corrupt official is appropriate. *See generally U.S. v. Crawley*, 533 F.3d 349, 358-59 (5th Cir. 2008) (affirming restitution in the amount of defendant union leader's salary and illegal kickback he received, where defendant "procured the salary . . . through his fraudulent acts").[59]

The purpose of restitution is compensatory: to restore a victim to the financial position he occupied before sustaining injury from the crime. *See Hughey v. U.S.*, 495 U.S. 411, 416 (1990). The Mandatory Victim Restitution Act, ("MVRA") mandates that restitution be ordered to crime victims for the "full amount" of losses caused by a defendant's criminal conduct, see 18 U.S.C. § 3664(f)(1)(A). The MVRA seeks "to make victims of

---

[59] In *U.S. v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998), the district court ordered restitution in the amount of one year of the defendant/corrupt police chief's salary, noting that the town would not have hired him had it known that he was corrupt. The Court of Appeals reversed, noting that defendant "performed most of his duties as police chief in exemplary fashion," *id*. at 1121, and that, had the town not hired the defendant, it would have had to pay the same salary to someone else to perform those duties, *id*. Here, by contrast, the evidence proved that Bryant's "official job" was cooked up by Gallagher solely as a QPQ to get Bryant on the SOM "team," where he could perform the illegal *quo*. Absent the bribery scheme, the position would not have existed, and SOM would not have paid anyone else to do it. Nor did Bryant, like Sapoznik, perform duties that were necessary to the operation of SOM "in exemplary fashion."

crime whole, to fully compensate [them] for their losses and to restore [them] to their original state of well-being." *U.S. v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006).[60]

Defendants challenge the restitution order on two grounds: (1) UMDNJ "was a knowing participant in Bryant's hiring and a beneficiary of his [unlawful] actions, not a 'victim' within the meaning of . . . the MVRA," and (2) the District Court supposedly declined to determine the fair market value of any supposedly "legitimate" services Bryant provided to SOM, which "would have to be deducted from" the restitution amount. DB98. The District Court properly rejected both of these claims.

### A. The District Court Did Not Clearly Err By Finding That Defendants Concealed The Bribery Scheme From Gallagher's Superiors At UMDNJ.

Defendants argue that UMDNJ was not a "victim" for purposes of the restitution statutes because Gallagher's superiors at

---

[60] The cases cited by defendants are not to the contrary. In *U.S. v. Harvey*, 532 F.3d 326 (4th Cir. 2008), defendant did not cause any out-of-pocket loss to the victim, but merely "failed to comply with certain aspects of its contract, [such as] failing to hire the contractually required number of employees." *Id.* at 340. The district court did not find that the victim suffered any monetary loss, and instead improperly used defendants' gain as a "proxy" for loss. *Id.* *U.S. v. Galloway*, 509 F.3d 1246, 1253-54 (10th Cir. 2007), is to the same affect.

In *U.S. v. Chalupnik*, 514 F.3d 748 (8th Cir. 2008), the Court of Appeals overturned the restitution order because putative victim, BMG, suffered no monetary loss from the appropriation of merchandise that BMG had treated as worthless. 514 F.3d at 754-55. The money that UMDNJ paid to Bryant, on the other hand, had obvious value in the hands of UMDNJ.

UMDNJ knew about and did not prevent his hiring of Bryant.[61]
DB101-02.  But the District Court permissibly found as a fact
that Gallagher kept his superiors at UMDNJ in the dark about his
QPQ agreement with Bryant.  At sentencing, the Court expressly
credited the trial testimony showing that Gallagher never
informed anyone in the UMDNJ hierarchy that Byrant was not
performing the legitimate community relations work that he had
supposedly been hired for.  JA5206-07.  Nor did Gallagher tell
his superiors that Bryant was exercising his official power as a
State Senator in exchange for a low-show job and pensionable
salary.  Accordingly, the Court rejected the notion that "there
was not a victim here."  JA5207.

Defendants do not claim that the finding was clearly
erroneous, nor could they prevail on such a claim.  Other than
co-plotters such as Crosbie and Prodoehl, who were subordinate to

---

[61] The MVRA defines a victim as

(2) . . . a person directly and proximately harmed as a
result of the commission of an offense for which restitution
may be ordered including, in the case of an offense that
involves as an element a scheme, conspiracy, or pattern of
criminal activity, any person directly harmed by the
defendant's criminal conduct in the course of the scheme,
conspiracy, or pattern....

18 U.S.C. § 3663A(a)(2).  A "person" includes an organization and
a Government entity.  *U.S. v. Ekanem*, 383 F.3d 40, 44 (2d Cir.
2004) (United States Government); *U.S. v. Lincoln*, 277 F.3d 1112,
1114 (9th Cir. 2002) (U.S. Post Office); *U.S. v. Zoher*, 205 Fed.
Appx. 36, 38 (3d Cir. 2006) (not precedential) (corporation).

134

Gallagher and worked under his express direction and control,

defendants fail to identify a single UMDNJ employee or official

who had the foggiest notion of the QPQ.[62]

### B. The District Court Permissibly Ordered Payment of Restitution To UMDNJ For The Losses From Bryant's Honest Services Fraud Against New Jersey And Its Citizens.

Defendants claim that the "the case was tried on the theory

that [the bribery scheme] benefitted the medical school, not that

the medical suffered any injury." DB99. Use of the ambiguous

term, "medical school," obscures the difference between UMDNJ and

SOM, where defendants sought to benefit the latter at the expense

of the former by carving out $2.325 million from the UMDNJ budget

and allocating it directly to SOM on an annual basis.

Defendants also incorrectly argue that they were not

required to pay restitution because the bribery scheme caused a

loss only to the public's intangible right to Bryant's honest

---

[62] Defendants cite *U.S. v. Brown*, 459 F.3d 509 (5th Cir. 2006), but that case did not involve restitution and is factually inapposite. There, corporate officials of Enron were charged with HSF for their involvement in a scheme to overstate Enron's earnings so that Enron would meet Wall Street earnings projections. Unlike a typical private-sector honest services fraud case where a third party, such as a bribe payer, encourages an employee to take actions that are contrary to the interests of his employer, Enron had created incentives that rewarded its employees for their involvement in the fraud. Accordingly, Enron was not defrauded by those employees. 459 F.3d at 522. Here, by contrast, Gallagher's superiors did not create any incentive for Bryant to sell his public office in exchange for a low show job. To the contrary, they insisted that Bryant could be hired by SOM only for a "real job" with "real work." JA3745-46.

services, and not pecuniary harm.  This honest services fraud

bribery case resulted in the public's loss of both money and

intangible rights; the two are not mutually exclusive.  *See*

*generally U.S. v. McGee*, 612 F.3d 627, 635-36 (7th Cir. 2010)

(allowing restitution for losses caused by offense (but not

relevant) conduct where defendant, a member of the Milwaukee

Common Council, demanded payments from businesses that depended

on liquor licenses and other permits that defendant controlled).

Here, the state of New Jersey and its citizens were deprived of

money that they would not have paid to Bryant but for the

unlawful QPQ bribery scheme.  Requiring defendants to repay to

the public entity UMDNJ the amount of money that Bryant

improperly received from the public fisc through UMDNJ was a

convenient and appropriate way to restore the defrauded State and

its citizenry the money that it should not have had to pay to

Bryant.  *See U.S. v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005)

(where defendant head of a non-profit agency, OIC, paid kickbacks

to state Senator in return for steering public contracts to OIC,

the district court properly awarded restitution to OIC in the

amount of the kickbacks; although "the victim in a prosecution

under § 371 is the United States, OIC is a proxy for the federal

interest because it was a recipient of federal funds that were

designated for a particular use [and] [r]estoring this money to

OIC will enable it to carry out the federal and state welfare

programs with the full resources that the contracts provided originally."). The District Court did not abuse its discretion by selecting UMDNJ as the recipient of the restitution award.[63]

**C. Defendants Did Not Meet Their Burden Of Proving Their Entitlement To An "Offset" Against The Restitution Amount.**

The District Court also properly considered and rejected the notion that defendants were entitled to an "offset" against Bryant's salary for the value of "legitimate services" that Bryant supposedly performed for SOM. JA5204-07. The District Court found as fact that, under this scheme, "Bryant would be taking actions to obtain funding for UMDNJ-SOM specifically, and those would be his chief duties, and there would be virtually nothing else he would do." JA5207. Once again, defendants do not attempt to show clear error.

Defendants are not entitled to any offset for "virtually nothing." To the extent that the District Court did not assign a "monetary value" to the supposedly legitimate "work" that Bryant performed for SOM, such as securing commencement speakers, the

---

[63] In *U.S. v. Pawlinski*, 374 F.3d 536 (7th Cir. 2004), cited by defendants, the defendant stole money from his campaign fund. Most of the persons who contributed to the fund did not seek restitution. The District Court ordered restitution in the amount of defendant's thefts to the Crime Victims' Fund, but the fund was "neither a victim of [defendant] nor a representative of his victims," *id*. at 539, and so was ineligible for restitution. *Id*. at 541. Here, UMDNJ, a public university, is a victim and an appropriate representative for the defrauded public.

137

absence of such a determination cuts against defendants' claim, not in favor of it.  The MVRA provides that, while the Government has the burden of proving the amount of the vicitm's loss, the defendant has the burden of demonstrating his financial resources and needs, and

> [t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

18 U.S.C. § 3664(e).  When a defendant claims an "offset" for something he provided to the victim against the loss he caused, it is his burden to prove the value, if any, of the offset, not the Government's burden to refute that supposed contribution. *U.S. v. Elson*, 577 F.3d 713, 735 (6th Cir. 2009); *U.S. v. Calbat*, 266 F.3d 358, 365 (5th Cir. 2001); *U.S. v. Parsons*, 141 F.3d 386, 393 (1st Cir. 1998).  "The government met its burden of proving actual loss by establishing that [UMDNJ paid $113,167 to Bryant]. After the government made this showing, the burden of proving any impermissible 'double recovery' fell on [defendants]."  *U.S. v. Karam*, 201 F.3d 320, 326 (4th Cir. 2000).

Neither defendant offered any evidence at sentencing regarding the monetary value, if any, of the supposed legitimate services that Bryant allegedly provided to SOM.  They were not entitled to sit on their hands at sentencing, then claim an offset against the restitution amount because the Government did not prove that Bryant's services had no value.  The "district

138

court's failure to credit the defendants for the value of
[Bryant's services] does not invalidate the restitution order, as
it was the defendants' burden to proffer evidence to the court as
to the value of the consideration they gave to the victim." *U.S.
v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998).[64]

Defendants declined to suggest any method, much less a
reasonable one, for assigning a monetary value to Bryant's
supposedly "legitimate services" for SOM, such as procuring
commencement speakers or convincing the Acting Governor to attend
a ribbon cutting on SOM's campus.  It is hardly apparent how any
of those events had any monetary value for SOM.  Fair market
value, "the measure most apt to serve" the compensatory purpose
of the MVRA, is the "price that a seller is willing to accept and
a buyer is willing to pay on the open market and in an
arm's-length transaction." *U.S. v. Boccagna*, 450 F.3d 107, 115
(2d Cir. 2006), citing *Black's Law Dictionary*, 1587 (8th ed.
2004).  Defendants suggest no method by which to establish the
fair market value of securing a commencement speaker.  Nor did
defendants demonstrate that Bryant's efforts were actually
responsible for the results for which he now takes credit.  For

---

[64] *U.S. v. Guthrie*, 64 F.3d 1510 (10th Cir. 1995), cited by
defendants, does not advance their claim.  *Guthrie* did not hold
that the Government bore the burden of disproving the value of
defendant's offset.  Rather, it remanded because the district
court did not even consider whether defendant was entitled to an
offset.  *Id.* at 1516.  Such was not the case here.  JA5204-07.

139

instance, no one with personal knowledge, such as Bryant or any of the commencement speakers, ever testified that the speaker signed on for the UMDNJ commencement because of Bryant's efforts.

If it is not possible on the current record to rationally offset whatever non-monetary value SOM received from those events against the actual money that Bryant received as the proceeds from his crime, that shortcoming must be laid at the defendants' door.  *See Karam*, 201 F.3d at 329 (where "the critical question is whether the victims have been actually compensated for losses caused by a defendant's criminal conduct . . . [defendant's failure] to meet his burden of proving that certain promissory notes fully compensated his victims for injuries caused by his misconduct" precluded his request for an offset).  Defendants have failed to demonstrate that the District Court erred.

## CONCLUSION

For all these reasons, this Court should affirm the judgments of the District Court.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By: /s Norman Gross
    Assistant U.S. Attorney
    United States Courthouse and
      Federal Building
    401 Market Street, Fourth Floor
    Camden, NJ 08101
    (856) 968-4930

Date: October 18, 2010

## CERTIFICATE OF COMPLIANCE

I hereby certify that I am an Assistant United States Attorney for the District of New Jersey, that I am filing the attached Brief for Appellee, and:

(1)    this brief complies with the length limitations of Fed. R. App. P. 32(a)(7) because it contains 34,437 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus does not exceed the 35,000-word limit requested in this case;

(2)    this brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it has been prepared using a Word Perfect X4 word-processing system and it is in a monospaced typeface, namely Courier New 12, having no more than 10½ characters per inch;

(3)    the text of the electronic PDF brief and appendix is identical to the text of the paper copies of the brief and appendix; and

(4)    the electronic PDF brief and appendix have been prepared on a computer that is automatically protected by a virus detection program, namely a continuously-updated version of Trend Micro OfficeScan, and no virus was detected.


/s Norman Gross
Assistant U.S. Attorney

Dated: October 18, 2010

141

## <u>CERTIFICATION OF FILING AND SERVICE</u>

I hereby certify that on October 18, 2008, I caused the Brief [and Supplemental Appendix] for Appellee to be filed with the Clerk of this Court by (a) electronic filing in the PDF form using the Circuit's electronic filing system, and (b) paper filing of an original and nine paper copies of the Brief and four copies of the Supplemental Appendix using postage-prepaid first-class mail.

I also certify that on October 18, 2010, I caused the Brief and Supplemental Appendix for Appellee to be served by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, and caused one paper copy of each of those documents to be served by postage-prepaid first-class mail on the following Filing Users:

Lisa Mathewson, Esquire
The Law Offices of Lisa A.
Mathewson, LLC
123 South Broad Street
Suite 810
Philadelphia, PA 19109
215.399.9592
lam@mathewson-law.com

Carl D. Poplar
1010 Kings Highway South
Building Two
Cherry Hill, NJ 08034
(856) 216-9979
cpoplar@poplarlaw.com

**attorneys for Wayne R. Bryant**

Ralph A. Jacobs
Jacobs & Singer
34 Tanner Street
Haddonfield, NJ 08033
(856) 427-0330
rjacobs@jacobs-singer-law.com

Jeremy Frey, Esquire
PEPPER HAMILTON LLP
3000 Two Logan Square
Philadelphia, PA 19103-2799
215.981.4445 – Direct
freyj@pepperlaw.com

**attorneys for R. Michael Gallagher**

/s Norman Gross
Assistant U.S. Attorney

Dated: October 18, 2010

142